Mona BRONSON, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the SCHOOL DISTRICT OF the CITY OF CINCINNATI, et al., Defendants.

No. C-1-74-205.

United States District Court,
S. D. Ohio, W. D.

Feb. 11, 1982.

See also D.C. 510 F.Supp. 1251.

**848**

·Thomas I. Atkins, Teresa Demchak, NAACP Special Contribution Fund, New York City, G. Phillip Arnold, William Caldwell, Ratner & Sugarmon, Memphis, Tenn., Elizabeth A. McKanna, Cincinnati, Ohio. Leonard D. Slutz, Wood, Lamping, Slutz & Reckman, Cincinnati, Ohio, Solvita McMillan, Cleveland, Ohio, for plaintiffs.

John A. Lloyd, Jr., Nancy A. Lawson, Glenn Weissenberger, Cincinnati, Ohio, for defendant City of Cincinnati School Dist.

A. David Nichols, Metzger, Phillips & Nichols Co., LPA, Cincinnati, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State of Ohio; Special Counsel to Attorney Gen., State of Ohio; Represents State Bd. of Ed.

Gary E. Brown, Richard W. Ross, Asst. Attys. Gen., Columbus, Ohio, for defendants William J. Brown, Atty. Gen. and James A. Rhodes, Governor.

James W. Farrell, Jr., Mark A. Vander Laan, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for defendants Deer Park City School Dist., Madeira City School Dist., Mariemont City School Dist., North College Hill City School Dist., Norwood City School Dist., St. Bernard-Elmwood Place City School Dist., Reading Community City School Dist.

Bruce I. Petrie, John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for defendant Indian Hill Exempted Village School Dist.

George E. Roberts, III, Ennis & Roberts, Cincinnati, Ohio, for defendant Lackland City School Dist.

Michael E. Maundrell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for defendant Princeton City School Dist.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Ind., for defendants Finneytown Local School Dist., Forest Hills Local School Dist., Northwest Local School Dist., Three Rivers Local School Dist., Hamilton County School Dist.

John C. Elam, Suzanne K. Richards, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendant Wyoming City School Dist.

James W. Harper, Cincinnati, Ohio, for defendant Oak Hills Local City School Dist.

Arnold Morelli, Bauer, Morelli & Heyd, Cincinnati, Ohio, for defendant Green-Hills Forest Park City School Dist.

William E. Santen, William B. Singer, Santen, Santen & Hughes Co., LPA, Cincinnati, Ohio, for defendant Sycamore City School Dist.

TABLE OF CONTENTS

INTRODUCTION ......................... 849

  I.  Positions of the Parties ............... 850

      A.  Plaintiffs ...................... 850

      B.  Defendants .................... 851

  II.  Summary of Discussion ............... 852

  III.  Synopsis of Conclusions ............... 860

DISCUSSION ........................... 861

  I.  Pre-1975 School Desegregation Cases Considered by Sixth Circuit: Held to Have Changed No Law Applicable to *Deal* ..... 861

      A.  *Green, Raney,* and *Monroe*: Considered by District Court and Sixth Circuit in *Deal II,* 1968, 1969 ....... 861

          1.  Conclusion of District Court and Sixth Circuit: Inapplicability of *Green, Raney,* and *Monroe* to *Deal*   861

          2.  As Remedy Cases, *Green, Raney,* and *Monroe* Were Inapplicable to *Deal* ...................... 864

B. *Swann* and *Keyes*: Considered by the Sixth Circuit in *Bronson*, 1975 ....... 865
1. Inapplicability of *Swann* to *Deal* 866
2. *Keyes*: No Changes in the Law of School Desegregation Warranting Departure From the Application of Collateral Estoppel .......... 867
  a. *Keyes*: Supreme Court Holding That a Finding of Contemporary De Jure Segregation in a Portion of the School System Is Highly Relevant in Assessing Claim of Current, Systemwide De Jure Segregation .................... 869
    1. The District Court ...... 869
    2. The Tenth Circuit Court of Appeals ............. 870
    3. The Supreme Court ..... 870
  b. Sixth Circuit's Discussion of *Keyes* in *Bronson* .......... 874
  c. Most of the Principles Developed by the Supreme Court in *Keyes* Were Not Directly Applicable to *Deal* Because, Unlike the *Keyes* Plaintiffs, the *Deal* Plaintiffs Failed to Prove Contemporary De Jure Segregation in any Portion of the Cincinnati School System 875
II. *Columbus* and *Dayton II*: Post-1975 School Desegregation Cases, Not Considered by the Sixth Circuit in Connection With *Deal* and *Bronson* ........................ 878
A. Preliminary Comments ............ 878
B. Evolutionary Developments: Extension of *Keyes'* Principles to Non-Statutory Dual School Systems, Created and Maintained by Remote, Intentionally Segregative Acts ................. 879
C. Reconsideration of *Deal* in Light of *Columbus* and *Dayton II*: Conflict in Legal Principles ................. 883
1. Re-examination of *Deal*: Legal Import of Historical Facts ...... 883
2. Sixth Circuit's Position on the Legal Import of Historical Facts in *Deal* Unaffected by Pre-1975 Supreme Court Desegregation Cases ..................... 886
3. Sixth Circuit's Position on the Legal Import of Historical Facts in *Deal* Compared to Supreme Court's Position as Developed in *Columbus* and *Dayton II* ........ 887
  a. Re-examination of *Columbus* and *Dayton II* ............. 888
  b. Supreme Court Position on Evidence of School Board's Remote Discriminatory Practices Offered to Meet Plaintiffs' Initial Burden of Proof 891
  c. Sixth Circuit's Position in *Deal II* Eliminated as a Viable Legal Option Under *Columbus* and *Dayton II* ............. 892

III. The Sixth Circuit 1975 *Bronson* Opinion and the Application of Collateral Estoppel In Light of *Columbus* and *Dayton II* .... 894
A. Collateral Estoppel: General Principles and Necessary Inquiries ........ 894
B. Sixth Circuit 1975 *Bronson* Opinion: Conclusions as to Appropriate Application of Collateral Estoppel .......... 898
C. Appropriate Application of Collateral Estoppel In Light of *Columbus* and *Dayton II* ...................... 900
1. Broader Rules of Res Judicata Inapplicable ................. 900
2. Identity of Issues In Light of *Columbus* and *Dayton II* ........ 900
  a. Collateral Estoppel Inapplicable to Issues Not Actually Litigated and Determined in *Deal* .................... 900
  b. Collateral Estoppel Technically Applicable to Issues Actually Litigated and Determined in *Deal* ................... 903
3. *Columbus* and *Dayton II* Have Not Significantly Changed the Law Applicable to the Issues Actually Litigated and Determined in *Deal* ....................... 904
4. *Columbus* and *Dayton II* Present No Reason, Not Discernible in 1975, to Justify an Exception to Collateral Estoppel With Respect to Issues Actually Litigated and Determined in *Deal* ............ 906
IV. Conclusions ........................ 907
A. Issues Not Actually Litigated and Determined in *Deal* .............. 907
B. Issues Actually Litigated and Determined in *Deal* .................... 908
C. Practical Effect on Conclusions on Admissibility and Consideration of Pre-July 26, 1965 Evidence ............. 908
Tentative Agenda For Meeting Between Court and Counsel on Friday, February 26, 1982 ...... 909
Appendix ............................... 910

## DECISION AND ENTRY CONCERNING APPLICABILITY OF COLLATERAL ESTOPPEL; CONFERENCE SET

RICE, District Judge.

### INTRODUCTION

On October 17, 1980, the Court met with counsel for all parties in this school desegregation case for the primary purpose of discussing the Court's Entry of October 16, 1980,[1] "Setting Forth This Court's Interpre-

---

1. *Bronson v. Board of Education*, 510 F.Supp. 1251 (S.D.Ohio, 1980).

tation of Sixth Circuit Opinion in *Bronson v. Board of Education*, 525 F.2d 344 (6th Cir. 1975)." (doc. # 476) In the Entry, the Court stated its opinion that the Sixth Circuit's decision, *if applicable in this case*, foreclosed the *Bronson* plaintiffs from relitigating the issues raised and resolved in the first Cincinnati school desegregation litigation. *Deal v. Cincinnati Board of Education*, 244 F.Supp. 572 (S.D.Ohio 1965) (*Deal I*), aff'd, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); *Deal v. Cincinnati Board of Education*, 419 F.2d 1387 (6th Cir. 1969) (*Deal II*), cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). Therein, Judge Peck had found that the Cincinnati Board of Education was not liable or legally responsible for the racial composition of the Cincinnati school system in 1965, because the racial imbalance existing in the system at that time had not been intentionally caused by the practices and policies of the board. In short, the Court found no intent to discriminate or segregate on the part of the school board, and thus, no violation of plaintiffs' fourteenth amendment rights. This Court concluded that the Sixth Circuit had determined that *Deal I* and *II* were still good law in 1975, and that the *Bronson* plaintiffs were collaterally estopped from attacking Judge Peck's findings of fact and conclusions of law. In reaching that conclusion, this Court necessarily adopted the position taken by the Sixth Circuit that, between July 26, 1965 (the date of the District Court's decision in *Deal I*) and September 24, 1975 (the date of the Sixth Circuit's *Bronson* decision), there had been no significant changes in the law applicable to this case that would render the application of collateral estoppel inappropriate.

A secondary purpose of the October 17 meeting was to discuss briefly the question

currently before the Court, namely, whether the Sixth Circuit's 1975 *Bronson* opinion is now obsolete in light of the Supreme Court decisions rendered subsequent to its filing, thereby making the application of collateral estoppel inappropriate at this juncture. This question was raised by plaintiffs a few days prior to the meeting. *See*, Plaintiffs' Memorandum in Support of the Admissibility of Pre-1965 Evidence Against the State and Cincinnati Defendants, October 14, 1980. (doc. # 475). The Court's October 16, 1980, Entry was explicitly limited to an interpretation of the Sixth Circuit's 1975 *Bronson* opinion, and did not address what, if any, impact the intervening Supreme Court decisions might have on that opinion.[2] Thus, at the October 17 meeting, the Court requested that the defendants submit memoranda in response to plaintiffs' position, and afforded plaintiffs an opportunity to reply thereto. On November 24, 1980, the matter came on for an oral hearing.

### I. *Positions of the Parties*

The parties have skillfully and exhaustively advocated their positions on the issue, both in writing, *see*, doc. # 475, 481, 483, 485, 488, and at the oral hearing. A detailed reiteration of the written memoranda would be redundant and would serve no useful purpose. Therefore, the Court will pause only briefly to highlight the positions which have been presented.

### A. *Plaintiffs*

Plaintiffs contend that the Supreme Court's decisions in *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) (*Columbus*), and *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720

---

2. Therein, this Court stated:

Nothing in this discussion should be read as expressing any view on the issue of whether there have been significant changes in the law since 1975 that would render the Sixth Circuit decision obsolete and collateral estoppel inapplicable. The conclusions expressed herein are based solely on the 1975 Sixth Circuit decision.

*Bronson v. Board of Education*, 510 F.Supp. 1251, 1265 n.1 (S.D.Ohio 1980).

Unfortunately, the headnotes of the reported decision, *see*, 510 F.Supp. at 1251–52, do not reflect its limited scope. However, the limited nature of this decision is reiterated in the Summary of Conclusions. *E.g., id.* at 1278.

(1979) (*Dayton II*), "mark a significant development in the constitutional law of school desegregation." (doc. # 475, at 4). Plaintiffs assert that, in these two cases, the Supreme Court approved a new theory of liability in school desegregation cases, referred to by them as the "pre-Brown" theory, and that this theory had not been developed, articulated or suggested in 1965, and "was not apparent at the time of the Sixth Circuit's 1975 *Bronson* decision." *Id.* at 13. According to plaintiffs, under this theory, a trial court's initial inquiry focuses on whether a school board had, by remote intentionally segregative actions, created and maintained a racially dual school system when the Supreme Court rendered its landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). If this threshold question is answered affirmatively, that is, if the court finds that the school system was a racially dual one as of 1954, the court then focuses on the boards' actions, inactions and policies in the period subsequent to 1954, to determine whether the board had effectively met its affirmative duty to dismantle the duality extant in 1954.

Plaintiffs maintain that this "pre-Brown" theory was neither presented nor litigated in *Deal*, wherein the courts and the plaintiffs treated the pre-*Brown* historical facts regarding the Cincinnati school system as largely irrelevant to the question whether the board had intentionally caused the racial imbalance that existed when *Deal* was filed. They further contend that if the "pre-Brown" theory were applied to the unchanging historical facts, it would now be abundantly clear that, as of 1954, the Cincinnati Board of Education operated a "classic state-imposed dual school system," doc. # 475 at 7, and that this dual system remained unliquidated in 1965. Since the *Deal* courts only considered the board's policies and practices *still in existence when the suit was commenced* in reaching the conclusion that the school board was not liable or legally responsible for the racial composition of the Cincinnati school system in 1965, and did not consider whether the board had created and maintained a dual system as of 1954, which remained unliquidated in 1965, plaintiffs contend that *Deal* would be decided differently under *Columbus* and *Dayton II*, and that the *Deal* judgment is, therefore, manifestly wrong in light of the intervening decisions. For these reasons, plaintiffs contend that the Sixth Circuit's 1975 *Bronson* opinion is now obsolete in light of the intervening changes in the law, and that the doctrine of collateral estoppel is, therefore, inapplicable in the present case.

Alternatively, plaintiffs argue that even if collateral estoppel is not altogether inapplicable, they are nonetheless entitled to proceed with their proof under the "pre-*Brown*" theory, as a new charge or issue, which was not litigated in *Deal*, because the *Deal* courts treated pre-*Brown* historical facts as irrelevant to the extent that they considered them at all. Plaintiffs further assert that the state defendants are not entitled to assert collateral estoppel based on *Deal* to preclude plaintiffs from attempting to prove primary state liability, even prior to 1965, because this issue was never litigated in *Deal*. Finally, plaintiffs urge the Court to conduct a trial on the pre-1965 facts, unrestrained by any preclusive restrictions, in order that those facts can be assessed in light of current legal principles.

### B. Defendants

The defendants in their memoranda and during oral argument did not necessarily stress the same points in opposition to the plaintiffs' contentions. However, they are unanimous in their contention that neither *Columbus* nor *Dayton II* significantly changed the law of school desegregation subsequent to the Sixth Circuit's *Bronson* opinion in 1975. They assert that the decisions in *Columbus* and *Dayton II* are fully grounded in the Supreme Court's pre-1975 decisions, and merely reflect an application of the earlier authorities to different fact situations. Because the Sixth Circuit rejected the claims of both the *Deal* and *Bronson* plaintiffs that any pre-1975 decisions had so changed the law of school desegregation as to warrant a departure

from the application of collateral estoppel, the defendants urge that it would be inappropriate for this Court to depart from that stance on the basis of more recent decisions that simply follow and apply the pre-1975 precedent.

The Cincinnati and Suburban defendants also briefly respond to plaintiffs' alternative contention that they (the plaintiffs) are not collaterally estopped from presenting pre-1965 evidence in an attempt to prove pre-1965 liability under the "pre-*Brown*" theory, because this matter was not litigated in *Deal*. The Cincinnati defendants flatly disagree that the matter was not litigated in the prior suit. They state that "[i]n *Deal*, this Court found *as a matter of fact* that at the time of the *Brown* decision the Cincinnati School System was not a racially dual one but, to the contrary, that it was a unitary, non-segregated school system," doc. # 481, at 13, and assert that this finding was central to the Sixth Circuit's ruling that plaintiffs are collaterally estopped from retrying *Deal*. *Id.* The Suburban defendants are of a similar opinion. They contend that plaintiffs' new, "pre-*Brown*" theory does not represent a new charge or issue that was not litigated in *Deal*. It is their position that, because this theory is related to the subject matter and is relevant to the issues adjudged in *Deal*, "*Deal* is conclusive on the new theory of plaintiffs." (doc. # 485, at 17). These defendants suggest that the doctrine of collateral estoppel would be rendered meaningless if a party were permitted to raise, in a second action, new or different legal theories which could have been, but were not raised in the prior action. *Id.*

## II. *Summary of Discussion*

In the discussion section, the Court sets forth in minute detail its reasons for concluding that the Sixth Circuit's 1975 *Bronson* opinion has been rendered obsolete to the extent that it forecloses any and all inquiries prior to July 26, 1965, on the ground that *Columbus* and *Dayton II*, by supplementing the body of school desegregation law existing in 1975, have established the propriety and necessity of considering certain issues that were not addressed in *Deal*. The Court also sets forth its reasons for concluding that *Columbus* and *Dayton II* provide no basis for departing from the Sixth Circuit's 1975 *Bronson* opinion to the extent that it forecloses the relitigation of the issues that were actually litigated and determined in *Deal*, should these issues become relevant in the case at bar. The following summary is not intended as a substitute for the discussion itself; rather, it is merely intended to apprise the parties of the Court's approach in determining the appropriate application of collateral estoppel under the now-prevailing Supreme Court authority, and to state, in general terms, the underpinnings of the Court's conclusions.

In order to explain fully this Court's reasons for concluding that the Sixth Circuit's 1975 *Bronson* opinion has, in part, become obsolete in light of *Columbus* and *Dayton II*, it is necessary to explore and identify the factors which distinguish these cases from their pre-1975 predecessors. The reasons for so doing should be fairly obvious. In *Deal II*, the plaintiffs contended that three intervening Supreme Court decisions had changed the law since the judgment in *Deal I*. The District Court and the Sixth Circuit considered these cases, but concluded that they had not changed any aspect of the law applicable to *Deal*. In *Bronson*, as argued before the Sixth Circuit in 1975, plaintiffs contended that certain aspects of *Deal* had been "overtaken" by Supreme Court cases decided after *Deal*, thereby rendering the application of collateral estoppel inappropriate. The plaintiffs also argued that the public policy considerations in this school desegregation case warranted an exception to the application of collateral estoppel. On the basis of the authority cited, the Sixth Circuit found that the law of school desegregation had been refined and clarified since *Deal II*, but rejected plaintiffs' claim that the intervening Supreme Court cases had "overtaken" or significantly changed any aspect of the law applied in *Deal*. The court also rejected plaintiffs' public policy arguments. Having thus con-

sidered the circumstances of the case, as they then appeared, together with the Supreme Court authority available at that time, the Sixth Circuit concluded that the doctrine of collateral estoppel was applicable, and that there was no compelling reason to except plaintiffs from its application.

This Court is bound by the Sixth Circuit's determinations in both *Deal II* and the 1975 *Bronson* opinion, insofar as they are grounded upon pre-1975 Supreme Court precedent. *The Court has no authority to question or depart from these determinations.* Therefore, before it can declare itself released, in any way, from the Sixth Circuit's 1975 *Bronson* opinion, the Court must demonstrate that *Columbus* and *Dayton II* have affected or contributed to the law of school desegregation, in a way that the earlier decisions did not.

To this end, Part I of the Discussion is devoted to an examination of the pre-1975 Supreme Court decisions that were considered by the Sixth Circuit in *Deal II* and *Bronson*, and were held to have changed no law applicable to *Deal*. The Court begins with the Supreme Court cases presented to the Sixth Circuit in *Deal II*. After a brief discussion of the cases, themselves, the Court summarizes the reasons given by the District Court and Sixth Circuit for rejecting the *Deal* plaintiffs' contentions that these decisions were applicable to *Deal* or changed any law applicable thereto. This Court then adds some additional comments to highlight why these cases, all dealing with issues concerning remedies to achieve desegregation in systems which had been segregated under state law in 1954, were distinguishable from, and, therefore, inapplicable to *Deal*, which involved the threshold issue of liability in a school system that had not been racially dual *pursuant to state law* at the time of *Brown I*, or for almost seventy years before that landmark decision.

Thereafter, the Court turns to the two Supreme Court cases relied upon by the *Bronson* plaintiffs in 1975, in support of their contention that certain aspects of *Deal* had been overtaken, thereby rendering the application of collateral estoppel inappropriate. The discussion of *Swann*, the first of the two cases, is relatively brief. This Court notes that the Sixth Circuit, itself, did not discuss *Swann* in detail, but simply reiterated that remedy cases, which addressed matters arising only after a school system has been adjudged constitutionally deficient, were distinguishable from a case like *Deal*, which involved the threshold question of liability. This Court identifies the similarities between *Swann*, and the three remedy cases considered by the Sixth Circuit in *Deal II*. It also illustrates why none of the developments emerging from *Swann* were applicable to *Deal*, and would only have been applicable if a constitutional violation had been established in *Deal*.

The Court's discussion of *Keyes*, the second of the two cases considered in *Bronson*, is much more detailed. As the first school desegregation case in which the Supreme Court addressed the requisite elements for a finding of current, systemwide de jure segregation in a school system which had never been racially segregated under state law, *Keyes*, unlike the remedies cases, presented a situation much closer to *Deal*, where there had been no state-imposed segregation since 1887. This Court, therefore, considered it imperative to look closely at *Keyes*, and at the Sixth Circuit's reasons for concluding that the case, despite its general similarity to *Deal*, and despite its contributions to the law of school desegregation, presented no reason for permitting plaintiffs to present any evidence for the purpose of attempting to establish a constitutional violation prior to July 26, 1965.

Initially, the Court sets forth the general characteristics of *Keyes* which, similar to *Deal*, distinguished it from the previously considered remedies cases. Then, as a predicate for further discussion, the Court takes a closer look at *Keyes*, tracing its progression from the trial level to the Supreme Court, to highlight certain nuances that are not discernible when the case is described only in general terms. In particular, the Court focuses on the precise question decid-

ed by the Supreme Court, from which most of the innovative principles emerged.

Upon completion of this close examination of *Keyes*, the Court turns to the Sixth Circuit's discussion of *Keyes* in the *Bronson* decision. The Court specifically notes that in *Bronson*, the Sixth Circuit considered *Keyes* to determine whether the standard to which the *Deal* plaintiffs were held, *i.e.*, to prove that the board had implemented policies and practices with the purpose to segregate, had been eliminated in favor of a test that looked only to the effects of, rather than the motivation behind, the board's actions. Thereafter, this Court examines *Keyes*, in greater detail than was necessary to resolve the narrow question presented in *Bronson*, to consider why most of the principles developed therein were not directly applicable to *Deal*. This inquiry reveals that *Keyes* gave no indication that the *Deal* courts' assessment of plaintiffs' evidence was unduly restrictive or *that plaintiffs' evidence on the board's discontinued programs and practices raised any issues relevant to the question whether the school board was liable or legally responsible for the racial imbalance existing in the system, as of July 26, 1965.* It also provides underlying support for this Court's conclusion that there are certain relevant or potentially relevant pre-July 26, 1965 issues in this case, as they now appear in light of the supplementary developments in the law of school desegregation emerging from *Columbus* and *Dayton II*, that were not addressed in *Deal*, to which collateral estoppel is inapplicable.

By attempting to apply the methodology developed by the Supreme Court in *Keyes* to *Deal*, the Court demonstrates that *Deal* is not susceptible to a strict *Keyes*-type analysis. Although the two cases shared certain general similarities, *Keyes* ceased to be directly analogous or applicable to *Deal* at the point where the lower *Keyes* courts and the *Deal* courts, applying virtually the same standard in their initial inquiries into plaintiffs' claims of intentional segregation by the school authorities, reached contrary conclusions on the basis of evidence spanning an almost identical period of time pri-

or to the commencement of each litigation. Whereas the lower *Keyes* courts found that the Denver school authorities had used numerous intentionally or purposefully segregative devices in Park Hill between 1960 and 1969, which supported a finding of contemporary de jure segregation therein, the *Deal* courts, considering evidence between approximately 1956 and 1965, found that the board had not only *not* employed any comparable devices, but had actually attempted to improve the racial balance in some schools.

By comparing the factual findings made by Judge Peck in *Deal II* with those made by the District Court in *Keyes*, the Court illustrates the significant differences between what was occurring in a substantial portion of the Denver school district, and what was apparently *not* occurring in any portion of the Cincinnati school system, in the decade preceding each litigation. Because the evidence considered by the *Deal* courts failed to support a finding of contemporary intentional or de jure segregation in any portion of the system, the *Deal* courts were not confronted with the question actually considered and decided by the Supreme Court in *Keyes*, namely, whether, and to what extent, a finding of contemporary de jure segregation in a substantial portion of the system is relevant in assessing plaintiffs' claim of current de jure segregation in the remainder of the system.

Moreover, because the *Keyes* petitioners were held to have met their initial burden of proof on the basis of their evidence of intentional segregation in the Park Hill schools during the decade prior to 1969, the Supreme Court had no occasion to establish any guidelines or methodology for assessing evidence of a school board's remote programs or practices in the context of plaintiffs' initial burden of proof. By declining to review the lower courts' finding in Park Hill, the Supreme Court simply had no opportunity to consider what, if any, legal significance should be accorded to the type of evidence to which the *Deal* courts accorded little or no import, and about which the Sixth Circuit made no ruling, *i.e.*, the

schools, programs and practices discontinued before the lawsuit was filed.

Since almost all of the principles developed by the Supreme Court in *Keyes* were grounded in the finding of contemporary de jure segregation in Park Hill, they had no direct application to *Deal* where, after conducting similar inquiries, addressing similar issues and applying a similar standard, the *Deal* courts reached a contrary conclusion on the threshold question of liability. Thus, under the circumstances, as they then appeared, *Keyes* provided no support for permitting the *Bronson* plaintiffs to present any evidence for the purpose of attempting to establish a constitutional violation prior to July 26, 1965.

After completing a review of the Supreme Court authorities considered by the Sixth Circuit as of 1975, and elaborating on the reasons why almost none of the principles developed therein could be said to have been directly applicable to *Deal*, this Court moves to Part II of the Discussion, which considers *Columbus* and *Dayton II*. Initially, the Court sets forth what it perceives to be the evolutionary, as opposed to revolutionary, developments in the law of school desegregation signaled by these cases. Specifically, the Court discusses the Supreme Court's extension of *Keyes'* principles to these cases, which involved school systems that had been officially dual at the time of *Brown I*, but which were not so segregated at that time under any state authorization or permission. The Court also stresses that, in these two cases, the Supreme Court unequivocally established that where plaintiffs' evidence demonstrates the existence of an official, dual school system at the time of *Brown I*, created or maintained by remote acts of the local school authorities, the fact that the duality was not sanctioned by state law is irrelevant.

At this point, the Court steps back to re-examine *Deal II*, wherein the Sixth Circuit's inquiry into the causes of the segregated condition of the system, as of July 26, 1965, was limited to issues raised with respect to specific schools, programs and practices *that were still in existence when the lawsuit was filed.* The Court focuses on the position adopted by the Sixth Circuit in *Deal II*, which accorded paramount importance to the fact that segregation had been outlawed in Ohio in the late nineteenth century, and which accorded a lack of import to any of the board's programs and practices discontinued before the suit was commenced. Of particular interest is the Sixth Circuit's explicit statement that it *need not make any ruling with respect to any schools, programs or practices discontinued before the suit was filed.*

Having set forth and discussed the Sixth Circuit's position on the legal import of historical facts in *Deal*, the Court then briefly sets forth its reasons for concluding that the soundness of this position had not been questioned, or, in any way, impugned by Supreme Court authority existing when the Sixth Circuit rendered its 1975 *Bronson* opinion. The remedy cases had involved statutorily-mandated dualities, and, therefore, raised no questions regarding a school board's remote acts in a system where statutory segregation had been abolished decades before *Brown I*. *Keyes* did not address the potential legal significance of a school board's remote acts in the context of petitioners' initial burden of proof. In *Keyes*, the prima facie case of current, systemwide de jure segregation was predicated on the finding of *contemporary* de jure segregation in Park Hill, that is, on the basis of the evidence of the board's actions *during the decade prior to commencement of the litigation.* Whether or not such a showing could be predicated on a board's *remote acts* was not a question presented or considered in *Keyes*. Thus, as of 1975, the Sixth Circuit's position in *Deal II* was consistent, or could be reconciled with all available Supreme Court authority.

This compatibility is effectively eliminated by the Supreme Court's opinions in *Columbus* and *Dayton II*. In those cases, the Court supplemented or added to the pre-existing body of school desegregation law by settling certain matters which had not been raised or considered in any of the pre-1975 cases. More specifically, *Columbus* and

*Dayton II* are the first two cases in which plaintiffs were held to have met their initial burden of proof, at least in part, on the basis of evidence of the board's remote intentionally segregative practices and which, therefore, established the necessity of conducting an initial inquiry into such practices.

Unlike the Sixth Circuit in *Deal II*, the Supreme Court in *Columbus* and *Dayton II*, attributed virtually no legal significance or relevance to the fact that the State of Ohio had abolished segregated schooling in 1887–1888. Instead, the Supreme Court looked to, and drew its legal conclusions from the plaintiffs' evidence regarding the board's remote acts. Based on that evidence, the Court found that, prior to 1954, the school authorities had acted in contravention of state law by implementing various intentionally segregative devices, which either created or maintained segregated schooling. Relying on this evidence, the Court concluded that the racial segregation existing in the systems at the time of *Brown I* was not merely a fortuitous happenstance. Rather, it found in both cases that the evidence supported a finding that the school authorities were officially operating racially dual school systems in 1954. Once this finding was made, the burden shifted to the school board to show that it had taken effective action to dismantle the pre-*Brown* duality.

The Supreme Court rejected the opportunity to impose a lesser constitutional duty to desegregate in this situation than it had where the dual system had been sanctioned by law, or had been created by a school board's contemporary, as opposed to remote, intentionally segregative acts. Because the Supreme Court's position, as developed in *Columbus* and *Dayton II*, is almost diametrically opposed to the one taken by the Sixth Circuit in *Deal II* (*i.e.*, that segregative activities which had been discontinued prior to suit were of no relevance), this Court concludes that the Sixth Circuit's position, although legally sound when adopted, and while retaining all semblance of vitality as of 1975, has now ceased to be legally viable in cases similar to *Deal*.

The preceding conclusion leads the Court to Part III of the Discussion, which reconsiders the Sixth Circuit's 1975 *Bronson* opinion, and the appropriate application of collateral estoppel in light of *Columbus* and *Dayton II*. As a starting place, the Court sets forth the governing principles of the doctrine and the necessary inquiries thereunder. After a threshold determination is made that res judicata is inapplicable, the three potentially relevant collateral estoppel inquiries are: (1) whether there is an identity between the issues in the second action and those actually litigated and determined in the prior action; if so, (2) whether there have been any changes in the controlling facts or law sufficient to render the application of collateral estoppel inappropriate; and, if the issues are determined to be substantially the same, and there have been no significant changes in the controlling facts or law, (3) whether there is any other special reason presented in the second action that would justify an exception from the general operation of the doctrine. The first of the above inquiries, regarding the identity of issues, is a threshold question to determine the extent to which collateral estoppel is technically applicable. Where the threshold inquiry discloses an identity between the issues in the second action and those actually litigated and determined in the prior action, the second and third inquiries are conducted to determine the appropriate application of collateral estoppel.

This Court then returns to the 1975 *Bronson* opinion to determine how the Sixth Circuit answered each of these questions. After determining that res judicata did not apply, that Court, at least implicitly, determined that the issues in this case, *as they then appeared*, were substantially the same as those decided in *Deal*. With respect to the second inquiry, the Sixth Circuit explicitly rejected the plaintiffs' contention that there had been any significant changes in the controlling law. The Sixth Circuit also conducted the third and final inquiry. Although cognizant of, and sensitive to the public policy against the continuation of racial segregation in public schools, the Court determined that the proper balance

between this and the competing public policy in favor of finality of judgments would be achieved by applying "issue preclusion," *i.e.,* collateral estoppel. Having found an identity of issues but no significant changes in the law and no other sufficiently compelling reason to justify an exception, the Court concluded that collateral estoppel should be applied to bar the relitigation of the issues decided in *Deal.* The Court, therefore, prohibited all inquiries into the board's segregative intent and its actions, inactions and policies prior to July 26, 1965, for the purpose of establishing a constitutional violation.[3]

When this Court reconsiders the same questions in light of the supplementation to the law of school desegregation brought about in *Columbus* and *Dayton II,* it concludes that the *absolute ban* against any and all inquiries prior to July 26, 1965, as set forth in the Sixth Circuit's 1975 *Bronson* opinion, has become obsolete, but that its *mandate foreclosing the relitigation of the issues* that were actually litigated and determined in *Deal* retains vitality. Preliminarily, the Court notes that it has become aware of no reason for departing from the Sixth Circuit's determination that the more strict rules of res judicata are inapplicable to this case. Thereafter, the Court reconsiders the threshold collateral estoppel question, regarding identity of issues, in light of *Columbus* and *Dayton II,* where the Supreme Court supplemented, rather than overruled or radically departed from its pre-1975 authority, by combining and extending the application of certain pre-1975 legal principles to matters it had not previously considered. Under this inquiry, the Court concludes that there are several relevant or potentially relevant pre-July 26, 1965 issues in this case, as they now appear in light of the evolutionary, as opposed to revolutionary, developments emerging from *Columbus* and *Dayton II,* that are *not* substantially the same as, or identical to those actually litigated and determined in *Deal.*

More specifically, the Court concludes that there is a category of threshold issues directly relating to the board's remote acts, (*i.e.,* as of 1954 or before), and a second category of issues relating to the board's post-*Brown* actions, inactions or policies, which *may* arise from the findings on the threshold issues, that were neither contemplated nor considered in *Deal.*

First, because the Sixth Circuit, in *Deal II,* accorded paramount legal import to the fact that the State had outlawed segregated schooling in 1887, and concluded from this fact that the Cincinnati school system had been desegregated for some 70 years before *Brown I,* it made no ruling on any school, program or practice discontinued before the lawsuit was filed and made no inquiry into the board's remote or pre-*Brown* acts. Instead, it limited the scope of its inquiry into the causes of the racial imbalance existing as of July 26, 1965, to the board's policies and practices between roughly 1956 and 1965. The Sixth Circuit did not, therefore, address the threshold issues which, under *Columbus* and *Dayton II,* must now be considered in cases where plaintiffs present evidence of the board's remote acts as part of their initial burden of proof. Generally stated, these broad threshold issues, upon which plaintiffs have the burden of proof are: (1) whether the board was officially operating a dual system at the time of *Brown I,* created and/or maintained in contravention of state law by the board's remote, intentionally segregative acts; *or* (2) whether, as a result of the board's remote, intentionally segregative acts, a substantial portion of the school system was segregated by race in 1954 which, when coupled with proof that the system is currently highly segregated by race, will establish a prima facie case of current, systemwide de jure segregation.

Second, because the Sixth Circuit considered the board's remote or discontinued programs and practices to be irrelevant, to

---

3. In *Bronson, supra,* 525 F.2d at 349, the Sixth Circuit affirmed "[t]he district court's order foreclos[ing] the plaintiffs from showing that the [Cincinnati] defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents."

the extent that it considered them at all, and did not address the threshold issues identified above, it could not and did not consider the issues which are raised and need only be considered if plaintiffs prevail on the threshold issues, as they did in *Columbus* and *Dayton II.* Stated generally, and corresponding to the threshold issues from which they arise, the issues relating to the board's post-*Brown* actions, inactions and policies, upon which the board, rather than plaintiffs, have the burden of proof are: (1) if plaintiffs' proof supports a finding that the board was officially operating a dual school system at the time of *Brown I,* whether the board effectively dismantled same in the subsequent years, or whether its actions, inactions and policies in the ensuing years perpetuated and/or exacerbated the condition extant in 1954; *or* (2) if plaintiffs make a prima facie showing of current, systemwide de jure segregation, predicated on a finding that a substantial portion of the system was segregated in 1954, whether the board's remote, intentionally segregative acts, in any way, caused or contributed to the current condition of segregation. The board's failure to carry its burden on these issues would require judgment for plaintiffs and warrant a systemwide desegregation order.

The Court recognizes that the resolution of this second category of issues, which may arise from the threshold inquiries, would undoubtedly turn, at least in part, on the *evidence* previously considered in *Deal.* However, the Court explains that the *potential sameness of evidence should not be confused or equated with a sameness or identity of issues.* In *Deal,* the burden of proof, at all times, remained upon plaintiffs and the inquiry therein was limited to determining whether, in the absence of a duty to desegregate arising from an established constitutional deficiency existing at the time of *Brown I,* the board had acted with segregative intent between approximately 1956 and 1965. In contrast, if the *Bronson* plaintiffs prevail on the threshold issues, they will have established that the system was unconstitutionally constituted in 1954 and the continuing, affirmative duty to correct that deficiency would attach to the board. Thereafter, the school board would have the burden of proof, and the *evidence* previously considered in *Deal* would be considered herein on the *issue* whether the board had remedied the effects of its remote, intentionally segregative acts, or whether, on the contrary, the current condition of segregation can be traced to those remote acts.

Having accorded virtually no legal import to the board's discontinued programs and practices in *Deal II,* the Sixth Circuit did not conduct the now mandatory threshold inquiries, nor did it address the issues that only arise as a result of those inquiries. Under the well-settled principles of collateral estoppel, the doctrine is only applicable to preclude the relitigation of issues that were actually litigated and determined in a prior action; it does not operate to preclude the litigation of issues that might have been raised and determined, but were not. Therefore, the Court concludes that collateral estoppel is wholly inapplicable to those two categories of issues which, under *Columbus* and *Dayton II,* are or may become relevant in this case and which either directly relate to, or potentially arise from plaintiffs' evidence regarding the schools, programs and practices discontinued by the board before commencement of the *Deal* litigation.

Although the Court acknowledges the possibility that this case could be resolved without any overlapping with the pre-July 26, 1965 issues actually litigated and determined in *Deal,* as distinguished from an overlapping or similarity of evidence, the Court recognizes that this is not an inevitable result. On the contrary, if plaintiffs do not prevail on the threshold issues relating to the board's remote acts, the second category of issues relating to the board's post-*Brown* policies and practices, upon which the board would have the burden of proof, would not be before this Court, as they were in *Columbus* and *Dayton II.* Instead, and in contrast to the more recent Supreme Court cases, the burden of proof would remain upon plaintiffs and the relevant in-

quiry with respect to the board's post-*Brown* programs and practices would focus on whether, absent a duty to improve the racial balance arising from an established constitutional deficiency in the system at the time of *Brown I*, the board had acted with segregative intent in the subsequent years, thereby causing the former unitary system to become de jure segregated. At least with respect to the actions, inactions and policies of the board between approximately 1956 and July 26, 1965, the issues that would become relevant herein are substantially the same, if not identical to those actually litigated and determined adversely to the *Deal* plaintiffs. With respect to these issues, which meet the threshold identity requirement, the Court concludes that the doctrine of collateral estoppel remains technically applicable.

The conclusion that there may remain relevant issues in this case which are substantially the same as those decided in *Deal*, if plaintiffs do not prevail on the threshold issues, to which collateral estoppel is technically applicable, requires the Court to consider whether it remains appropriate to invoke the doctrine with respect to these issues. The Court, therefore, proceeds to the second collateral estoppel inquiry to determine whether *Columbus* and *Dayton II* have so changed the law of school desegregation since 1975 as to render the Sixth Circuit's 1975 *Bronson* opinion obsolete to the extent that it forecloses the relitigation of the pre-July 26, 1965 issues that were actually litigated and determined in *Deal*.

In responding to this question, the Court reiterates that *Columbus* and *Dayton II* did not overrule any pre-1975 Supreme Court precedent nor did they radically depart therefrom. Rather, in these cases, the Supreme Court supplemented or added to the body of school desegregation law which has been steadily evolving since *Brown I*, by combining and extending the application of certain pre-1975 legal principles to matters which it had not previously had an occasion or opportunity to consider. This supplementation, which is evolutionary, as opposed to revolutionary, in nature established the propriety and necessity of considering the threshold issues that were not addressed in *Deal*, regarding the board's remote acts, and the issues that may arise as a result of the threshold inquiries which were, likewise, not addressed in *Deal*.

However, *Columbus* and *Dayton II* have not significantly changed or altered any of the legal principles applicable in a case where the school system involved is found to have been unitary, in a constitutional sense, at the time of *Brown I*. Thus, if the evidence adduced at trial supports a finding that the Cincinnati school system was truly a unitary one as of 1954, that is, if plaintiffs do not prevail on the threshold issues directly relating to the board's remote acts, the posture of this case will be virtually the same as it was in *Deal II*, where the inquiry focused on whether, in the absence of a pre-existing duty, the board had acted with segregative intent in the years after *Brown I*, thereby causing or contributing to the racial imbalance existing, as of July 26, 1965. The resolution of the issues based solely on the board's actions, inactions and policies after 1954, through July 26, 1965, as well as those based on the board's actions, inactions and policies after *Deal*, would be controlled, not by any new principles announced in *Columbus* and *Dayton II*, but rather, by principles of school desegregation law developed prior to 1975. Thus, although the supplementary developments emerging from *Columbus* and *Dayton II* have established the propriety and necessity of considering certain relevant and potentially relevant issues that were not addressed in *Deal*, the Court concludes that, with respect to the issues that were actually litigated and determined in *Deal*, *Columbus* and *Dayton II* have not significantly changed or altered any aspect of the applicable law since 1975. Therefore, under the second collateral estoppel inquiry, the Court concludes that the Sixth Circuit's 1975 *Bronson* opinion retains full vitality to the extent that it forecloses the relitigation of the pre-July 26, 1965 *issues* decided in *Deal*.

The Court then conducts the third and final collateral estoppel inquiry and concludes that *Columbus* and *Dayton II* do not

present any other compelling reasons, not discernible in 1975, that would now justify excepting plaintiffs from the application of collateral estoppel with respect to the issues actually litigated and determined in *Deal.* The only differences between the circumstances of this case, as they now appear and those existing in 1975, all relate to the propriety and necessity of resolving issues to which collateral estoppel is inapplicable because they were not addressed in *Deal.* Once again, if plaintiffs do not satisfy their initial burden of proof on the threshold issues, regarding the board's remote practices, the circumstances of this case will thereafter be essentially the same as they were when the Sixth Circuit considered the appropriate application of collateral estoppel in 1975. Given the Sixth Circuit's specific consideration of the circumstances of this case, as they then appeared, and its rejection of plaintiffs' claim that a departure from the general operation of the doctrine was warranted, the Court concludes that the Sixth Circuit's 1975 *Bronson* opinion, foreclosing the relitigation of the pre-July 26, 1965 issues *actually litigated and determined in Deal*, remains binding.

### III. *Synopsis of Conclusions*

Upon completion of the third collateral estoppel inquiry, the Court moves to Part IV of the Discussion, which capsulizes the Court's conclusions based on all of the preceding discussion. The Court declares that the Sixth Circuit's 1975 *Bronson* opinion has been rendered obsolete by *Columbus* and *Dayton II* to the extent that it forecloses any and all inquiries into the board's segregative intent and constitutional violations prior to July 26, 1965. The Court stresses that it reaches this conclusion *not* because *Columbus* and *Dayton II* have significantly changed the law, in the sense of overruling or radically departing from any pre-1975 Supreme Court authority, but because the supplementary developments emerging from these cases have established the propriety and necessity of considering numerous relevant and potentially relevant pre-July 26, 1965 issues that are not substantially the same as, or identical to those actually litigated and determined in *Deal.* In other words, although the major thrust of the parties' arguments, both orally and in writing, dealt with the second collateral estoppel question, that is, whether *Columbus* and *Dayton II* have so changed the law since 1975 that it would no longer be appropriate to invoke collateral estoppel, this Court has reached its conclusion, that the Sixth Circuit's 1975 *Bronson* opinion has, in part, become obsolete, under the threshold collateral estoppel inquiry regarding identity of issues. Plaintiffs raised this matter in their alternative contention that, even if collateral estoppel is not altogether inapplicable in this case, they should nonetheless be permitted to proceed under the pre-*Brown* theory, as a charge or issue that was not litigated in *Deal*, and was not recognized under the pre-1975 Supreme Court authority. Insofar as the pre-*Brown* theory refers to the two categories of issues that do not share the requisite identity with those decided in *Deal*, the Court agrees that plaintiffs are entitled to present their proof unrestrained by the July 26, 1965 cut-off date established in the Sixth Circuit's 1975 *Bronson* opinion. However, the Court rejects plaintiffs' primary contention that collateral estoppel is now altogether inapplicable because *Columbus* and *Dayton II* have significantly changed the law of school desegregation since 1975. The doctrine remains fully and appropriately applicable with respect to the issues that were actually litigated and determined in *Deal.*

Thus, under the threshold collateral estoppel inquiry, regarding identity of issues, the Court concludes that the doctrine of collateral estoppel is wholly inapplicable to the threshold issues directly relating to the board's remote acts, and to the issues relating to the board's post-*Brown* actions, inactions and policies, which will arise and become relevant herein *only* if plaintiffs prevail on the threshold issue. With respect to these issues, the Court specifically releases plaintiffs from the July 26, 1965 cut-off date established by the Sixth Circuit in its 1975 *Bronson* opinion. With respect to these issues, the Court also specifically re-

leases plaintiffs from the restrictions set forth in its Entry of October 16, 1980, on the presentation and consideration of pre-July 26, 1965 evidence. The preclusion order imposed upon plaintiffs by Judge Porter on March 10, 1980, is not affected, and therefore, remains in full force and effect.

Notwithstanding the above, the Court further concludes that the vitality of the Sixth Circuit's 1975 *Bronson* opinion has, in no way, been impaired or diminished by *Columbus* and *Dayton II* to the extent that it forecloses the relitigation of the pre-July 26, 1965 issues that were actually litigated and determined in *Deal*. Whether these issues will become relevant in this case depends upon the determinations made on the threshold issues that were not addressed in *Deal*, to which collateral estoppel does not apply. However, in the event that plaintiffs' evidence regarding the board's remote acts fails to support a finding that the board was officially operating a dual or substantially segregated system in contravention of state law at the time of *Brown I*, the burden of proof will remain upon plaintiffs, and the issues that would thereafter become relevant with respect to the board's actions, inactions and policies after *Brown I* through July 26, 1965, are essentially the same as those settled by the *Deal* judgment. The Court, therefore, concludes that collateral estoppel is technically applicable to these issues. Moreover, because *Columbus* and *Dayton II* have not significantly changed any aspect of the law applicable to these issues, and because the more recent cases present no compelling reason, not discernible in 1975, that would now justify excepting plaintiffs from the general operation of the doctrine, the Court concludes that collateral estoppel is appropriately invoked to foreclose the relitigation of the issues decided in *Deal*.

The practical effect of the Court's ruling is that all of the plaintiffs' evidence, both pre- and post-July 26, 1965, will be admissible at trial, subject to the normal operation of the Federal Rules of Evidence. Initially, the Court will consider plaintiffs' pre-*Brown* evidence for the purpose of resolving the threshold issues that were not addressed in *Deal*. These inquiries will determine what issues will become relevant in this case with respect to the board's post-*Brown* actions, inactions and policies, both before and after July 26, 1965, and will also determine the purposes for which the evidence regarding the board's programs and practices after *Brown* through July 26, 1965 will be considered. If plaintiffs prevail on the threshold issues, the burden of proof will shift to the board, the second category of issues not addressed in *Deal* will be raised, and the parties' pre-July 26, 1965 evidence will be considered, together with the post-July 26, 1965 evidence, for the purpose of determining whether the school board is liable or legally responsible for the current racial composition of the Cincinnati Public Schools. If, however, plaintiffs do not prevail on the threshold issues, the burden of proof will remain on plaintiffs and, although the issues that were actually litigated and determined in *Deal* would be relevant, collateral estoppel applies to foreclose the relitigation of same. Consequently, plaintiffs' claim of current de jure segregation will, at that point, be assessed only on the basis of evidence regarding the board's actions, inactions and policies after July 26, 1965. None of the pre-July 26, 1965 evidence previously admitted will be considered for any purpose other than those expressly approved by the Sixth Circuit in its 1975 *Bronson* opinion, as interpreted by this Court in its Entry of October 16, 1980.

DISCUSSION

I. Pre-1975 School Desegregation Cases Considered by Sixth Circuit: Held to Have Changed No Law Applicable to *Deal*

    A. *Green, Raney,* and *Monroe*: Considered by District Court and Sixth Circuit in *Deal II*, 1968, 1969

        1. Conclusion of District Court and Sixth Circuit: Inapplicability of *Green, Raney,* and *Monroe* to *Deal*

On remand to the trial court in *Deal II*, 419 F.2d 1387, 1395 (6th Cir. 1968), for further factual findings, the plaintiffs con-

tended that the law had been substantially modified by three Supreme Court decisions rendered subsequent to the Sixth Circuit's opinion in *Deal I,* 369 F.2d 55 (6th Cir. 1966). The three cases presented similar issues, were argued together, and were decided by the Supreme Court on the same day. *Green v. County Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (*Green*); *Raney v. Board of Education of the Gould School District,* 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968) (*Raney*); and *Monroe v. Board of Commissioners of the City of Jackson,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968) (*Monroe*). Each case involved a school system which had been racially segregated under compulsion of state statute in 1954, when the Supreme Court declared de jure or statutorily-imposed segregation to be unconstitutional. *Brown I,* 347 U.S. 483, 487, 74 S.Ct. 686, 688, 98 L.Ed. 873 (1954). Each school system remained racially segregated a year later, when the Supreme Court commanded the abolition of dual school systems existing pursuant to state statute in 1954. *Brown v. Board of Education,* 349 U.S. 294, 300–301, 75 S.Ct. 753, 756–57, 99 L.Ed. 1083 (1955) (*Brown II*).

The petitioners in *Green, Raney* and *Monroe* sought injunctive relief against the respective school boards on the ground that each had continued to maintain a dual school system up to the filing of the lawsuits, despite the mandate to desegregate laid down in *Brown II.* Although, by the mid-1960's, each school board had implemented a desegregation plan, the petitioners challenged the plans as falling short of bringing the systems into compliance with *Brown II.* In *Green* and *Raney,* the school boards had adopted "freedom of choice" plans, under which a pupil was allowed to select the school he would attend. *Green, supra,* 391 U.S. at 433–434, 88 S.Ct. at 1692; *Raney, supra,* 391 U.S. at 445, 88 S.Ct. at 1698. In *Monroe,* the school board had adopted a slightly different plan, known as a "free transfer" plan, which enabled a student originally assigned to one school to transfer freely therefrom, provided that the

receiving school had space to accommodate the student. 391 U.S. at 453–54, 88 S.Ct. at 1702.

The Supreme Court gave its most detailed analysis in *Green,* and the principles articulated therein were then applied in *Raney* and *Monroe.* The Court described the segregation existing in the New Kent County school system at the time of the litigation as "precisely the pattern of segregation to which *Brown I* and *Brown II* were addressed, and which *Brown I* declared unconstitutionally denied Negro school children equal protection of the laws." 391 U.S. at 435, 88 S.Ct. at 1692. The Court stated:

> It was such dual systems that 14 years ago *Brown I* held unconstitutional and a year later *Brown II* held must be abolished; school boards operating such school systems were *required* by *Brown II* "to effectuate a transition to a racially nondiscriminatory school system." 349 U.S. at 301, 75 S.Ct. at 757.

391 U.S. at 435, 88 S.Ct. at 1692 (emphasis in the original).

In the face of a clearly established statutory duality in 1954, the Court viewed its task in *Green* as that of measuring "the effectiveness of respondent School Board's 'freedom-of-choice' plan to achieve" the mandatory transition to a non-discriminatory, unitary system. *Id.* at 437, 88 S.Ct. at 1693. The Court framed the issue as follows:

> In light of the command of ... [*Brown II*], what is involved here is the question whether the Board has achieved the "racially nondiscriminatory school system" *Brown II* held must be effectuated in order *to remedy* the *established unconstitutional deficiencies* of its segregated system.

*Id.* (emphasis added).

The Court acknowledged that "*Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which require time and flexibility for a successful resolution." *Id.* However, the Court stressed:

School boards such as the respondent then operating *state-compelled dual systems* were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.

*Id.* at 437–38, 88 S.Ct. at 1693–94 (emphasis added) (citations omitted).

The Court remarked that the Board's failure to initiate a desegregation plan until some 11 years after *Brown I* and 10 years after *Brown II* "could only have compounded the harm of such a system," *id.* at 438, 88 S.Ct. at 1694, and then announced that "[s]uch delays are no longer tolerable . . . ." *Id.* The Court set forth the standard by which desegregation plans implemented by school boards which had formerly operated under statutorily-imposed segregation would, henceforth, be judged: "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now." Id.* at 439, 88 S.Ct. at 1695 (emphasis in the original).

Assessing the New Kent County School Board plan against this standard, the Court concluded:

> [T]he school system remains a dual system. Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents with a responsibility which *Brown II* placed squarely on the School Board.

*Id.* at 441–42, 88 S.Ct. at 1696. The Court, therefore, ordered the board to formulate a new desegregation plan; one which included "steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." *Id.* at 442, 88 S.Ct. at 1696. The Court reached similar conclusions about the desegregation plans that had been implemented in *Raney* and *Monroe*, and ordered that new plans be developed for each school system. *See*, 391 U.S. at 449, 88 S.Ct. at 1700; 391 U.S. at 459–60, 88 S.Ct. at 1704–05.

In *Deal II*, Judge Peck, sitting as District Judge by designation, *see* 419 F.2d at 1389, considered the three cases but concluded that "none of [them] is applicable because each involved a review by the Supreme Court of desegregation plans in school districts that had formerly operated under de jure segregation." Appendix: Memorandum and Subsidiary Findings of Fact, 419 F.2d 1395, 1396 (S.D.Ohio 1968). He noted that the plans adopted by the school boards "did not comply with the desegregation requirement of" *Brown II. Id.* Distinguishing the cases from the one before him, Judge Peck recalled Chief Judge Weick's preliminary observation on appeal in *Deal I*:

> "At the outset it should be pointed out that the State of Ohio abolished segregation in public schools on February 22, 1887, which was more than 67 years before the Supreme Court barred it on constitutional grounds in the momentous decision of *Brown v. Board of Education*, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] . . . (1954)."

419 F.2d at 1396, *quoting, Deal I*, 369 F.2d 55, 58 (6th Cir. 1966). Judge Peck then added this observation:

> The record herein clearly supports our earlier determination that while segregation in the Cincinnati public educational system was practiced between 1849 and 1887, since that date Negroes have attended neighborhood schools on the same basis as white children living in the same locality.

419 F.2d at 1396. He, therefore, concluded that "[t]he group of cases cited above [*Green, Raney* and *Monroe*] dealt with situations in which the imbalance between white and Negro children was caused by an act of discrimination on the part of the school authorities, and accordingly present an entirely different situation than that here under consideration." *Id.* at 1396–97.

The *Deal* plaintiffs disputed the District Court's conclusions, but the Sixth Circuit agreed that these cases did not change any law applicable to *Deal*. The Court found appellants' reliance on them to be misplaced:

The gist of the holdings in these cases was that in desegregating a dual school system, a plan utilizing "freedom of choice" or a variant "free transfer" is not an end in itself and would be discarded where it did not bring about the desired result.

On the other hand, our case involves the operation of a long-established unitary non-racial school system—just schools where Negro as well as white children may attend in the district of their residence. There is not an *iota* of evidence in this record where any of the plaintiffs or any of the class which they represent, was denied admission to a school in the district of his residence.

419 F.2d 1387, 1390 (emphasis in the original).

2. As remedy cases, *Green, Raney*, and *Monroe* were inapplicable to *Deal*.

This Court is bound by the Sixth Circuit's conclusion that *Green, Raney* and *Monroe* did not change or modify any law applicable to *Deal*. Moreover, given the factual differences, and the disparity between the issues presented and resolved therein and the issue presented in *Deal*, this Court wholly agrees with the Sixth Circuit's conclusion.

Liability arising from intentionally caused segregation was a foregone conclusion in *Green* and its companion cases. Statutorily-imposed school segregation had been struck down as a matter of constitutional law in *Brown I*. Because the school systems involved in the 1968 trilogy had operated under a state segregation statute at the time of *Brown I*, each school board had, since *Brown II*, been under an affirmative duty to convert its school system into a non-segregated, unitary system. The Supreme Court's inquiry and discussion in these cases centered on issues which arose only *after* de jure segregation or intent to discriminate had been established. The developments in the law of school desegregation articulated in these decisions concerned the adequacy of school authorities' efforts, in the years after 1955, "*to remedy* the *established* unconstitutional deficiencies of [their] segregated system[s]." *Green, su-*

*pra*, 391 U.S. at 437, 88 S.Ct. at 1693 (emphasis added). Testing the adequacy of the remedial measures selected by the boards, the Court found that each board had taken actions after *Brown II*, which tended to perpetuate the segregation formerly imposed by statute. The Court also found that the boards had omitted or failed to implement plans that would realistically work to achieve desegregation. Consequently, the Court concluded that the respondent school boards had failed to meet their duty to remedy the deficiencies existing in their school systems in 1954.

In *Deal*, however, the courts were presented with the very issue that was settled in *Green, Raney* and *Monroe*. Before the principles developed in these later cases, regarding the adequacy of remedial measures, could properly be considered in *Deal*, it was necessary to determine, as a threshold matter, whether the school board was liable for the existing racial imbalance. Since the imbalance could not be traced to a segregation statute, as was the situation in the 1968 Supreme Court cases, the *Deal* courts considered whether the racial imbalance had been caused by the Cincinnati school authorities through some other intentionally segregative means. *Green, Raney*, and *Monroe* provided little, if any, guidance for resolving this question.

When the Sixth Circuit remanded *Deal* for more comprehensive factual findings, it identified the issue as "whether the racial imbalance was intentionally caused by gerrymandering or by other alleged discriminatory practices on the part of the Board." *Deal I*, 369 F.2d 55, 64. Having no basis for treating any of the board's omissions to act as giving rise to liability, in the absence of an established duty to desegregate, and having been affirmed by the Sixth Circuit on his previous conclusion that desegregation had occurred in Cincinnati upon repeal of Ohio's segregation statute in 1887, Judge Peck limited the scope of his inquiry on remand to evidence of contemporary school board programs and practices. As the Subsidiary Findings of Fact indicate, during the years which he considered relevant to

the inquiry, Judge Peck "found and determined that neither gerrymandering nor any other alleged practice on the part of the Board brought about such racial imbalance as existed . . . ." 419 F.2d at 1398. After a review of those findings, the Sixth Circuit affirmed, and agreed with Judge Peck that there was no reason to rule on practices and policies which had been discontinued prior to the filing of the lawsuit. *Id.* at 1395. Relying on evidence for the period between approximately 1956–1965, the *Deal* courts concluded that the school board was not liable or legally responsible for the racial composition of the Cincinnati school system, as of July 26, 1965.

Absent the existence of a state segregation statute in 1954, which would have settled the initial issue of liability, and absent a finding that the board had intentionally acted to bring about the racial imbalance in the system after *Brown I* and *II*, the *Deal* courts had no reason or occasion to reach the matters raised and resolved in *Green* and its companion cases. Those cases dealt with the affirmative duty to desegregate school systems which were formerly segregated under state statute, and with the adequacy of remedies to achieve the goal of desegregation. They had no bearing on *Deal*, which dealt solely with the threshold issue of liability, and they, therefore, changed no law applicable to *Deal*.

B. *Swann* and *Keyes*: Considered by the Sixth Circuit in *Bronson*, 1975

In *Bronson v. Board of Education*, 525 F.2d 344, 345 (6th Cir. 1975), the Sixth Circuit granted an interlocutory appeal in the case at bar "to consider the important question of the applicability of the doctrine of res judicata to this school desegregation litigation." Judge Lively, writing for the Court, began the opinion by tracing the history of the proceedings, including a brief history of *Deal*. He recalled that in *Deal II*, the District Court and the Sixth Circuit rejected the *Deal* plaintiffs' assertions concerning changes in the law since *Deal I*. Regarding *Green, Raney*, and *Monroe*, he commented:

These three cases were viewed as holding that a court may require a school board to discard as inadequate a plan based on "freedom of choice" or "free transfer" which has not effectively desegregated a dual school system, and thus as applying only to districts formerly having *de jure* segregation.

*Id.* at 346.

The Court then considered "whether intervening changes had occurred in the law applicable to school desegregation litigation since *Deal I* and *II* which would make it inappropriate to permit the defendants [in *Bronson*] to rely on res judicata or collateral estoppel." *Id.* at 346–47. As a prelude, Judge Lively summarized the District Court's handling of the question. First, he pointed out that the District Court had concluded "that the basic holdings of *Deal I* and *II* have not been reversed or overruled." *Id.* at 347. The summary continued:

It was noted that instances where school boards had been charged with the affirmative duty to weed out all vestiges of segregation "root and branch" involved *remedy* proceedings where previous actions or proceedings had established constitutional violations. The district court held that the Supreme Court decisions impose no such affirmative duty in the absence of a finding that a board has operated a dual school system or that *de jure* segregation has been practiced.

*Id.* (emphasis in the original). Judge Lively also noted that the District Court had acknowledged " 'developments and refinements' in the law since *Deal*," but none "so drastic as to permit a relitigation of the issues" determined in *Deal I* and *II*. *Id.* The Court reiterated the District Court's holding that "the question of segregative intent was critical to the decisions in *Deal I* and *II* and . . . this issue was settled by a finding that the Cincinnati Board had no such intent up to July 26, 1965, when the *Deal* inquiry ended." *Id.*

As to the District Court's first conclusion, the Sixth Circuit held that "[it] was clearly correct in finding that *Deal I* and *II* contin-

ue to have 'vitality.'" *Id.* The Court also pointed out that the plaintiffs "in the present case agree ... that the 'holding [of *Deal*] that racial imbalance alone does not justify a school desegregation order by a Federal District Court ... remains good law ....'" *Id.* (ellipses in the original).

The Court thereafter turned its attention to the *Bronson* plaintiffs' contention "that certain aspects of *Deal* have been 'overtaken' by more recent decisions of the Supreme Court and this court." *Id.* The two Supreme Court decisions urged by plaintiffs as having "changed the law sufficiently to render collateral estoppel inapplicable to the present case," *id.* at 347–48, were *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (*Swann*), and *Keyes v. School District No. 1, Denver, Colo.*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (*Keyes*). However, after distinguishing *Keyes*, and briefly commenting on several of its own school desegregation decisions rendered subsequent to *Deal*, the Sixth Circuit concluded that "there has been no such change in the law since *Deal* as to prevent altogether the application of the doctrine of collateral estoppel to this case." *Id.* at 348–49.

### 1. Inapplicability of *Swann* to *Deal*

*Swann* and its companion cases [4] "arose in States having a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to segregate pupils solely on the basis of race." *Swann, supra,* 402 U.S. at 5–6, 91 S.Ct. at 1271. In *Swann,* the proceeding which culminated in Supreme Court review "was initiated in September 1968 by petitioner Swann's motion *for further relief* based on *Green v. County Board* ... and its companion cases." *Id.* at 7, 91 S.Ct. at 1271 (emphasis added) (footnote omitted). The Court stat-

ed that it was presented with "issues as to the duties of school authorities and the scope of powers of federal courts under this Court's mandates to eliminate racially separate public schools established and maintained by state action ... (*Brown I*)." *Id.* at 5, 91 S.Ct. at 1271. The Court explained that the cases under consideration "present us with the problem of defining in more precise terms than heretofore *the scope of the duty* of school authorities and district courts in implementing *Brown I* and the mandate *to eliminate dual systems* and establish unitary systems at once." *Id.* at 6, 91 S.Ct. at 1271 (emphasis added) (footnote omitted).

In *Bronson,* the Sixth Circuit made no explicit determination as to the impact of *Swann* on the law applicable to *Deal,* or to this case. Aside from noting that the District Court had distinguished remedy cases, of which *Swann* is one, from cases like *Deal* and *Bronson,* which involved the threshold question of liability, and later citing *Swann* as one of the cases upon which the *Bronson* plaintiffs relied in support of their position, 525 F.2d at 347, Judge Lively made no specific comments about *Swann.* However, since the Sixth Circuit did not disagree with the District Court on the distinguishability of remedies cases from liability cases, it is fairly obvious that the Sixth Circuit agreed with Judge Porter's conclusion, and therefore, implicitly agreed that the principles set forth in *Swann* did not change any law applicable to *Deal* that would support a departure from the application of collateral estoppel.

This conclusion, that *Swann* changed no law applicable to *Deal,* is not subject to review by this Court, nor would this Court disagree with that conclusion even if it had the power to do so. By more precisely defining "the scope of the duty of school authorities and district courts in implementing *Brown I* and the mandate to eliminate

---

4. The following companion cases were listed in a footnote by the Court, 402 U.S. at 5–6 n.1, 91 S.Ct. at 1271: *McDaniel v. Barresi*, No. 420, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582; *Davis v. Board of School Commissioners of Mobile County*, No. 436, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; *Moore v. Charlotte-Mecklenburg Board of Education*, No. 444, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590; and *North Carolina State Board of Education v. Swann*, No. 498, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586.

dual systems and establish unitary systems at once," 402 U.S. at 6, 91 S.Ct. at 1271, *Swann* did, indeed, bring about further refinements in the law of school desegregation. However, those changes, all of which pertain to remedial considerations once a constitutional deficiency has been established, were no more applicable to *Deal*, or to the threshold questions of liability presented in the case at bar, than the changes brought about by the Supreme Court's decisions in *Green, Raney,* and *Monroe.*

Like the 1968 cases, *Swann* focused on matters that arose only *after* de jure segregation had been established, and the constitutional duty to desegregate had attached to the school board. Also like the 1968 cases, the Court in *Swann* was not presented with, and did not consider the question at issue in *Deal* of whether the racial imbalance in the system had been intentionally caused by the practices and policies of the school board. That question was settled in *Swann*, as it had been in *Green, Raney,* and *Monroe,* by virtue of the fact that the school system involved had been segregated under the state statute at the time of *Brown I.* This fact obviated the need for any threshold inquiry into the board's intent to discriminate. Thus, *Swann*, like its 1968 predecessors, presented an entirely different situation from that presented in *Deal*, where there had been no statutorily-imposed segregation since 1887, and where the courts had found no de jure segregation in the years after *Brown I* and *II.*

In *Swann*, the Court made no pronouncements that would have authorized the *Deal* courts to order the school board to alleviate racial imbalance that it was held not to have caused. On the contrary, the Court stressed that, absent a finding of constitutional violation, the federal courts had no power or authority to order a school board to improve the racial balance of its schools. 402 U.S. at 16. The Court stated that a school board, in its discretion, could formulate a policy of prescribing ratios of blacks to white schools, reflecting the racial composition of the district, but such a policy "would not be within the authority of a federal court," "absent a finding of consti-

tutional violation . . . ." *Id.* Conversely, "[o]nce a right and a violation have been shown, the scope of the district court's equitable power *to remedy past wrongs* is broad . . . ." *Id.* at 15, 91 S.Ct. at 1275 (emphasis added). Moreover, the Court explained that under the circumstances presented in *Swann*, a neighborhood school policy was an ineffective *remedy* to achieve conversion from a dual system to a unitary one, but "[a]bsent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis." *Id.* at 28, 91 S.Ct. at 1282.

The *Deal* courts were simply not presented with a school system which had been racially dual *under compulsion of state statute in 1954*, and which, despite the mandate of *Brown II*, had remained unliquidated or largely unremedied in the intervening years. Rather, their inquiry concentrated on whether the racial imbalance existing in the system *when the suit was filed* could be traced to contemporary, intentionally segregative actions and policies of the school board. Finding no indicia of segregative intent on the part of the board in the years after *Brown I* and *II*, and having no reason to believe that a broader temporal inquiry was required, the requisite finding of liability that would have made *Swann* applicable, was absent. The conclusion in *Deal* that no remedial desegregation order was warranted or appropriate was entirely consistent with the principles set forth in *Swann*. Without the initial determination that the school system was, in some way, constitutionally deficient, *Swann*, like *Green, Raney,* and *Monroe*, did not change any law applicable to *Deal*. On the contrary, *Swann* gave all appearances of reinforcing the soundness of the findings and conclusions reached in *Deal*. It, therefore, presented no compelling reason for excepting the *Bronson* plaintiffs from the application of collateral estoppel.

2. *Keyes*: No Changes in the Law of School Desegregation Warranting Departure From the Application of Collateral Estoppel

*Keyes*, the second post-1968 Supreme Court decision relied upon by the *Bronson*

plaintiffs in 1975 to avoid the preclusive effect of the *Deal* judgment, was immediately distinguishable from the cases previously considered by the Sixth Circuit. Unlike the earlier cases, *Keyes* did not involve a school system that had been statutorily dual at the time of *Brown I.* In fact, as the Supreme Court noted in its statement of the case, the Denver school system had "never been operated under a constitutional or statutory provision that mandated or permitted racial segregation in public education." *Keyes, supra,* 413 U.S. at 191, 93 S.Ct. 2688. Further, unlike the plaintiffs in the *Green* trilogy or in *Swann,* whose claims for relief were grounded in the school boards' failure to meet their affirmative constitutional duty to effectively dismantle the dual systems existing pursuant to state statute in 1954, the *Keyes* plaintiffs sought relief on the grounds that the "School Board *alone,* by use of various techniques . . . [had] created or maintained racially or ethnically (or both racially and ethnically) segregated schools throughout the school district . . . ." *Id.* (emphasis added). Therefore, unlike the earlier cases, all of which involved issues arising from previously established de jure segregation, *i.e.,* a former state segregation provision, *Keyes* presented the broad, threshold question whether the racial imbalance in the Denver schools, which could not be traced to a comparable state segregation provision, had been caused by the school authorities, thereby rendering it de jure, as opposed to de facto, segregation.

Of all the cases considered by the Sixth Circuit as of 1975, the potential for some aspect of *Deal* being overtaken by intervening Supreme Court authority was, by far, greatest in *Keyes.* The general features of *Keyes,* which distinguished it from the *Green* trilogy and *Swann,* were much the same as those identified to illustrate the inapplicability of those cases to *Deal, e.g.,* the absence of a segregation statute for nearly eighty years before the action was brought; plaintiffs' claims of school board discrimination in specific schools and programs within the system; and the need to determine the question of liability, as a

threshold matter. *Keyes,* therefore, unlike any of its predecessors, provided the Sixth Circuit with its first opportunity to test the soundness of the approach and legal principles (*e.g.,* application of the dominant purpose test) underlying the *Deal* courts' conclusion that the racial imbalance in the Cincinnati schools was not violative of the constitutional rights of minority students and their parents. However, despite the general similarities, the Sixth Circuit ultimately found nothing in the guidelines developed by the Supreme Court in *Keyes* to justify permitting the *Bronson* plaintiffs to relitigate the issues decided in *Deal.*

Before turning to the Sixth Circuit's discussion of *Keyes* in its 1975 *Bronson* opinion, this Court must digress to consider certain, specific aspects of *Keyes* that are not reflected when the case is described in general terms. Specifically, it is necessary to examine how the lower *Keyes'* courts assessed plaintiffs' claims and the conclusions they reached based on their factual findings and their methodologies. Thereafter, it is necessary to consider the precise question with which the Supreme Court was concerned, to which it devoted most of its opinion, and from which the Court developed the appropriate methodology to be applied in cases similar to *Keyes.*

Admittedly, this digression will disrupt the continuity of the instant discussion, to a certain extent. However, it will serve at least three purposes. First, it will provide an element of perspective to the Sixth Circuit's relatively brief and narrowly focused discussion of *Keyes* in its *Bronson* opinion. Additionally, it will, by calling attention to certain important nuances in the case, establish the groundwork for this Court's consideration of why most of the principles developed therein by the Supreme Court were not directly applicable to *Deal.* Finally, it will lay the necessary foundation for differentiating between *Keyes,* and *Columbus* and *Dayton II.* This, of course, is an essential predicate to this Court's conclusion that the more recent Supreme Court cases have supplemented the law of school desegregation since 1975, by establishing the ne-

cessity of considering certain issues that were not addressed in *Deal*, thereby rendering the Sixth Circuit's 1975 *Bronson* opinion obsolete to the extent that it would bar the litigation of these issues.

a. *Keyes*: Supreme Court Holding That a Finding of Contemporary De Jure Segregation in a Portion of the School System Is Highly Relevant in Assessing Claim of Current, System-wide De Jure Segregation

(1) The District Court

The *Keyes* plaintiffs brought suit in June, 1969, shortly after a newly elected Denver school board voted to rescind three resolutions adopted by the predecessor board, which had been "designed to desegregate the schools in the Park Hill area of the northwest portion of the city." *Keyes, supra*, 413 U.S. at 192, 93 S.Ct. at 2689. When the cause came on for trial the following year, the plaintiffs were essentially proceeding on three claims for relief. The first claim alleged that the schools in Park Hill had been deliberately segregated by the school authorities, and that the rescission of the resolutions was unconstitutional. *See, id.*; *see also*, 313 F.Supp. 61, 63. The second claim alleged that the school board had "created or maintained . . . segregated schools throughout the school district." 413 U.S. at 191, 93 S.Ct. at 2689; *see also*, 313 F.Supp. at 63. The third claim alleged that the school authorities had "provided an unequal educational opportunity to students attending segregated schools within the District." *Id.*

The District Court considered plaintiffs' claims seriatim. On the basis of evidence of the board's actions in the Park Hill area during a ten year period preceding commencement of the litigation, *see*, 303 F.Supp. 279, 284, the District Court held that the board had "engaged over almost a decade after 1960 in an unconstitutional policy of deliberate racial segregation with respect to the Park Hill schools." 413 U.S. at 192, 93 S.Ct. at 2689 (footnote omitted). This holding was supported by findings that the board had, *inter alia*, constructed a "rel-

atively small elementary school . . . in the middle of the Negro community west of Park Hill," *id.*; that it had gerrymandered attendance zones, *id.*; that it had used "'optional zones,'" *id.*, and that there had been an "excessive use of mobile classroom units." *Id.* Having concluded that the board's deliberate policy of discrimination in these schools for nearly a decade constituted de jure segregation, the District Court ordered the board to desegregate these schools by implementing the resolutions that had been rescinded. *Id.*

The District Court then turned to plaintiffs' second claim, which sought a desegregation order for "all segregated schools in the city . . ., particularly the heavily segregated schools in the core city area." *Id.* (footnote omitted). In addressing this claim, the Court made certain threshold determinations. It concluded that "its finding of a purposeful and systematic program of racial segregation . . . in the Park Hill area did not, in itself, impose on the School Board an affirmative duty to eliminate segregation throughout the school district." *Id.* at 193, 93 S.Ct. at 2689. Additionally, it concluded that "its finding of intentional segregation in Park Hill was not in any sense material to the question of segregative intent in *other areas* of the city." *Id.* (emphasis added). Consequently, plaintiffs were required "to make a fresh showing of *de jure* segregation in each area of the city for which they sought relief." *Id.*

In contrast to its conclusion regarding the existence of de jure segregation in Park Hill, the District Court determined the evidence adduced with respect to the other areas, and without regard to the finding in Park Hill, "was insufficient to 'dictate the conclusion that this is *de jure* segregation . . . . [Instead, the Court concluded,] It is more like *de facto* to which the rule is that the court cannot order desegregation to provide a better balance.'" *Id., quoting*, 313 F.Supp. at 73. Therefore, the Court granted no relief on plaintiffs' second claim.

However, the District Court did find in favor of plaintiffs on their third claim. Specifically, it found plaintiffs' evidence

sufficient to establish "that the segregated core city schools were educationally inferior to the predominantly 'white' or 'Anglo' schools in other parts of the district . . . ." 413 U.S. at 193. To alleviate the inequalities, the Court concluded that the board must adopt a program " 'of desegregation and integration which provides compensatory education in an integrated environment.' " *Id.* 413 U.S. at 194, 93 S.Ct. at 2690, *quoting,* 313 F.Supp. 90, 96.

Thus, of the three claims presented to the trial court, only the first, regarding contemporary de jure segregation in Park Hill, and the third, regarding unequal educational opportunity in the core city schools, were found to be supported by the evidence. The evidence presented by plaintiffs with respect to the second claim regarding de jure segregation primarily in the core city schools, which was assessed separate and apart from the finding of contemporary de jure segregation in Park Hill, was found to be insufficient to support the relief sought, that is, "all-out desegregation," *id.,* of the entire Denver school district.

### (2) The Tenth Circuit Court of Appeals

The Tenth Circuit's opinion can be summarized with relative dispatch. With respect to plaintiffs' first claim, and the trial court's finding of contemporary de jure segregation in the Park Hill schools, the Court concluded, "there is ample evidence in the record to sustain the trial court's findings that race was made the basis for school districting with the purpose and effect of producing substantially segregated schools in the Park Hill area." 445 F.2d at 990, 1002; *see also,* 413 U.S. at 194, 93 S.Ct. at 2690. The Court rejected plaintiffs' contentions with respect to the second claim and left undisturbed the trial court's finding of no de jure segregation in the core city schools. However, the Tenth Circuit reversed the trial court's determination with respect to the third claim regarding unequal educational opportunity in the core city schools. *Id.* at 194–95, 93 S.Ct. at 2690.

Like the District Court, "the Court of Appeals also disregarded . . . [the] Board's deliberate racial segregation policy respecting the Park Hill schools . . . ," *id.* at 195, 93 S.Ct. at 2690, in assessing plaintiffs' claims respecting the core city schools. Based on its review, the Tenth Circuit upheld the trial court's order that the Park Hill schools be desegregated, but set aside that portion of the decree requiring the implementation of remedial measures in the core city schools. *Id.*

### (3) The Supreme Court

Although it may appear to be an unimportant point, this Court notes at the outset of its consideration of the Supreme Court's opinion in *Keyes* that both the plaintiffs and the school board petitioned for certiorari. Plaintiffs petitioned for review of that portion of the Tenth Circuit's judgment reversing "the District Court's Final Decree as pertained to the core city schools (*i.e.,* based on plaintiffs' third claim)." *Id.* at 195, 93 S.Ct. at 2690. The school board cross-petitioned for review of that portion of the Tenth Circuit's judgment affirming "the District Court's Final Decree as pertained to the Park Hill schools (*i.e.,* based on plaintiffs' first claim)." *Id.* The Supreme Court, however, granted certiorari *only* on plaintiffs' petition; it denied the cross-petition, seeking review of the lower courts' resolution of the plaintiffs' claim with respect to Park Hill.

Given the posture of the case when it came before the Supreme Court, it is not surprising that, after briefly addressing an issue of no relevance herein,[5] the question identified by the Court as "the only . . . question that requires our decision at this time . . . ," *id.* at 198, 93 S.Ct. at 2692, had nothing whatever to do with the correctness of the lower courts' finding of contemporary de jure segregation in the Park Hill schools. Instead, the Court's attention was solely directed to the question "whether the District Court and Court of Appeals applied an incorrect legal standard in addressing

---

**5.** The first portion of the Court's discussion is devoted to "the District Court's method of defining a 'segregated' school." *Id.* at 195–98, 93 S.Ct. at 2690–92. That discussion does not bear on any issue under discussion herein.

petitioners' contention that respondent School Board engaged in an unconstitutional policy of deliberate segregation *in the core city schools.*" *Id.* (emphasis added). In a footnote, the Court emphasized, in rebuttal to a point raised by the dissent, "[W]e have no occasion to review the factual findings concurred in by the two courts below.... We address *only* the question whether those courts applied the correct legal standard in deciding the case as it affects the core city schools." *Id.* n.9 (emphasis added). Thus, the undisturbed finding of contemporary de jure segregation in Park Hill became the focal point for the analytical guidelines developed by the Supreme Court in *Keyes.* To put it another way, it became the predicate for both of the alternative inquiries that the Supreme Court said must be conducted by a court in assessing plaintiffs' claim of current, systemwide de jure segregation in the absence of a former segregation statute.

To illustrate, the Court began its discussion with a general proposition regarding the plaintiffs' initial burden of proof in a case where the school system had never been statutorily dual. In such a case, "plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." *Id.* Applying this standard to the case before it, the Court immediately pointed out that, at least with respect to Park Hill, plaintiffs had proven that the board "had engaged in an unconstitutional policy of deliberate racial segregation," *id.*, for almost ten years prior to commencement of the litigation. The Court then added an observation that is not clearly reflected in the lower courts' opinions, namely, that this finding of deliberate or de jure segregation in Park Hill "did not relate to an insubstantial or trivial fragment of the school system," *id.* at 199, 93 S.Ct. at 2692, but rather, in the 1969 school year, affected some "37.69% of Denver's total Negro school population...." *Id.*

From the point at which the Court reiterated the lower courts' finding in Park Hill, and remarked that the finding of de jure segregation therein had more than a *de*

*minimis* effect on the Negro student population in the system as a whole, the question to which the Court thereafter directed its attention was, roughly stated, of what relevance is a finding of contemporary de jure segregation in a substantial portion of a school system in assessing plaintiffs' claim that the entire school system is, likewise, unconstitutionally constituted. In other words, the Court considered whether, and to what extent, the lower courts' total disregard of this finding of contemporary de jure segregation in a substantial portion of a school system (*i.e.*, Park Hill) had been a fatal flaw in their methodologies with respect to the remainder of the system. The Supreme Court answered this question in two alternative ways, both of which made clear that such a finding is of potentially dispositive importance, and, as such, had been erroneously ignored by the lower courts.

The Court's first answer, regarding the relevance of this finding of de jure segregation in Park Hill to the consideration of plaintiffs' claim of de jure segregation in the core city, came in response to the following contention by the school board:

> [A] finding of state-imposed segregation as to a substantial portion of the school system can be viewed in isolation from the rest of the district, and that even if state-imposed segregation does exist, *it does not follow that the District Court could predicate on that fact a finding that the entire school system is a dual system.*

*Id.* at 200, 93 S.Ct. at 2693. (emphasis added). The Court disagreed for several reasons. First, it stated that "a practice of concentrating Negroes in certain schools by structuring attendance zones or designating 'feeder' schools on the basis of race has a reciprocal effect of keeping other nearby schools predominantly white." *Id.* at 201, 93 S.Ct. at 2694 (footnote omitted). The Court also listed numerous other practices which, if racially motivated, "may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing

further racial concentration within the schools." *Id.* at 202, 93 S.Ct. at 2694.

The Court acknowledged that, in rare cases, the physical characteristics of a school district "may have the effect of dividing the district into separate, identifiable and unrelated units." *Id.* at 203, 93 S.Ct. at 2695. However, absent such a factual determination, the Court declared that "proof of state-imposed segregation in a *substantial* portion of the district will suffice to support a finding by the trial court of the existence of a dual system." *Id.* (emphasis added).

Applying the above principle to the facts of the case, the Supreme Court directed the District Court on remand to determine, in the first instance, whether the Park Hill area of the district, wherein contemporary de jure segregation had been established, could be viewed in isolation from the remainder of the district. *Id.* at 213, 93 S.Ct. at 2699. If the Board failed to make such a showing, a finding of a dual system could properly be predicated on the finding of de jure segregation in Park Hill, and the Board would, thereafter, be under an affirmative duty to desegregate the *entire* Denver School system. *See, id.* at 203, 213, 93 S.Ct. at 2695, 2699.

The Court's discussion did not, however, end when it directed the District Court to consider whether the finding of contemporary de jure segregation in Park Hill provided a predicate for finding the entire school system a dual one. Rather, the Court then proceeded to announce a second or alternative way in which this finding should have been considered in "addressing petitioners' contentions of deliberate segregation in the core city schools," *id.* at 205, 93 S.Ct. at 2696, that is, as a predicate for establishing a presumption or prima facie showing of current de jure segregation in those schools. The starting point for this discussion was the rejection of the District Court's "premise that the finding as to the Park Hill schools was irrelevant to the consideration of the rest of the district," *id.*, and the concomitant requirement that plaintiffs prove "a current condition of seg-

regation resulting from intentional state action directed specifically to the core city schools." *Id.* at 205–06, 93 S.Ct. at 2696 (footnote omitted).

The Court recalled that on the question of the board's segregative intent, plaintiffs had "presented evidence tending to show that the Board, through its actions over a period of years, intentionally created and maintained the segregated character of the core city schools," *id.* at 206, 93 S.Ct. at 2696, but that the lower courts had accepted the board's explanation that the racial imbalance in these schools was the result of a "racially neutral 'neighborhood school policy,'" *id.* at 206, 93 S.Ct. at 2696, and concluded therefrom that a finding of de jure segregation was impermissible. The Supreme Court found the lower courts' assessment "clearly incorrect," *id.* at 207, 93 S.Ct. at 2697, assigning as error the lower courts' failure to perceive the relevance between the deliberate segregation proven to exist in Park Hill and petitioners' contention of deliberate segregation in the core city schools. Specifically, the Court stated, "[a]lthough petitioners had already proven the existence of intentional school segregation in the Park Hill schools, *this crucial finding was totally ignored* when attention turned to the core city schools." *Id.* (emphasis added).

The Court found this aspect of the lower courts' methodology untenable because:

> Plainly, a finding of intentional segregation as to a portion of a school system is not devoid of probative value in assessing the school authorities' intent with respect to other parts of the same school system. On the contrary, where ... the case involves one school board, *a finding of intentional segregation is highly relevant to the issue of the board's intent with respect to other segregated schools in the system.*

*Id.* (emphasis added).

Applying certain well-established evidentiary principles, *see, id.* at 207–08, 93 S.Ct. at 2696–97, the Supreme Court articulated its second reason for finding error in the lower court's approach with respect to the core city schools:

*[A] finding of intentionally segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.*

*Id.* at 208, 93 S.Ct. at 2697 (emphasis added). The Court added that the presumption would be created and the prima facie case established, even if the system were determined to be comprised of independent units because:

[E]ven in that situation, there is a high probability that where school authorities have effectuated an intentionally segregative policy in a meaningful portion of the system, similar impermissible considerations motivated their actions in other areas of the system.

*Id.* The Court emphasized "that the differentiating factor between *de jure* segregation and so-called *de facto* segregation ... is *purpose* or *intent* to segregate." *Id.* (emphasis in the original) (footnote omitted).

Having announced that a prima facie showing of intentional segregation shifts the burden to school authorities to rebut the presumption that the segregation shown to exist was motivated by or resulted from intentionally segregative acts of the school board, the Court advanced to a discussion of the means by which school authorities could and could not meet their burden. For example, reliance "upon some allegedly logical, racially neutral explanation for their actions," *id.* at 210, 93 S.Ct. at 2698, would not satisfy the burden. On the other hand, proof that "segregative intent was not among the factors that motivated their actions," *id.*, would suffice.

Additionally, the Court, in essence, apprised the *Keyes* board that it could not rebut the presumption of current segregative intent in the core city schools, predicated on the finding of contemporary de jure segregation in Park Hill, merely by relying on the fact that its intentionally segregative acts in the core city schools had taken place at some point in the remote past. *Id.* at 210–11, 93 S.Ct. at 2698–99. On the other hand, the presumption could be rebutted "by evidence ... that a lesser degree of segregated schooling in the core city area would not have resulted even if the Board had not acted as it did." *Id.* The Court added that "if respondent School Board cannot disprove segregative intent, *it can rebut the prima facie case* only by showing that its past segregative acts did not create or contribute to the current segregated condition of the core city schools." *Id.* (emphasis added).

The Supreme Court also indicated that an application of the above principles, concerning the establishment of a prima facie case and rebuttal of same by the school authorities, might not be called for under the peculiar facts of the case. If the District Court determined, on the basis of the board's decade-long policy of deliberate segregation in Park Hill, that the entire school system was a dual one, the board's duty to desegregate the entire system would attach, and no further inquiry into liability would be required. *See, id.* at 213, 93 S.Ct. at 2699. However, in the event that the District Court was unable to reach such a conclusion, it was then directed to inquire further. Specifically, the Supreme Court directed the trial court to "afford ... [the] Board an opportunity to rebut petitioners' prima facie case of intentional segregation in the core city schools *raised by the finding of intentional segregation in the Park Hill schools.*" *Id.* If the board failed to present sufficient evidence to rebut the presumption, the trial court was required to "decree all-out desegregation in the core city schools." *Id.* at 214, 93 S.Ct. at 2700.

In summary, the Supreme Court in *Keyes* dismissed the board's petition to review the lower court's legal conclusion that the Park Hill schools had been intentionally segregated by the board during the ten years prior to commencement of the litigation, and declined to review any of the factual

findings upon which that conclusion rested. Instead, the Court directed, its attention toward determining whether, and in what manner, the lower courts had applied a faulty methodology in assessing plaintiffs' claims of current de jure segregation in the core city schools. The flaw identified by the Supreme Court was the lower courts' total disregard of the finding of contemporary de jure segregation in, what the Court described as, a substantial portion of the school district, *i.e.*, Park Hill. The Court discussed two different ways in which this finding should have been considered. First, it should have been considered for the purpose of determining whether it provided a predicate for finding the entire school system a dual one, thereby ending the inquiry into liability and requiring systemwide desegregation. Second, even if the finding in Park Hill did not constitute the entire system a dual one, it, nonetheless, established a prima facie case of current, systemwide de jure segregation which, if not rebutted by the school authorities, also ended the inquiry into liability and required an "all-out" desegregation order.

b. Sixth Circuit's Discussion of *Keyes* in *Bronson*

Having examined *Keyes* in some detail, highlighting certain vagaries of the litigation from its inception through the Supreme Court's review, this Court now turns to the Sixth Circuit's discussion of *Keyes* in its 1975 *Bronson* opinion, which is relatively brief and narrowly focused. In *Bronson, supra,* 525 F.2d at 347, the Sixth Circuit specifically considered *Keyes* in connection with plaintiffs' contention that "the *Deal* finding of no segregative intent" had been rendered invalid "to the extent that [it] was based upon a 'dominant purpose' test rather than one which looked to the natural and probable effects of the Board's action and inactions . . . ." The Court focused on the aspects of *Keyes* which plainly refuted plaintiffs' claim.

Rather than supporting the proposition that the Supreme Court had directly or indirectly disavowed an inquiry into pur-

pose or intent to segregate in a case similar to *Deal*, in favor of one that looked only to the effects of the board's actions, the Sixth Circuit found that the *Keyes*' plaintiffs had been held to a burden of proof which specifically included a showing of intent or purpose to segregate. The Sixth Circuit observed:

[I]n *Keyes* . . . which involved a school system like Cincinnati's, where there had never been state-mandated segregation, the plaintiffs were required to prove "not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." 413 U.S. at 198 [93 S.Ct. at 2692] . . . In *Keyes*, the Court emphasized that the "differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is *purpose* or *intent* to segregate." 413 U.S. at 208 [93 S.Ct. at 2697] . . . (emphasis in the original).

525 F.2d at 348. Given the above, explicit language from *Keyes*, the Sixth Circuit reasoned that "contrary to plaintiffs' claim [that the "dominant purpose" test used in *Deal* had been replaced by an "effects" test], the Supreme Court appears to have held that intent is synonymous with purpose in determining whether racial imbalance . . . in a school system that was never segregated by state law results in a constitutional violation." *Id.*

The Court stressed that in *Keyes* the Supreme Court had retained, rather than eliminated, the distinction between de jure and de facto segregation, and that it had continued "to apply different standards to the determination of two different questions." *Id.* To clarify, the Sixth Circuit explained that in cases where the school system had formerly been segregated under state law, an inquiry into the board's intent was unnecessary because "[t]he state action requirement of the Fourteenth Amendment is not an issue." *Id.* Consequently, the pertinent question in such a case is whether "the methods adopted by a school board [are] *effective* to dismantle a dual system." *Id.* (emphasis added). In contrast, where the school system involved had never been segregated under a state segregation provi-

sion, the state action requirement is at issue, and is satisfied only if the segregation is "shown to result from intentional acts, omissions or policies of public officials or public bodies." *Id.* In this type of school desegregation case, the pertinent question is whether "a racial imbalance in a unitary system exist[s] because of actions and policies of public officials, primarily the school board, *which reflect and carry out a purpose or intent to segregate.*" *Id.* (emphasis added). Of these two, separate and distinct questions, *Keyes* involved only the later inquiry. In *Bronson,* the Sixth Circuit recognized that it, too, was "concerned only with the second question." *Id.*

Thus, in *Bronson,* the Sixth Circuit illustrated that the general burden of proof adopted by the Supreme Court in *Keyes,* for plaintiffs in a case where the school system had never been statutorily dual, was virtually the same as that to which the plaintiffs had been held in *Deal,* where statutorily-mandated segregation had been abolished nearly eighty years prior to the commencement of the litigation. In view of these similarities, the correctness of the standard applied by the *Deal* courts, underlying their finding of no segregative intent, was fully reinforced, rather than invalidated by *Keyes.* Since *Keyes* had not significantly changed the requirement that intent or purpose to segregate be proven to establish de jure segregation in the absence of a former segregation statute, the Sixth Circuit concluded that *Keyes* had not overtaken *Deal* and, therefore, provided no basis for excepting plaintiffs from the application of collateral estoppel.

c. Most of Principles Developed by Supreme Court in *Keyes* Were Not Directly Applicable to *Deal* Because, Unlike the *Keyes* Plaintiffs, the *Deal* Plaintiffs Failed to Prove Contemporary De Jure Segregation in Any Portion of the Cincinnati School System

This Court is unquestionably bound by the Sixth Circuit's conclusion in *Bronson,* that *Keyes* presented no reason for permitting plaintiffs to present any evidence for the purpose of attempting to establish a constitutional violation prior to July 26, 1965. The Court is also well aware that *Keyes* is the authority most heavily relied upon by the Supreme Court in *Columbus* and *Dayton II,* and that, because of this reliance, defendants herein contend that a departure from the Sixth Circuit's 1975 *Bronson* opinion cannot be justified on the basis of the intervening authority.

As a final step before turning to *Columbus* and *Dayton II* to consider how the developments therein have supplemented the body of school desegregation law existing in 1975, and in so doing have, in part, rendered the Sixth Circuit's 1975 *Bronson* opinion obsolete, it is necessary to consider why, when the Sixth Circuit considered *Keyes* in 1975, none of the principles developed therein, regarding the ingredients of a prima facie case of current, systemwide de jure segregation, burden shifting, or the means by which a school board could and could not meet its burden, were directly applicable to *Deal.* This inquiry will disclose the reasons why *Keyes,* standing alone in 1975, gave no indication that the *Deal* courts had not addressed all of the relevant issues arising or potentially arising from plaintiffs' evidence, in concluding that the school board had not caused or contributed to the racial imbalance existing in the system, as of July 26, 1965. Moreover, it will provide underlying support for this Court's conclusion that the supplementary developments emerging from *Columbus* and *Dayton II* have rendered the Sixth Circuit's 1975 *Bronson* opinion obsolete to the extent that it would foreclose litigation of certain pre-July 26, 1965 issues which are or may become relevant in this case, that were not discernible to the Sixth Circuit in 1975, and which were not actually litigated and determined in *Deal.*

When this Court attempted to apply the methodology advanced by the Supreme Court in *Keyes* to *Deal,* it became apparent almost immediately that, because of significant differences between the factual findings concurred in by the lower *Keyes* courts and those concurred in by the *Deal* courts, *Deal* is not susceptible to a strict *Keyes-*

type analysis. There are general similarities between the two cases, *e.g.*, plaintiffs' claims of current de jure segregation in the absence of a state segregation statute at the time of *Brown I*, and the necessity of considering the question of liability, as a threshold matter. However, the analogy between them ends abruptly at the point where the lower *Keyes* courts and the *Deal* courts, applying virtually the same standard, reached contrary conclusions on the first question they considered, that is, whether the school authorities had intentionally segregated certain schools in the system during the decade or so prior to the commencement of the respective lawsuits. More specifically, *Keyes* ceases to be directly applicable to *Deal* when the lower *Keyes* courts, considering plaintiffs' evidence from approximately 1960 to 1969, found that the board had used a variety of intentionally segregative devices in the Park Hill schools, whereas the *Deal* courts, considering plaintiffs' evidence of the board's programs and practices in certain schools between approximately 1956 and 1965, *see, Deal II, supra*, 419 F.2d at 1395, 1398–1401, found no comparable indicia of the use of intentionally segregative devices anywhere in the Cincinnati school system.

Looking first at *Keyes*, it will be recalled that, in addressing plaintiffs' first claim regarding de jure segregation in Park Hill, all the board actions considered by the District Court occurred "during the last ten years." 303 F.Supp. at 285. On the basis of that evidence, the *Keyes*' plaintiffs were held to have met their general burden of proof on this claim, by showing that the school board had implemented numerous intentionally segregative tactics, to wit:

> [B]y construction of a new, relatively small elementary school . . . in the middle of the Negro community west of Park Hill, by gerrymandering student attendance zones, by use of so-called "optional zones," and by the excessive use of mobile classroom units, among other things . . . over almost a decade after 1960 . . . .

413 U.S. at 192, 93 S.Ct. at 2689 (footnote omitted). Based on these factual findings, sustained by the Tenth Circuit, and unre-

viewed by the Supreme Court, the District Court found that:

> "[B]etween 1960 and 1969 the Board's policies with respect to these northwest Denver schools shows an undeviating purpose to isolate Negro students" in segregated schools "while preserving the Anglo character of [other] schools." 303 F.Supp. at 294.

413 U.S. at 198–99, 93 S.Ct. at 2692–93. It was this "crucial finding . . . totally ignored," *id.* at 207, 93 S.Ct. at 2697, by the lower *Keyes*' courts, which became the starting point for the Supreme Court's discussion, and which precipitated the development of most of the principles emerging from the Supreme Court's opinion.

The factual findings in *Deal* are markedly different. Although the *Deal* plaintiffs offered evidence about the past history of the Cincinnati school system, the trial court focused its attention on the contemporary evidence presented by plaintiffs in support of their claim of board discrimination in specific schools and programs. *See, Deal II*, 419 F.2d at 1398–1401 (Subsidiary Findings of Fact). Only two of these findings make any reference to events or occurrences in the early 1950's or before. *See, id.* at 1398, 1399 (Subsidiary Findings of Fact # 1, 8). Moreover, the Sixth Circuit explicitly declined to rule on remote programs and practices, discontinued prior to commencement of the litigation. *Id.* at 1395. Thus, the temporal scope of the *Deal* courts' inquiry, approximately 1956–1965, closely parallels the District Court's initial inquiry in *Keyes*, roughly 1960–1969.

However, in contrast to the evidence in *Keyes*, which showed that the Denver school board had employed various intentionally segregative techniques to segregate the schools in Park Hill between 1960 and 1969, Judge Peck found no evidence that the Cincinnati school board had employed similar techniques between 1956 and 1965. Specifically, the District Court in *Deal* found no evidence of gerrymandering, *see* 244 F.Supp. at 572; 419 F.2d at 1398, 1399, 1400 (Findings of Fact, # 5, 6, 12); no

evidence of attendance zones being drawn with segregative intent, *id.* at 1398–1400 (Findings of Fact, # 7, 8, 10 -12); no evidence of an intentionally segregative transfer policy, *id.* at 1400–01 (Findings of Fact # 13–15); and no evidence of intentionally segregative school site selection or construction. *Id.* at 1399-1400 (Findings of Fact # 8, 9, 12). Although there was evidence regarding the transportation of students, the trial court found that such transportation was not only *not* undertaken with intent to segregate, but that it had actually brought the races into closer proximity. *Id.* at 1400 (Findings of Fact # 13 14). The Sixth Circuit made an additional finding that there had been no evidence of discrimination in the hire or assignment of faculty or staff. *Id.* at 1393–1394.

Additionally, in contrast to the *Deal* plaintiffs' claim that the school board had intentionally segregated schools in Cincinnati, and in contrast to the findings supported by the evidence presented by *Keyes'* plaintiffs regarding the Park Hill schools, Judge Peck found, from the evidence considered, that the attendance zones in Cincinnati reflected an "avoidance where possible of predominantly Negro schools to the extent that the Board had any control over the causes which create such predominance," *id.* at 1398 (Findings of Fact # 2); that the board had "consistently withstood efforts to assign children on the basis of race," *id.* at 1401 (Findings of Fact # 15); and that the board had denied "[a]pplication for transfer from one school to another to avoid attendance with schools [sic] of another race . . . ." *Id.*

The above juxtaposition of the factual findings supported by the evidence considered in *Keyes* and *Deal* discloses significant differences between what was occurring in the Park Hill area of the Denver school district, and what was apparently *not* occurring in any portion of the Cincinnati school system in the ten year periods preceding the lawsuits. Given these disparities, it is not surprising that the courts reached different conclusions on the intent issue, while applying virtually the same standard. The record in *Keyes* is replete

with evidence supporting the finding that "for almost a decade after 1960 respondent School Board had engaged in an unconstitutional policy of deliberate racial segregation in the Park Hill schools." 413 U.S. at 198, 93 S.Ct. at 2692. In direct contrast, the evidence presented by the *Deal* plaintiffs, with respect to the board's programs and practices between approximately 1956 and 1965, fully supported the finding that "neither gerrymandering nor any other alleged discriminatory practice on the part of the Board brought about such racial imbalance as existed . . . [in the Cincinnati school system, as of July 26, 1965]." 419 F.2d at 1398.

Because of the significant differences between the factual findings concurred in by the lower *Keyes* courts, and those concurred in by the *Deal* courts, the *Deal* courts were not confronted with the question to which the Supreme Court directed its attention in *Keyes.* Obviously, the question whether, and to what extent, a finding of contemporary de jure segregation in a substantial portion of the school system is relevant in assessing plaintiffs' claim of current de jure segregation in the remainder of the system is one that is raised only *after* there has been a threshold finding of contemporary de jure segregation in a substantial portion of the system. Since the *Deal* courts found plaintiffs' evidence insufficient to support a preliminary finding of contemporary de jure segregation in even a single school, much less a substantial portion of the system, their inquiry ended without the necessity of considering the question decided by the Supreme Court in *Keyes.*

Moreover, because of several factors peculiar to the *Keyes* litigation, including the manner in which the *Keyes* plaintiffs had presented their claims to the lower courts (beginning first with Park Hill), the factual findings concurred in by the lower courts regarding Park Hill, and the Supreme Court's denial of the board's petition to review those findings, *Keyes* afforded the Supreme Court with no opportunity to establish any guidelines or methodology for assessing evidence of a school board's *re-*

*mote programs or practices* when offered by plaintiffs as part of their initial burden of proof. Within the precise contours of the case, the subject of the board's remote practices was broached only in connection with the core city schools, and thus, only in the context of the means by which the board could and could not rebut the presumption that the core city schools were also de jure segregated, which had been raised by the finding of contemporary de jure segregation in Park Hill. By declining to review the lower courts' finding, which was based solely on the board's practices in Park Hill during the decade prior to 1969, the Supreme Court had no reason to consider what, if any, legal import should be accorded to the type of evidence about which the Sixth Circuit made no ruling in *Deal II*, *i.e.*, regarding schools, programs and practices discontinued before the lawsuit was filed. Consequently, the question whether plaintiffs could, in whole or in part, rely on such evidence of a board's remote acts to establish the predicate for finding an entire school system a dual one, or for a prima facie showing of current systemwide de jure segregation was simply not within the perimeters of the Supreme Court's opinion in *Keyes*.

Because the Supreme Court was not called upon to consider any evidence of the board's remote practices in the context of petitioners' initial burden of proof, nothing in *Keyes* indicated that the *Deal* courts' assessment of plaintiffs' evidence was unduly restrictive or that plaintiffs' evidence on the schools, programs and practices discontinued before the lawsuit was filed raised any issues relevant to the question whether the racial imbalance existing in the system, as of July 26, 1965, had been caused by or was legally attributable to the school board. Compared with *Keyes*, the *Deal* courts had conducted similar inquiries, had considered comparable issues, had applied virtually the same standard, and on the basis thereof had reached a contrary conclusion on the threshold question of the board's liability or legal responsibility for the existing racial imbalance. Under the circumstances, it is readily apparent that the Sixth

Circuit's conclusion in its 1975 *Bronson* opinion, that *Keyes* presented no reason for permitting plaintiffs to present any evidence for the purpose of establishing a constitutional violation prior to July 26, 1965, is both logically and legally sound. When the Sixth Circuit considered *Keyes*, by itself in 1975, it had every reason to believe that most of the principles developed therein were simply inapplicable to *Deal*, and no reason to believe that there were or might be any relevant pre-July 26, 1965 issues in this case which had not been settled by *Deal*.

## II. *Columbus* and *Dayton II*: Post-1975 School Desegregation Cases, Not Considered By the Sixth Circuit in Connection With *Deal* and *Bronson*

### A. Preliminary Comments

The issue before the Court, regarding the appropriate application of collateral estoppel in light of *Columbus* and *Dayton II*, is one which has, obviously, not been considered by the Sixth Circuit. It is, therefore, a matter of first impression. However, the Court also realizes that its determinations on the appropriate application of collateral estoppel to the issues in this case, as they now appear in light of *Columbus* and *Dayton II*, must not be inconsistent with, or contrary to conclusions reached by the Sixth Circuit with respect to the pre-1975 Supreme Court cases. In other words, no departure from any aspect of the Sixth Circuit's 1975 *Bronson* opinion will be warranted unless *Columbus* and *Dayton II* have contributed to the law of school desegregation in a way that the earlier cases did not.

Initially, the Court will identify what it perceives to be the evolutionary, as opposed to revolutionary, developments in the law of school desegregation emerging from *Columbus* and *Dayton II*. Thereafter, the Court will conduct a close comparison of *Deal* and the two post-1975 Supreme Court cases, focusing upon specific tenets of school desegregation law applied by the respective courts to identical and/or similar facts in the three cases. This process of

comparison will disclose the differences between the Sixth Circuit's position on the legal import of historical facts in *Deal*, and the Supreme Court's position on similar and/or identical facts, as developed for the first time in *Columbus* and *Dayton II*.

In the latter discussion, the Court will illustrate that none of the school desegregation cases considered by the Supreme Court before 1975 presented it with any opportunity to address certain matters laid to rest in *Columbus* and *Dayton II*, specifically with respect to the legal import of evidence of a school board's remote, intentionally segregative acts offered by plaintiffs to satisfy their initial burden of proof. The Court will demonstrate that, by combining and extending the application of certain pre-1975 principles to previously unsettled questions, *Columbus* and *Dayton II* supplemented or added to the body of school desegregation law existing in 1975. In short, the Court will set forth the reasons underlying its conclusion that *Columbus* and *Dayton II* have established the propriety and necessity of considering certain pre-July 26, 1965 issues that are or may become relevant in this case, as they now appear, which were neither contemplated nor considered in *Deal*, to which the doctrine of collateral estoppel is inapplicable.

B. Evolutionary Developments: Extension of *Keyes'* Principles to Non-Statutory Dual School Systems, Created and/or Maintained by Remote Intentionally Segregative School Board Acts

*Columbus* and *Dayton II* are the first two Supreme Court school desegregation cases involving school systems that were not statutorily dual at the time of *Brown I*, in which the plaintiffs were held by the Court of Appeals to have satisfied their initial burden of proof on the basis of evidence of *remote, as well as contemporary*, school board practices. They are the first two cases in which the Court of Appeals found that, notwithstanding the absence of a state provision requiring or permitting racial separation, the school authorities were operating dual school systems in 1954. In *Columbus*, the Sixth Circuit sustained the District Court's finding that, " '[w]hile the Columbus school system's dual black-white character was not mandated by state law as of 1954, the record certainly shows intentional segregation by the Columbus School Board.' " *Columbus, supra*, 443 U.S. at 456, 99 S.Ct. at 2946, *quoting*, 583 F.2d at 798. Similarly, in *Dayton II*, "[t]he Court of Appeals expressly held that, 'at the time of *Brown I*, defendants were intentionally operating a dual school system ....' " *Dayton II, supra*, 443 U.S. at 534, 99 S.Ct. at 2977, *quoting*, 583 F.2d at 347. *Columbus* and *Dayton II* are also the first two cases in which the Court of Appeals concluded that proof of current segregated schooling, *coupled with proof that a non-statutory duality had been maintained as of 1954*, establishes a prima facie case of current, systemwide de jure segregation which, if not rebutted by the school authorities, warrants a systemwide desegregation order. *See generally, Columbus*, 583 F.2d at 793, 813; *Dayton II*, 583 F.2d at 252.

On review in the Supreme Court, the school boards in both cases vehemently challenged the correctness of the Sixth Circuit's findings and conclusions, predicated on plaintiffs' evidence concerning remote school board practices. It is the Supreme Court's responses to the boards' contentions to which this Court now directs its attention.

When the Columbus school board contended that the finding of a dual school system as of 1954 was not warranted "since segregated schooling was not commanded by state law and since not all schools [at that time] were wholly black or wholly white ...," 443 U.S. at 456, 99 S.Ct. at 2946, it raised a question, the precise contours of which had not previously been considered by the Supreme Court. However, without even acknowledging that it had not previously considered the matter, the Court gave relatively short shrift to the board's contention. In fact, the Court's reasoning is relegated to a footnote. *See, id.* at 457 n.5, 99 S.Ct. at 2946 n.5. Therein, the Court completely dispelled any notion that the

absence of a state segregation provision at the time of *Brown I* should be considered a barrier to finding a fourteenth amendment violation. On the contrary, the Court explained that "the Equal Protection Clause was aimed at all official actions not just those of state legislatures." *Id.* By way of illustration, the Court recalled several of its past decisions in which equal protection violations had been established without reference to a statutory provision. *Id.; e.g., Ex parte Virginia,* 100 (10 Otto) U.S. 339, 25 L.Ed. 339 (1880); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); and *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

Additionally, the Court observed that its "decision in *Keyes* . . . plainly demonstrates in the educational context that there is no magical difference between segregated schools mandated by statute and those that result from local segregative acts and policies." *Id.* The Court also pointed out that although "[t]he presence of a statute or ordinance commanding separation of the races would ease the plaintiff's [sic] problems of proof, . . . here the District Court found that the local officials, by their conduct and policies, had maintained a dual school system in violation of the Fourteenth Amendment." *Id.* The Court, therefore, declared "[w]e fail to see why there should be a lesser constitutional duty to eliminate that system than there would be had the system been ordained by law." *Id.*

In the text of the opinion, the Court emphasized that "the District Court found the 'Columbus Public Schools were *officially* segregated· by race in 1954 . . . .'" *Id.* at 457, 99 S.Ct. at 2946 (emphasis added by the Court) (citation omitted). The Supreme Court further stated, "[I]n any event, there is no reason to question the finding that the Board maintained 'an enclave of separate, black schools . . . .'" *Id.* at 457–58, 99 S.Ct. at 2946–47 (citation omitted).

Neither here nor at any other point in the *Columbus* opinion did the Supreme Court further elaborate its reasons for blurring the distinction between statutorily created dual systems and those created by a school board's remote, intentionally segregative practices. Rather, it simply ended this portion of the discussion by reiterating and applying one of the principles developed in *Keyes,* 413 U.S. at 203, 93 S.Ct. at 2695:

> Proof of purposeful and effective maintenance of a body of separate black schools in a substantial part of the system itself is prima facie proof of a dual system and supports a finding to this effect absent sufficient contrary proof by the Board, which was not forthcoming in this case.

443 U.S. at 458, 99 S.Ct. at 2946 (citation and footnote omitted).

Moreover, the Court made no effort to elaborate further its reasoning anywhere in *Dayton II.* In sustaining the finding of a dual system in Dayton, 443 U.S. at 534, 99 S.Ct. at 2977, the Court stated, "On the record before us, we perceive no basis for petitioners' challenge to this holding . . . ." *Id.* (footnote omitted). After summarizing the factual indicia of a dual system in 1954, the Court stated:

> These facts, the Court of Appeals held, made clear that the Board was purposefully operating segregated schools in a substantial part of the district, which warranted an inference and a finding that segregation in other parts of the system was also purposeful absent evidence sufficient to support a finding that the segregative actions "were not taken in effectuation of a policy to create or maintain segregation" or were not among the "factors . . . causing the existing condition of segregation in these schools." *Keyes* . . . 413 U.S. 189, 214 [93 S.Ct. 2686, 2700, 37 L.Ed.2d 548] (1973); *see id.,* at 203 [93 S.Ct. at 2695]; *Columbus* . . . *ante,* at 467–68 [99 S.Ct. at 2951–52].

443 U.S. at 535, 99 S.Ct. at 2977. The Court also remarked that the "District Court *had* . . . *ignored* the legal significance of the intentional maintenance of a substantial number of black schools in the system at the time of *Brown I.*" *Id.* at 535–36, 99 S.Ct. at 2977–78 (emphasis added).

This last comment is somewhat curious in that the Supreme Court did not acknowledge that it had only just expressly articulated the position that "the intentional maintenance of a substantial number of black schools in the system at the time of *Brown I*," *id.*, in the absence of a state segregation statute, was "legally significant." *See, e.g., Columbus, supra*, 443 U.S. at 457 n.5, 99 S.Ct. at 2946 n.5. The fact that the Court gave no indication whatsoever that the matter had ever been disputed tends to indicate that the Court, itself, was of the opinion that it was not breaking any particularly new ground or breaching any new frontiers in the general law of school desegregation.

With this in mind, this Court would be hard-pressed to say that the Supreme Court perceived its affirmances of the Sixth Circuit's findings of non-statutory dual school systems in Columbus and Dayton, as of 1954, to be revolutionary advancements in the law of school desegregation, in the sense of overruling or radically departing from any of its earlier decisions. As indicated, most of the Court's reasoning for upholding these determinations appears in a footnote, which is "matter of fact" in tone. On the other hand, the Court's reasoning on this matter of first impression, did eliminate any legal justification for distinguishing *Columbus* and *Dayton II* from *Keyes* on factual grounds, and can, on one level, therefore, be viewed as a supplementation to, or an evolutionary development in the law of school desegregation.

It will be recalled that the prima facie showing of current, systemwide de jure segregation in *Keyes*, was predicated on the finding of contemporary de jure segregation in Park Hill, specifically during the ten year period prior to the lawsuit. In other words, petitioners proved that the board's *contemporary*, intentionally segregative policies and practices had caused segregated schooling in a substantial portion of the school district. Thus, strictly speaking, the principles developed in *Keyes*, regarding the ingredients of the prima facie case, burden shifting, and the means by which a school board could and could not meet its burden, were only directly applicable in a situation where plaintiffs showed, as a threshold matter, that current segregation in at least some portion of the school system had been caused by the school board's *contemporary*, intentionally segregative acts.

This, of course, was *not* the situation presented in *Columbus* and *Dayton II* where, as a threshold matter, plaintiffs had shown that, through the use of *remote* (*i.e.*, not contemporary), intentionally segregative devices, the school authorities had created a dual school system which existed at the time of *Brown I*. However, by placing non-statutory dualities, caused by *remote*, intentionally segregative acts, on the same constitutional level with those created or maintained by statute in 1954, or by *contemporary*, intentionally segregative acts, the Court removed the only obstacle that could logically be raised to bar an extension of the *Keyes'* principles to the factual underpinnings of *Columbus* and *Dayton II*. The Supreme Court's failure to specifically note that it was applying *Keyes* by way of extension to these fact situations which were not squarely on point, simply indicates that the Court did not believe that the extension was particularly strained, but rather, that it was entirely logical as the next step in the evolutionary process.

The Supreme Court's explicit determination that *Keyes* had not been misused by the Sixth Circuit in either *Columbus* or *Dayton II, see, id.* at 467–68, 99 S.Ct. at 2951–52; *id.* at 541, 99 S.Ct. at 2981, is consistent with the position that the principles from *Keyes* were applied by way of extension, and that making the extension was logically and legally sound. There is certainly no inherent misuse when a court compares a pending case to one previously decided, and determines that, despite certain factual differences, the cases are sufficiently analogous to warrant an extension of the principles from the decided case to the facts of the pending one. Once the Supreme Court determined in *Columbus* that the absence of a state segregation provision did not bar a finding of a dual school system in 1954, any more than it had barred

a finding of a dual system created by contemporary school board policies and practices, the facts of *Columbus* and *Dayton II* fit easily into a *Keyes'* analysis.

Thus, the Supreme Court found no misuse of the Sixth Circuit's application of that portion of *Keyes* which spelled out the requisite elements of plaintiffs' initial burden of proof, that is, "where no statutory dual system ever existed, plaintiffs must prove not only that segregated schooling exists but that it was brought about or maintained by intentional state action." 413 U.S. at 198, 93 S.Ct. at 2692. Obviously, the existence of statutorily-compelled segregation in Ohio until 1888, *see Columbus*, 443 U.S. at 455 & n.4, 99 S.Ct. at 2946, created a factual disparity between *Columbus* and *Dayton II*, and *Keyes*, where the school system had never been segregated pursuant to state law. However, once the Supreme Court refused to recognize a lesser constitutional duty to eliminate an unliquidated, non-statutory dual school system, created by a school board's *remote*, intentionally segregative acts and maintained at the time of *Brown I*, than for one created and/or maintained by the school board's *contemporary*, intentionally segregative acts, this factual difference lost all semblance of legal significance. As a result, there was no reason not to conclude that plaintiffs could satisfy their initial burden of proof, as set forth in *Keyes*, by proving either remote or contemporary intentional segregation by the school board, or a combination thereof. Under this standard, plaintiffs in both *Columbus* and *Dayton II* were held to have met their burdens by proving that, through the use of remote intentionally segregative devices, both boards were operating racially dual school systems at the time of *Brown I*. *See, Columbus, id.* at 453, 456, 464, 99 S.Ct. at 2944, 2946, 2949; *Dayton II, id.,* 443 U.S. at 534, 535, 99 S.Ct. at 2981.

Similarly, once the Supreme Court eliminated any legal distinction between statutory and non-statutory dualities existing at the time of *Brown I*, it could not be said that the Sixth Circuit had misused *Keyes* in finding that the Columbus and Dayton school authorities had, by actions and omissions after 1954, failed to meet their affirmative constitutional duties to dismantle the non-statutory dualities existing in 1954. *See, Columbus,* 443 U.S. at 467, 99 S.Ct. at 2951; *Dayton II, id.,* 443 U.S. at 538, 541–42, 99 S.Ct. at 2979, 2981. *Keyes* had merely reiterated the well-settled principle that, once a dual system has been established, the school board is under a continuing affirmative duty to eliminate the effects of same. *See, Keyes, supra,* 413 U.S. at 203, 213, 93 S.Ct. at 2695, 2699.

Nor could it be said that the Sixth Circuit had misused *Keyes* in finding that the Columbus and Dayton school boards had failed to meet their burden to counter the evidence that their remote intentionally segregative acts continued to have current, systemwide impact. *See, Columbus,* 443 U.S. 464–65, 466 n.15–16, 468, 99 S.Ct. at 2949–50, 2951 n.15–16; *Dayton II, id.* at 537, 541, 99 S.Ct. at 2979, 2981. As with the other principles from *Keyes*, the principle that a school board's remote, intentionally segregative acts could have a current effect in a school system, *Keyes,* 413 U.S. 210–11, 213, 93 S.Ct. at 2698–99, 2700, was also applied to the facts of *Columbus* and *Dayton II* by way of extension. In *Keyes*, the Supreme Court's discussion of remote acts arose only in the context of how the school board could and could not rebut the presumption of segregative intent in the core city schools, predicated on the board's contemporary acts of discrimination in the Park Hill schools. The board's remote acts played no part in creating the presumption or prima facie case of current, systemwide de jure segregation.

In contrast, the prima facie showings of current, systemwide de jure segregation in both *Columbus* and *Dayton II* were not created solely on the basis of contemporary school board practices; rather, the presumption was predicated, in large part, on findings of non-statutory dual school systems in 1954, which had been created and/or maintained by remote, intentionally segregative acts. Therefore, under a strict *Keyes'* analysis, the remoteness principles would not have been directly applicable in

*Columbus* and *Dayton II.* However, when the Supreme Court refused to recognize a distinction between contemporary and remote, intentionally segregative acts, for the purpose of establishing a prima facie case of current, systemwide de jure segregation, *see, generally, Columbus,* 443 U.S. 457 n.5, 99 S.Ct. at 2946 n.5, the way was paved for an extension of the guidelines developed in *Keyes,* regarding the school board's burden of showing that its remote practices did not, in any way, cause or contribute to the segregation existing in the school system when the lawsuits were commenced. *See, Keyes, supra,* 413 U.S. at 211, 93 S.Ct. at 2698.

There can be no question that the Supreme Court consistently relied upon *Keyes* principles to test the correctness of the Sixth Circuit's legal conclusions in both *Columbus* and *Dayton II.* Because of this heavy reliance on the earlier decision, this Court would place itself in a precarious position if it were to conclude that these two 1979 decisions heralded precedent-shattering or revolutionary advancements in the general law of school desegregation. If the Supreme Court had intended them to be interpreted in such a manner, this Court must assume that it would have so stated. Yet, no such pronouncement or intimation thereof appeared in either opinion. Rather, the Court gave a rather succinct and low-key explanation in *Columbus* about why it would not recognize a lesser constitutional standard for nonstatutory dual systems, created and maintained by remote, intentionally segregative school board acts than for those created and maintained by contemporary, intentionally segregative school board acts or pursuant to an explicit statutory mandate. *Columbus,* 443 U.S. at 457 n.5, 99 S.Ct. at 2946 n.5. On the basis of that stated opinion, the Supreme Court subjected the Sixth Circuit's judgments in both *Columbus* and *Dayton II* to a rigorous, but routine *Keyes* analysis, and concluded that the Sixth Circuit's judgments were free from reversible error.

The extension of the *Keyes'* principles to the facts of *Columbus* and *Dayton II,* flowing logically from the Court's refusal to recognize a lesser constitutional standard

for nonstatutory dualities existing in 1954, than it had for those of statutory origin, or those created and maintained by contemporary, local state action, was, obviously, not a radical departure from earlier Supreme Court precedent. It is also fairly obvious from the dearth of discussion on this aspect of each case that the Court, for whatever reason, did not choose to focus attention on this point. However, the facts of these cases did raise certain questions which the Supreme Court had not previously had an occasion or opportunity to consider. The Court's analytical approach to these questions, and the discussion arising therefrom, undoubtedly, added to the body of school desegregation law. Therefore, at the very least, these cases do mark evolutionary developments in school desegregation law, occasioned by the Court's continuing role to clarify and refine the law in response to the precise questions raised by particular fact situations, and where necessary, to supplement the pre-existing body of law, by resolving previously unpresented, or unsettled questions.

### C. Reconsideration of *Deal* in Light of *Columbus* and *Dayton II*: Conflict in Legal Principles

Having identified what this Court perceives to be the evolutionary developments in the law of school desegregation brought about by *Columbus* and *Dayton II*, the Court now considers *Deal* in light of these evolutionary developments. The Court begins with a re-examination of *Deal* itself, undertaken for the purpose of isolating the Sixth Circuit's position on the legal import of the repeal of Ohio's compulsory segregation statutes in the late 19th-century, and the corresponding legal import accorded to programs and practices discontinued by the Cincinnati school board before the lawsuit was filed.

### 1. Re-examination of *Deal*: Legal Import of Historical Facts

In *Deal I,* 369 F.2d 55, 65 (1966), the Sixth Circuit directed the trial court on

remand to make specific findings of fact on "issues of claimed discrimination in specific schools and programs and claimed harm to Negro students allegedly caused by racially imbalanced schools . . . ." In *Deal II*, 419 F.2d at 1398–1401, Judge Peck complied with this directive by making eighteen (18) "Subsidiary Findings of Fact." *See also, id.* at 1390.

The first of these findings capsulized the racial history of the Cincinnati school system from 1849 through 1955:

> 1. From 1849 to 1887, separate educational facilities for Negro and white children were required by law. Thereafter, *the Cincinnati Board of Education . . . established nondistricted schools for Negro children* attended by them on a voluntary basis. No such schools have existed in the Cincinnati school system since 1955 when the last such school was districted. *Except for such voluntary attendance in such districted schools*, since 1887 Negroes have attended the same neighborhood schools on the same basis as white children.

*Id.* at 1398 (emphasis added). Only one other finding refers to the school board's actions in the early 1950's. That finding, # 8, concerns the opening of Ach Junior High School in 1950, and the attendance zone changes resulting therefrom. The Court found that the changes "resulted from routine administrative decisions rather than any racial consideration." *Id.* at 1399.

The remaining findings concern schools and programs in the system from approximately 1956 through 1965. *E.g.,* Finding # 4 (1964–65); Finding # 6 (1959–60)[6]; Findings # 7, 14 (1956–57); Findings # 9, 11 (1962)[7]; Finding # 12 (1964); and Finding # 13 (1963–64). Based on the evidence presented regarding these schools and programs for the years under consideration, Judge Peck found that the actions taken by the school board, usually in the persona of

the Superintendent, were "reasonable exercise[s] of discretion," Findings # 10–14, *id.* at 1399–1400; were taken for fiscal, emergency, administrative or topographical reasons, Findings # 2, 6, 7, 11–14, *id.* at 1398–1400; but were not taken for the purpose of intentionally separating children on a racial basis, Findings # 2, 6, 8, 9–15, *id.* at 1398–1401.

The Court made specific findings that the school board had not gerrymandered its attendance zones during the years under consideration, Findings # 5, 6, 12, *id.* at 1399–1400. The Court further found that the board had attempted to avoid drawing attendance boundary lines that would cause predominantly black schools, Finding # 2, *id.* at 1398; and had averted efforts to assign or transfer students for racially based reasons, Finding # 15, *id.* at 1401. The Court also found that some of the board's actions had brought about a better racial mix, either temporarily or on a more permanent basis. Findings # 12–13, *id.* at 1400.

On the basis of these findings, the trial court concluded "that neither gerrymandering nor any other alleged discriminatory practice on the part of the Board brought about such racial imbalance as existed . . . ." *Id.* at 1398. In considering whether the board had caused the racial imbalance existing at the time of trial, the District Court made no ruling on the "voluntary schools," described in Finding # 1, evidently attributing little or no legal significance to these schools, which had existed until the last one was districted in 1955.

When the case came before the Sixth Circuit for the second time, *Deal II*, 419 F.2d 1387, 1392 (1969), the Court made the following comment about Judge Peck's findings of fact:

> The District Court adopted eighteen findings of fact dealing with specific schools and programs which appellants complained were formulated to promote or

---

**6.** Joint Exhibit # 54 indicates that Eastern Hill Junior High opened at the beginning of the 1959–60 school year.

**7.** Joint Exhibit # 251 is a copy of the report, "Survey of Student Plant Needs, Cincinnati Public Schools," dated 1962.

perpetuate segregation in the public schools of Cincinnati. Contrary to appellants' contentions, the Court found that the schools and programs were not formulated for any such purpose . . . .

In addition to adopting all of the District Court's factual findings, the Sixth Circuit also found, "There is no evidence . . . that the Board assigned teachers or other staff members on the basis of race. The evidence demonstrates the contrary, namely, that the Board was actively *attempting to integrate* its staff at all levels, and that to do so it had to consider the race of the person to be assigned." *Id.* at 1394 (emphasis added).

In the course of its opinion, the Sixth Circuit paused to emphasize the fact that statutorily-mandated segregation had long since ceased to exist in the Cincinnati schools:

It was more than eighty-two years ago that the Legislature of Ohio abolished segregation in the public schools. 84 Ohio Laws 34, enacted February 22, 1887. The Supreme Court of Ohio upheld and enforced that law in the following year. *Board of Educ. v. State*, 45 Ohio St. 555, 16 N.E. 373 (1888). After enactment of this statute, the Cincinnati Board of Education promptly discontinued *compulsory* segregation in its school system, and ever since that time *Negro children have had the opportunity to attend the neighborhood schools* in Cincinnati on the same basis as white children living in the same locality.

*Id.* at 1391 (emphasis added).

Near the end of the opinion, the Court commented that "[t]he amended complaint . . . in the form commonly used in actions for desegregation of dual school systems," was "totally inappropriate here, where *desegregation took place eighty-two years ago.*" *Id.* at 1395 (emphasis added). In the following paragraph of the opinion, the Court stated its position regarding the voluntary schools, which had been the subject of the trial court's first factual finding, and other, discontinued board actions:

*It is not necessary for us to rule on the so-called "Voluntary Schools"* which had been established at the request of Negroes but which no longer exist, *or on other programs and practices which were discontinued prior to the filing of this lawsuit.*

*Id.* (emphasis added). Immediately thereafter, the Sixth Circuit sustained all of Judge Peck's findings as "not clearly erroneous," and determined that his "conclusions of law are correct."

Thus, any lingering doubts that might have been raised about the propriety of Judge Peck's silence on the legal significance of the voluntary schools was laid to rest by the Sixth Circuit, which made its position absolutely unambiguous. First, it concluded that desegregation had been accomplished in Cincinnati when the compulsory segregation statute was repealed in 1887. Second, by declining to rule, the Court made it quite clear that it did not consider the formerly maintained voluntary schools or any other discontinued programs or practices of the school board germane to the question whether the school board had intentionally caused the racial imbalance existing in the system in 1965. Having thus limited the scope of the inquiry to schools, programs and practices still in existence when the suit was filed, having found no factual indicia of intentional segregation in the board's existing programs and practices, and having been apprised of no legal authority that would command a contrary conclusion, *see, id.* at 1390, the Court affirmed the trial court's ultimate conclusion that the existing racial imbalance in the Cincinnati school system, as of July 26, 1965, had not been caused by or was not legally attributable to the school board.

The preceding examination of *Deal* reveals that the Sixth Circuit's position on the legal import of the historical facts presented therein is comprised of three related components. First, desegregation occurred in the Cincinnati school system by virtue of the repeal of Ohio's compulsory segregation statute in 1887, as upheld and enforced by

the Ohio Supreme Court in 1888. Second, the board's establishment and continued maintenance of one or more schools to be attended by black children on a voluntary or racial basis until 1955, was of *no* legal import to the question of whether the racial imbalance existing in the Cincinnati schools at the time the suit was commenced had been caused by or was legally attributable to intentionally segregative actions and policies of the school board. Third, *any* board practices and programs abandoned before the suit was filed were of *no* legal import to the question presented in *Deal*.

2. Sixth Circuit's Position on the Legal Import of Historical Facts in *Deal* Unaffected by Pre-1975 Supreme Court School Desegregation Cases

This Court has scoured the pre-1975 Supreme Court school desegregation decisions, *e.g., Green, Raney, Monroe, Swann* and *Keyes*, to determine whether the soundness of the Sixth Circuit's position on the legal import of the historical facts in *Deal* had been questioned, or its viability in any way diminished, by the Supreme Court *before* the Sixth Circuit rendered its 1975 *Bronson* decision. The search reveals that none of these cases presented questions regarding the legal import of historical facts in relation to plaintiffs' initial burden of proof, and none of the questions presented to, and resolved by, the Supreme Court in these cases led to the development of an analytical approach or methodology with which the Sixth Circuit's position could not be reconciled.

Questions concerning whether a dual school system existed as of 1954 or the origins thereof were not presented or at issue in *Green*, its companion cases, or in *Swann*, because the school systems involved in those cases had been racially dual at the time of *Brown I* pursuant to a state segregation provision. As a result, in those cases, there was no initial liability question to resolve. Rather, the Court was presented with questions concerning the effectiveness of the boards' remedial efforts in dismantling and removing all remnants of the former statutory dualities, and on the federal judiciary's role in insuring that the mandate to desegregate, laid down in *Brown II*, was satisfied.

*Keyes* gives the surface appearance of having presented questions bearing on the Sixth Circuit's position in *Deal II*. Similar to the situation in Cincinnati, the segregated schooling existing in Denver could not be traced to a statutory provision in 1954. The Court adopted the position that "in the case of a school system like Denver's, where *no statutory dual system had ever existed*, plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." *Keyes, supra*, 413 U.S. at 198, 93 S.Ct. at 2692 (emphasis added). Further, notwithstanding the absence of a statutory duality as of 1954, the Court held, *inter alia*, that "proof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system." *Id.* at 203, 93 S.Ct. at 2695. Additionally, the *Keyes* Court did broach the subject of remote intentionally segregative actions, and did state that such actions, despite the passage of time, could have current effects in a school system. *Id.* at 210–11, 93 S.Ct. at 2698.

As general legal propositions, and without regard to the factual setting or the legal issues from which they were developed, these principles from *Keyes* may, in retrospect, seem to have impacted on the position taken by the Sixth Circuit in *Deal II*, regarding the legal import of the historical facts. However, because the Supreme Court, in *Keyes*, was only concerned with the legal relevance of a finding of *contemporary* intentional or de jure segregation to the claim of current, systemwide de jure segregation, and not with a finding that was, in any part, predicated on evidence preceding the litigation by more than ten years, the Supreme Court was simply not afforded an opportunity in *Keyes* to make any ruling which would have directly undermined or raised any questions about the Sixth Circuit's position in *Deal II*.

At the outset of the *Keyes* opinion, the Denver school system was described as one which "has *never* been operated under a constitutional or statutory provision that mandated or permitted racial segregation in public education." *Id.* at 191, 93 S.Ct. at 2688 (emphasis added). The fact that *"no statutory dual system ever existed,"* id. at 198 (emphasis added), was reiterated several times in the opinion. *E.g., id.* at 200, 201, 203, 93 S.Ct. at 2693, 2694, 2695. Having not been confronted with a school system, like Cincinnati's, which had, at a point in history, been segregated by a statute that was later repealed, the *Keyes* Court was not asked to, and did not rule on whether the repeal of such a statute was legally or constitutionally equivalent to desegregation. Thus, the Sixth Circuit's view that the repeal of Ohio's segregation statute had resulted in the desegregation of the Cincinnati school system survived *Keyes* unscathed.

The remaining components of the Sixth Circuit's position on the voluntary schools and other, discontinued programs and practices also escaped consideration in *Keyes.* The plaintiffs therein were found to have made a prima facie showing of current, systemwide de jure segregation on the basis of the finding of contemporary de jure segregation in Park Hill. This finding, regarding Park Hill, was based entirely upon actions of the school board "during the last ten years." 303 F.Supp. at 285. Having specifically declined to review the factual findings made by the lower *Keyes* courts, the Supreme Court had no reason to enlarge the scope of the initial inquiry to encompass evidence of any board practices in the Park Hill area prior to 1960, and, therefore, had no occasion to consider whether a broader inquiry would have been appropriate or necessary under other circumstances.

The Court's discussion in *Keyes* about the school board's remote acts are not in conflict with the Sixth Circuit's decision not to rule on the voluntary schools or other discontinued board programs and practices. That discussion arose only in the context of the board's burden to rebut the presumption of segregative intent in the core city

schools, which was predicated on the board's contemporary acts of discrimination in Park Hill. *Keyes* does not address the potential legal significance of discontinued programs and practices in the context of the plaintiffs' initial burden of proof. Because the *Deal* plaintiffs' evidence regarding specific schools and practices between 1956–1965 failed to support a finding of segregative intent, the litigation ended short of the point at which the discussion in *Keyes* would have become applicable. There being no presumption of intent for the school board to rebut, a further inquiry by the Court, reaching back in time to encompass the board's discontinued practices, would not have been warranted under a strict application of *Keyes.* Therefore, there was no principle of law articulated in *Keyes* which indicated that the *Deal* courts had unduly discounted the plaintiffs' evidence concerning the voluntary schools or any other discontinued practice or program, or that this evidence raised any issues relevant to the question whether the board was liable or legally responsible for the racial imbalance existing in the system, as of July 26, 1965.

3. Sixth Circuit's Position on Legal Import of Historical Facts in *Deal* Compared to Supreme Court's Position as Developed in *Columbus* and *Dayton II*

It was not until *Columbus* and *Dayton II* that the Supreme Court was presented with two cases in which the plaintiffs had relied, at least in part, on evidence of the school boards' remote discriminatory practices to meet their initial burden of making a prima facie showing of current, systemwide de jure segregation. The school systems involved were historically similar to Cincinnati's in that they, too, had ceased to operate under statutorily-imposed segregation in 1887. However, despite the absence of such a statute, the Court of Appeals found that the school boards had officially operated dual school systems at the time of *Brown I.* The Court of Appeals made a further finding that the current segregation in the sys-

tems could be traced back to the boards' remote, intentionally segregative acts, the effects of which were not only *not* eliminated in the years after *Brown I* and *II*, but were perpetuated and aggravated in the intervening years, up to the time the complaints had been filed.

With these two cases, the Court had its first opportunity to consider and resolve many of the questions that had not arisen in *Keyes* because of the peculiar facts of that case. In resolving the issues posed by the Columbus and Dayton school boards, the Court had its first opportunity to define, with specificity, the legal import of evidence concerning remote, intentionally segregative acts on the part of a school board when introduced to establish a prima facie case of current systemwide de jure segregation. In the process of so doing, the Court ascribed a legal import to remote, intentionally segregative acts that had not been contemplated by the courts in *Deal*, and which, consequently, was not taken into account in assessing the historical evidence introduced by the *Deal* plaintiffs.

At this point, it is necessary to re-examine *Columbus* and *Dayton II*, in some detail, to isolate or identify the propositions that did emerge therefrom regarding remote discriminatory practices of a school board, as such evidence is relevant to the court's initial assessment of plaintiffs' case, and as it is relevant to, and potentially determinative of the legal conclusions to be drawn from evidence adduced about the school board's programs and practices after *Brown I* and *II*, up until the filing of the lawsuit.

a. Re-examination of *Columbus* and *Dayton II*

When the complaints were filed in *Columbus* and *Dayton II*, both school systems were "highly segregated by race." *Columbus, supra*, 443 U.S. at 452, 99 S.Ct. at 2943; *Dayton II, supra, id.*, 443 U.S. at 529, 99 S.Ct. at 2974. "In 1976, over 32% of the 96,000 students in the [Columbus] system were black. About 70% of all students attended schools that were at least 80% black or 80% white. Half of the 172 schools were 90% black or 90% white." *Id.* at 452, 99 S.Ct. at 2943 (citations omitted). In the 1971–72 school year, during which the complaint was filed in *Dayton II*, "43% of the students in the ... system were black, but 51 of the 69 schools ... were virtually all white or all black." *Id.* 443 U.S. at 529, 99 S.Ct. at 2974 (footnote and citation omitted). The conclusion reached by the Court in both cases was that the existing segregation in both systems was traceable back to the school boards' remote, intentionally segregative programs and practices, the effects of which had never been eliminated, and which had either been perpetuated or aggravated by more recent school board policies and practices. *Columbus, id.* 443 U.S. at 461, 99 S.Ct. at 2948; *Dayton II, id.* 443 U.S. at 540–41, 99 S.Ct. at 2980–81.

The first issue presented to the Court in *Columbus* was whether the District Court, as affirmed by the Court of Appeals, erred in holding that the school board was operating a dual school system as of 1954. *Id.* at 456–57, 99 S.Ct. at 2946. The Board argued that this determination was unwarranted "since segregated schooling was not commanded by state law and since not all schools were wholly black or wholly white in 1954 ...." *Id.* at 456, 99 S.Ct. at 2946. However, before addressing this contention, the Court reiterated the facts which gave rise to the determination. At the outset, the Court acknowledged that "at least since 1888 there had been no statutory requirement or authorization to operate segregated schools" *id.* at 455, 99 S.Ct. at 2945 (footnote omitted), yet, the District Court had held:

[I]n 1954, when ... [*Brown I*], was decided, the Columbus Board was not operating a racially neutral, unitary school system, but was conducting "an enclave of separate, black schools on the near east side of Columbus," and that "[t]he then-existing racial separation was the direct result of cognitive acts or omissions of those school board members and administrators who had originally intentionally caused and later perpetuated the racial isolation ... [ellipses in the original]."

*Id.* at 455–56, 99 S.Ct. at 2945–46 (citations omitted). The Court of Appeals, after reviewing the record, "agreed with the District Court in this respect, observing that, '[w]hile the Columbus school system's dual black-white character was not mandated by state law as of 1954, the record certainly shows intentional segregation by the Columbus Board." *Id.* at 456, 99 S.Ct. at 2946.

The Supreme Court provided its own brief summary of the facts underlying the above determinations:

In 1871, pursuant to the requirements of state law, Columbus maintained a complete separation of the races in the public schools. The Ohio Supreme Court ruled in 1888 that state law no longer required or permitted the segregation of schoolchildren. Even prior to that, in 1881, the Columbus Board abolished its separate schools for black and white students, but *by the end of the first decade of this century it had returned to a segregated school policy.* Champion Avenue School was built in 1909 in a predominantly black area and was completely staffed with black teachers. Other black schools were established as the black population grew. The Board gerrymandered attendance zones so that white students who lived near these schools were assigned to or could attend white schools, which often were further from their homes. *By 1943, a total of five schools had almost exclusively black student bodies, and each was assigned an all-black faculty,* often through all-white to all-black transfers that occurred each time the board came to consider a particular school as a black school.

*Id.* at 455–56 n.4, 99 S.Ct. at 2945–46 n.4 (emphasis added) (citations omitted).

Against this factual setting, the Court considered and rejected the board's contention that the finding of a dual school system as of 1954 was unwarranted. Responding to this contention, the Court made clear that the absence of a segregation statute at the time of *Brown I* posed no impediment to finding the existence of a dual system at that time. *Id.* at 457–58, 99 S.Ct. at 2946–

47; *see also, id.* at 457 n.5, 99 S.Ct. at 2946. In further response, the Court stated for the first time that the constitutional duty to desegregate attaches to a school board that officially maintained a dual system in 1954, regardless of whether it did so pursuant to or independent of statutory sanction. *Id.* Moreover, the Court also determined that plaintiffs' proof, that in 1954 the Columbus Board "maintained 'an enclave of separate, black schools on the near east side of Columbus,'" *id.* (citation omitted), "itself is a prima facie proof of a dual system and supports a finding to this effect absent sufficient contrary proof by the Board," which the Court concluded "was not forthcoming in this case." *Id.* at 458, 99 S.Ct. at 2946, relying on *Keyes, supra,* 413 U.S. at 203, 93 S.Ct. at 2695. The application of the above proposition from *Keyes* to the proof concerning the board's conduct as of 1954, left no doubt that remote, intentionally segregative acts of a school board can make out a prima facie showing of current, systemwide de jure segregation, which shifts the burden of proof to the school board to show that its remote acts in no way caused or contributed to the current condition of segregation in the school system. *See also, id.* 443 U.S. at 467–68, 99 S.Ct. at 2951–52.

The Court followed a similar methodology in *Dayton II* and reached similar conclusions. Prefatorily, the Court identified numerous remote board practices which gave rise to the Court of Appeals' determination that "at the time of *Brown I,* defendants were intentionally operating a dual school system in violation of the Equal Protection Clause . . ." *Dayton II, supra,* 443 U.S. at 534, 99 S.Ct. at 2977. In so doing, the Court relied on the trial court's opinion and on the opinion of the Court of Appeals, which had reversed the trial court's legal conclusions as "clearly erroneous." *Id.* Remote intentionally segregative programs and practices of the Dayton Board of Education included: separating black elementary students from white students until at least 1934, *id.* at 532 n.6, 99 S.Ct. at 2976 n.6; the deliberate racial segregation of high school athletics until about 1950, *id.;* and intentional segre-

gative faculty hiring and assignment practices until approximately 1951. *Id.* at 533 n.7, 99 S.Ct. at 2976 n.7. The following facts were also recounted by the Court:

> [I]n the early 1950's, "77.6 percent of all students attended schools in which one race accounted for 90 percent or more of the students and 54.3 percent of the black students were assigned to four schools that were 100 percent black." One of these schools was *Dunbar High School,* which, the District Court found, *had been established as a districtwide black high school* with an all-black faculty and a black principal, and remained so at the time of *Brown I* and up until 1962. The District Court also found that "among" the early and relatively undisputed acts of purposeful segregation was the *establishment of Garfield as a black elementary school.* The Court of Appeals found that *two other elementary schools were,* through a similar process of optional attendance zones and the creation and maintenance of all-black faculties, *intentionally designed and operated as all-black schools in the 1930's, in the 1940's, and at the time of Brown I.* Additionally, the District Court specifically found that in 1950 the faculty at 100% black schools was 100% black and the faculty at all other schools was 100% white.

*Id.* at 535, 99 S.Ct. at 2978 (emphasis added) (citations omitted). On the basis of this record, teeming with evidence of the board's remote, intentionally segregative actions, the Court stated that it "perceive[d] no basis for petitioners' challenge" to the Court of Appeals' determination that a dual system existed in Dayton in 1954. *Id.* at 534, 99 S.Ct. at 2977.

The Dayton school board contended that "even if a dual system did exist a quarter of a century ago, the Court of Appeals erred in finding any widespread violations of constitutional duty since that time." *Id.* at 537, 99 S.Ct. at 2979. Relying specifically on its earlier declarations in *Columbus,* the Court found this contention to be wholly without merit:

> Given intentionally segregated schools in 1954, however, the Court of Appeals was

quite right in holding that the Board was thereafter under a continuing duty to eradicate the effects of that system, *Columbus, ante,* [443 U.S.] at 458 [99 S.Ct. at 2946], and that the systemwide nature of the violation furnished prima facie proof that current segregation in the Dayton schools was caused at least in part by prior intentionally segregative official acts. Thus, *judgment for the plaintiffs was authorized and required* absent sufficient countervailing evidence by the defendant and school officials. *Keyes, supra,* [413 U.S.] at 211 [93 S.Ct. at 2698]; *Swann, supra,* [402 U.S.] at 26 [91 S.Ct. at 1281].

443 U.S. at 537, 99 S.Ct. at 2979 (emphasis added). Noting that "[a]t the time of trial, Dunbar High School and the three black elementary schools, or the schools that succeeded them, remained black schools; and most of the schools in Dayton were virtually one-race schools, as were 80% of the classrooms," *id.,* and after referring to other statistical data regarding the racial composition of the Dayton schools from 1950 to the 1971–72 school year, the Court reached the following conclusion:

> At the very least, defendants had failed to come forward with evidence to deny "that the current racial composition of the school population reflects the systemwide impact" of the Board's prior discriminatory conduct.

*Id.* at 537–38, 99 S.Ct. at 2979–80 (citation omitted).

Near the end of the opinion, in response to contentions that the Court of Appeals had misused previous Supreme Court authority, including *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (*Dayton I*) and *Keyes,* the Court reiterated its earlier conclusion:

> The Court of Appeals was also quite justified in utilizing the Board's total failure to fulfill its affirmative duty—and indeed its conduct resulting in increased segregation—to trace the current, systemwide segregation back to the purposefully dual

system of the 1950's and to the subsequent acts of intentional discrimination. See *supra*, [443 U.S.] at 537 [99 S.Ct. at 2979]; *Columbus, ante*, [443 U.S.] at 464–65 [99 S.Ct. at 2949–50]; *Keyes, supra*, [413 U.S.] at 211 [93 S.Ct. at 2699]; *Swann, supra*, [402 U.S.] at 21, 26–27 [91 S.Ct. at 1278, 1281–82].

443 U.S. at 541–42, 99 S.Ct. at 2981.

b. Supreme Court Position on Evidence of School Board's Remote Discriminatory Practices Offered to Meet Plaintiffs' Initial Burden of Proof

▮▮▮ From the foregoing, this Court has gleaned the following legal propositions, which reflect the Supreme Court's position that evidence of a school board's remote, intentionally segregative programs and practices is highly relevant in determining whether a school board is liable or legally responsible for the current racial imbalance in a school system, and which, must, hereafter, be applied by a trial court when such evidence is introduced by plaintiffs in a school desegregation case:

1. The repeal of a segregation statute is not necessarily the constitutional equivalent to desegregation; therefore, evidence of a school board's practices after such repeal *must* be considered in assessing whether the current segregation in the school system has been caused by or is legally attributable to the school board.

2. Absent a segregation statute at the time of *Brown I*, evidence presented by plaintiffs that a school board, by its remote, intentionally segregative programs and practices, created and/or maintained a racially dual system extant in 1954, requires the finding of an officially dual system, which constitutes a violation of the equal protection clause.

3. A school board operating an official, albeit non-statutory dual system as of 1954, is thereafter charged with the continuing, affirmative constitutional duty to desegregate and eliminate the effects of that dual system, and its failure to fulfill this duty, either by further intentionally segregative actions, or omissions to act in the face of that duty after 1954, constitutes a violation of the equal protection clause, and requires a systemwide desegregation order.

4. Where a court determines in its initial inquiry that plaintiffs have shown current segregated schooling in a substantial part of the system, and have also proven that a board, by its remote programs and practices, maintained intentionally segregated schools in a substantial part of the system as of 1954, the court is required to find that plaintiffs have met their burden of making a prima facie showing of current, systemwide de jure segregation. Once this showing has been made, the burden shifts to the defendant school board to prove that its remote acts in no way caused or contributed to the current condition of segregation, and failure by the school board to present sufficient countervailing evidence requires a systemwide desegregation order.

This Court recognizes that none of these propositions is totally unprecedented and that each, in turn, can be traced to one or more pre-1975 Supreme Court decisions. The first two propositions flow from several Supreme Court cases, wherein the Court found violations of the equal protection clause arising out of non-legislative, official state action. *See, Columbus, id.*, at 457 n.5, 99 S.Ct. at 2946 n.5 (and citations therein). These propositions, specifically discussed in *Columbus, id.*, and implicitly and explicitly applied in *Dayton II*, were judicial extensions of earlier Supreme Court decisions to the precise context of school desegregation litigation, as presented under the facts of *Columbus* and *Dayton II*. The third proposition reflects well-settled principles of school desegregation law, as first enunciated in *Brown II*, and as thereafter refined and developed in such later decisions as *Green* and *Swann*. Its applicability, with all of its constituent elements to the facts of *Columbus* and *Dayton II* was precipitat-

ed when the Court expressly refused to impute a "lesser constitutional duty to eliminate a [nonstatutory dual system in 1954] than there would have been had the system been ordained by law." *Columbus, id.* at 457 n.5, 99 S.Ct. at 2946 n.5. The fourth proposition, with its sequential elements is, of course, derived from *Keyes* which, as this Court has stressed, was not directly applicable because the finding of contemporary de jure segregation in Park Hill obviated a consideration of the legal import of remote, intentionally segregative programs and practices of a school board as they relate to the plaintiffs' initial burden of proof. The *Keyes* principles also became applicable to the facts of *Columbus* and *Dayton II* when the Court refused to recognize a distinction between intentionally segregated schooling in a substantial portion of a system, caused by remote discriminatory practices and the same condition being caused by contemporary discriminatory practices.

This Court realizes that, after *Keyes*, any trial or appellate court, given similar facts, could have relied on the same pre-1975 authorities, and could have been led to the same results reached by the Supreme Court in *Columbus* and *Dayton II*. Since the authorities from which the four enumerated propositions originate have all been available since *Keyes*, the potential has existed, at least since 1973, for any federal court to make the same extensions from the existing authorities, and to reach similar conclusions under analogous facts.

However, another possibility was equally viable prior to these two cases. Before 1979, a trial or appellate court could have concluded, based on its own interpretation of the then-existing authorities, that remote, intentionally segregative acts were of no legal import with respect to plaintiffs' initial burden of proof and that they became relevant, if at all, only after plaintiffs had made a prima facie showing of current, systemwide de jure segregation by proving that the segregation in a substantial portion of the system was the result of contemporary or post-*Brown* intentionally segregative programs and practices of the school board. A court could, based on its reading of the then-existing Supreme Court school desegregation decisions, have concluded that application of pre-1975 cases or extensions of the principles articulated therein was unjustified and unwarranted.

*Columbus* and *Dayton II* effectively eliminate this second possibility. They are the first two decisions in which the Supreme Court, itself, as final interpreter of the Constitution, made the extensions from the earlier authorities, and for the first time, combined these four propositions in a school desegregation context, where plaintiffs offered evidence of the boards' remote, intentionally segregative programs and practices as part of their initial burden of proof. By embracing these four propositions, and applying them collectively in this precise context, the Supreme Court has added to the pre-1975 body of school desegregation law and has removed certain elements of chance or reasoned discretion from lower federal courts in similar kinds of school desegregation cases. Viewed as interrelated rules of law that *must* now be applied to similar or closely analogous facts, these propositions effectively eliminate the previously viable option of disregarding, as irrelevant or legally unimportant, plaintiffs' evidence of remote programs and practices of local school authorities.

c. Sixth Circuit's Position in *Deal II* Eliminated as a Viable Legal Option Under *Columbus* and *Dayton II*

Under the Supreme Court authority available in 1969, the position taken by the Sixth Circuit in *Deal II* regarding the legal import of historical facts, was soundly reasoned and above reproach. At that time, the only school systems for which court-imposed desegregation had been ordered were those in which racial segregation had been required or permitted by state statutory or constitutional provisions at the time of *Brown I*. The cases provided very little in the way of guidance to a court presented with a school system in which racial segregation had been banned by the state legislature and the state's highest court almost 70 years before it had been outlawed on federal constitutional grounds in 1954.

Further, the position retained all appearances of vitality even after *Keyes* was decided in 1973. Although this case expanded the definition of de jure segregation to non-statutory dualities, maintained by local school authorities, the initial finding of de jure segregation therein was predicated on deliberate discriminatory practices in the years after *Brown I* and *II*, specifically those implemented during the decade or so immediately preceding the filing of the lawsuit. It was only after contemporary discrimination had been established that the Court suggested the propriety of delving into the school board's more remote conduct. *Keyes* did not discuss the propriety of considering a school board's discontinued programs and practices in the context of an initial inquiry into the causes of current segregation.

It is only in the aftermath of *Columbus* and *Dayton II*, where the Supreme Court resolved issues heretofore not specifically addressed by it, that the Sixth Circuit's position in *Deal* has been eliminated as a viable legal option. In the course of supplementing the body of desegregation law that has been steadily evolving since *Brown I*, the Supreme Court has now adopted a position that is, in effect, almost diametrically opposed to the one taken by the Sixth Circuit in *Deal II*. The Supreme Court's position must now be followed in similar cases.

*Deal, Columbus*, and *Dayton II* share a common, historical fact. Intentional racial segregation in public education was prohibited as a matter of state law, by the Ohio legislature in 1887, and by the Ohio Supreme Court in 1888. *See, Columbus, supra*, 443 U.S. at 455 & n.4, 99 S.Ct. at 2945 & n.4; *Deal I, supra*, 369 F.2d 55, 58 & n.3; *Deal II, supra*, 419 F.2d at 1391. However, the legal import imputed to this fact by the Sixth Circuit in *Deal II* is far different than that attributed to it by the Supreme Court in *Columbus* and *Dayton II*.

In *Deal*, the Sixth Circuit found this historical fact to be highly significant. Relying thereon, the Court concluded that "desegregation took place eighty-two years ago." *Id.* at 1395. Consistent with that conclusion, the Court determined that it was "not necessary . . . to rule on the so-called 'Voluntary Schools' . . . which no longer exist, or on other programs and practices which were discontinued prior to the filing of this lawsuit." *Id.* Also consistent with this position, the Court limited the scope of its inquiry to "claimed discrimination [in] specific schools and programs . . .," *id.* at 1389; *see also, Deal I*, 369 F.2d 55, 65, all of which were existing or continuing when the lawsuit was filed. Except for the voluntary schools, about which no ruling was made, all of the schools involved in *Deal* were operating when the suit was filed. *Id.* at 1398–1401; *see also*, Joint Exhibit # 54. With the exception of the attendance zone changes discussed in Finding # 8, the Court did not consider any program or practice implemented or taken before 1956. *Id.* On the basis of this inquiry, the perimeters of which were fixed by the Court, the Sixth Circuit concluded that the school board was not liable or legally responsible for the racial imbalance existing in the system, as of July 26, 1965.

In contrast, Ohio's long-standing prohibition against racial segregation in public schools was accorded very little legal significance in *Columbus* and *Dayton II*. The only reference to this historical fact appears in *Columbus*, where the Court noted in passing that "since 1888 there had been no statutory requirement or authorization to operate segregated schools . . . ." 443 U.S. at 455 & n.4, 99 S.Ct. at 2945 & n.4. However, unlike the Sixth Circuit in *Deal II*, the Supreme Court placed no particular value on this fact. It neither automatically assumed nor inevitably concluded that desegregation had been achieved or maintained in Columbus or Dayton, nor did it decline to rule on plaintiffs' evidence regarding the boards' remote acts in determining whether the boards had caused or contributed to the segregated condition of the respective school systems when the lawsuits were filed in the early 1970's. On the contrary, rather than relying on this historical fact and concentrating only on plaintiffs' evidence regarding existing schools and contemporary programs and practices, the Supreme Court

conducted a preliminary inquiry to determine whether the local school authorities, in the years after 1888, had acted in contravention of state law, by creating and/or maintaining racially segregated schools. Relying on the facts, as shown by plaintiffs' evidence, rather than on the fact that there was no statutory authorization for segregation, the Supreme Court concluded in both *Columbus* and *Dayton II* that the defendant school boards were operating racially dual systems at the time of *Brown I*, the effects of which were still being felt in the systems some thirty years later. *See, id.* at 458, 99 S.Ct. at 2946; *Dayton II, supra, id.* 443 U.S. at 537, 99 S.Ct. at 2979.

Asserting a position reminiscent of the one adopted by the Sixth Circuit in *Deal II*, the Columbus school authorities argued that "since segregated schools were not commanded by state law and since not all schools were wholly black or wholly white, the District Court was not warranted in finding a dual system." *Id.* at 456–57, 99 S.Ct. at 2946. However, in light of the District Court's finding, fully supported by the evidence, that the " 'Columbus Public Schools were *officially* segregated by race in 1954,' " *id.* at 457, 99 S.Ct. at 2946 (citation omitted), the Supreme Court found the board's reasoning unpersuasive. Satisfied that the dual system was "officially," albeit not statutorily maintained, the Court "fail[ed] to see why there should be a lesser constitutional duty to eliminate that system than there would have been had the system been ordained by law." *Id.* at n.5.

Thus, the fact to which the Sixth Circuit accorded paramount importance in *Deal II*, in the nature of an irrebuttable presumption that the school board had complied with the state mandate, and that desegregation had, therefore, been a fait accompli in the Cincinnati school system for some eighty years, was accorded virtually no legal significance by the Supreme Court in *Columbus* and *Dayton II*. Whereas, the *Deal* Court, in effect, accepted this fact as proof positive that the Cincinnati school authorities were operating "a long-established unitary non-racial school system . . . ," 419 F.2d at 1390; thus, obviating the

need to rule on the board's discontinued programs and practices, the Supreme Court merely acknowledged this fact at the beginning of *Columbus*, and made no mention of it at all in *Dayton II*. In both cases, the Court focused its attention on the plaintiffs' evidence regarding the boards' remote programs and practices to determine whether the state's prohibition against racially segregated schooling had been honored or circumvented. In both cases, the Court found the evidence more than sufficient to support a finding of a dual school system at the time of *Brown I*. The only reasonable conclusion which can be drawn from this dichotomy is that under the *now* prevailing Supreme Court authority, the Sixth Circuit's position in *Deal II*, although legally sound when adopted, has ceased to retain the vitality it had enjoyed for over a decade.

III. The Sixth Circuit's 1975 *Bronson* Opinion and the Appropriate Application of Collateral Estoppel in Light of *Columbus* and *Dayton II*

In the preceding discussion, the Court has identified what it believes to be certain evolutionary developments in the law of school desegregation emerging from *Columbus* and *Dayton II*. The Court has also illustrated what it perceives to be an irreconcilable disparity between the Supreme Court's analytical approach in the more recent cases and the one taken by the Sixth Circuit in *Deal*. It now becomes necessary to consider the extent to which the *Deal* judgments should operate to bar the litigation of pre-July 26, 1965 issues which, under *Columbus* and *Dayton II*, are or may become relevant in this case. After examining the applicable principles of res judicata, the Court will briefly recall the reasoning underlying the Sixth Circuit's 1975 *Bronson* opinion. Thereafter, the Court will set forth its conclusions regarding the appropriate application in light of *Columbus* and *Dayton II*.

A. Collateral Estoppel: General Principles and Necessary Inquiries

The related doctrines of res judicata and collateral estoppel serve " 'the interest

of the state ... that there be an end to litigation.'" Polansky, *Collateral Estoppel—Effect of Prior Litigation*, 39 Iowa L.Rev. 217, 219 (1954), *quoting Reed v. Allen*, 286 U.S. 191, 198, 52 S.Ct. 532, 533, 76 L.Ed. 1054 (1932). *See also, Bronson, supra,* 525 F.2d at 349. As recently reiterated by the Supreme Court, the doctrines embody "[a] fundamental precept of common-law adjudication ... that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ....'" *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (ellipses in the original), *quoting, Southern Pacific Railroad Co. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). In *Montana*, the Court explained:

> To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

440 U.S. at 153–54, 99 S.Ct. at 973 (footnote omitted).

"The scope of the estoppel of a judgment depends upon whether the question arises in a subsequent action between the same parties upon the same claim or demand or upon a different claim or demand." *Tait v. Western Maryland Railway Co.*, 289 U.S. 620, 623, 53 S.Ct. 706, 707, 77 L.Ed. 1405 (1933). *See also, Cromwell v. County of Sac*, 94 U.S. 351, 24 L.Ed. 195 (1887); *Southern Pacific Railroad Co. v. United States*, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355 (1897); *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); and *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). "The general rule of *res judicata* applies to repetitious law suits involving the same cause of action." *Commissioner v. Sunnen, supra,* 333 U.S. at 597, 68 S.Ct. at 719. Under the broad rules of res judicata:

> [T]he [first] judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, ... not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

*Cromwell v. County of Sac, supra,* 94 U.S. at 352 (emphasis added). *See, e.g., Southern Pacific Railroad Co. v. United States, supra,* 168 U.S. at 50, 18 S.Ct. at 28; *Tait v. Western Maryland Railway Co., supra,* 289 U.S. at 623, 53 S.Ct. at 707; *Commissioner v. Sunnen, supra,* 333 U.S. at 597, 68 S.Ct. at 719; *Montana v. United States, supra,* 440 U.S. at 153, 99 S.Ct. at 973. *See also, Nolan v. City of Owensboro*, 75 F.2d 375, 377 (6th Cir. 1935); and *Cream Top Creamery v. Dean Milk Co.*, 383 F.2d 358, 361–62 (6th Cir. 1967).

Thus, if the same parties or their privies seek to litigate in a subsequent suit the same cause of action for which judgment was rendered in a prior suit, the judgment of the first litigation is res judicata, that is, it "estops not only ... every ground of recovery or defense actually presented in the [first] action, but also ... every ground which might have been presented ...." *Cromwell v. County of Sac, supra,* 94 U.S. at 353 (emphasis added). *See also, Southern Pacific Railroad Co. v. United States, supra,* 168 U.S. at 48–51, 18 S.Ct. at 27–28; and *Harrington v. Vandalia-Butler Board of Education*, 649 F.2d 434, 437–438 (6th Cir. 1981). Conversely, if the threshold inquiry reveals that the cause of action between the same parties or their privies in the subsequent suit is *different* from the one brought to judgment in the prior suit, the broad doctrine of res judicata, which estops the parties from raising any claim or defense that could have been presented in the first suit, regardless of whether it was, in fact, raised therein, does not apply.

A court's inquiry is not, however, at an end when it determines that the broad doctrine of res judicata is inapplicable because the causes of action are different in

the first and second suit. Rather, the court must thereafter consider whether one or more of the issues raised by the parties in the second suit were actually litigated and determined in a prior suit, thereby creating the potential for applying the more narrow doctrine of collateral estoppel. *See generally, Commission v. Sunnen, supra,* 333 U.S. at 597–98, 68 S.Ct. at 719.

> Where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an *estoppel only as to those matters in issue or points controverted,* upon the determination of which the finding or verdict was rendered.

*Cromwell v. County of Sac, supra,* 94 U.S. at 353 (emphasis added). *See, e.g., Southern Pacific Railroad Co. v. United States, supra,* 168 U.S. at 50, 18 S.Ct. at 28; *Commissioner v. Sunnen, supra,* 333 U.S. at 598, 68 S.Ct. at 719. *See also, Dixie Sand & Gravel Corp. v. Holland,* 255 F.2d 304, 310 (6th Cir. 1958); and *Cream Top Creamery v. Deal Milk Co., supra,* 383 F.2d at 362.

"Under the doctrine of collateral estoppel . . . such a judgment precludes relitigation of *issues actually litigated and determined* in the prior suit, regardless of whether it was based on the same cause of action in the second suit." *Id.* (emphasis added), *quoting, Lawlor v. National Screen Service,* 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955). On the other hand:

> Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, *the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time.*

*Commissioner v. Sunnen, supra,* 333 U.S. at 598, 68 S.Ct. at 719 (emphasis added).

■ Once it is determined that the parties are proceeding in a second suit upon a different claim or demand—upon a different cause of action—than that previously litigated, several further inquiries may be required in order "to determine the appropriate application of collateral estoppel." *Montana v. United States, supra,* 440 U.S.

at 155, 99 S.Ct. at 974. Preliminarily, it is necessary to determine "whether the issues presented [in the second action] are in substance the same as those resolved [in the first action]." *Id.* Stated that with more specificity:

> In all cases ... where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, *the inquiry must always be as to the point or question actually litigated and determined* in the original action, *not what might have been thus litigated and determined.* Only upon such matters is the judgment conclusive in another action.

*Cromwell v. County of Sac, supra,* 94 U.S. at 353 (emphasis added). *See, e.g., Southern Pacific Railroad Co. v. United States, supra,* 168 U.S. at 50, 18 S.Ct. at 28; *Tait v. Western Maryland Railway Co., supra,* 289 U.S. at 625, 53 S.Ct. at 708; *Emich Motors v. General Motors,* 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951); *Montana v. United States, supra,* 440 U.S. at 155, 99 S.Ct. at 974. *See also, Dixie Sand & Gravel v. Holland, supra,* 255 F.2d at 310. *See generally,* Polansky, *Collateral Estoppel— Effect of Prior Litigation,* 39 Iowa L.Rev. 217 (1954); Scott, *Collateral Estoppel by Judgment,* 56 Harv.L.Rev. 1 (1942).

■ If the inquiry discloses that the issues sought to be litigated in the second action were not actually litigated and determined in the prior suit, or are not identical thereto, the doctrine of collateral estoppel is inapplicable. "On principle, a point not in a litigation in one action cannot be received as conclusively settled in any subsequent action upon a different cause, because it *might* have been determined in the first action." *Cromwell v. County of Sac, supra,* 94 U.S. at 356 (emphasis added). Obviously, the converse is also true, that is, to the extent that there is determined to be an identity between the issues sought to be litigated in the second action and those actually litigated and determined in the first action, the principles of collateral estoppel are technically applicable.

If there exists an identity of issues in the second action with those actually litigated and determined in the prior suit, such a "conclusion does not, however, end [the] inquiry . . . ." *Harrington v. Vandalia-Butler Board of Education, supra,* 649 F.2d at 439. *Accord, Commissioner v. Sunnen, supra; Montana v. United States, supra,* 440 U.S. at 155, 157–164, 99 S.Ct. at 974, 975–76. "Neither collateral estoppel nor res judicata is rigidly applied. Both rules are qualified or rejected when their application would contravene an overriding public policy or result in manifest injustice." *Tipler v. E.I. duPont deNemours and Co.,* 443 F.2d 125, 128 (6th Cir. 1971); *United States v. La Fatch,* 565 F.2d 81, 83 (6th Cir. 1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978); *Shimman v. Frank,* 625 F.2d 80, 89 (6th Cir. 1980); and *Harrington v. Vandalia-Butler Board of Education, supra,* 649 F.2d at 439. In *Montana v. United States, supra,* 440 U.S. at 155, 99 S.Ct. at 974, the Supreme Court identified the following two additional questions, both of which must be resolved favorably to the party asserting collateral estoppel, before the doctrine is appropriately invoked: (a) "[W]hether controlling facts or legal principles have changed significantly" since the judgment in the prior suit; and (b) "whether other special circumstances warrant an exception to the normal rules of preclusion."

The first of the two additional inquiries is required because:

[The] principle [of collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. *It is not meant to create vested rights in decisions that have become obsolete or erroneous with time,* thereby causing inequities . . . .

*Commissioner v. Sunnen, supra,* 333 U.S. at 599, 68 S.Ct. at 719 (emphasis added). This inquiry ensures that the application of the principles of collateral estoppel is "confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and

where the controlling facts and applicable legal rules remained unchanged." *Id.* at 599–600, 68 S.Ct. at 719–720 (citation omitted).

If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation. *And where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive.*

*Id.* at 600, 68 S.Ct. at 720 (emphasis added) (citations omitted). Consequently, "[b]efore a party can invoke the collateral estoppel doctrine . . . the legal matters raised in the second proceeding must involve the same set of events or documents and *the same bundle of legal principles that contributed to the rendering of the first judgment."* *Id.* at 601–02, 68 S.Ct. at 720–21 (emphasis added).

Finally, if the court making the inquiry determines that there has been no "change in the legal climate," *Montana v. United States, supra,* 440 U.S. at 161, 99 S.Ct. at 977, *quoting, Commissioner v. Sunnen, supra,* 333 U.S. at 606, 68 S.Ct. at 723, "the sole remaining question is whether the particular circumstances of [the] case justify an exception to the general principles of estoppel." *Montana v. United States, supra,* 440 U.S. at 162, 99 S.Ct. at 977. *See also, Harrington v. Vandalia-Butler Board of Education, supra,* 649 F.2d at 439–40.

This final inquiry may disclose one or more of a variety of special circumstances warranting an exception to the general operation of the rules of collateral estoppel. In *Montana v. United States, supra,* 440 U.S. at 162–63, 99 S.Ct. at 978, the Supreme Court observed:

This exception is of particular importance in constitutional adjudication. Unreflective invocation of collateral estoppel against parties with an ongoing interest in constitutional issues could freeze doctrines in areas of the law where responsiveness to changing patterns of conduct or social mores is critical.

898

"[U]nfairness or inadequacy" in the prior proceedings may present circumstances which justify a departure from the general rules. *Id.* at 163, 99 S.Ct. at 978. Additionally, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness or fairness of the procedures followed in prior litigation." *Id.* at 164 n.11, 99 S.Ct. at 979 n.11 (& citations therein).

The Sixth Circuit has also recognized the necessity of flexibility in the application of the doctrine of collateral estoppel. Circumstances which have been found to justify an exception to the rigid application of the doctrine, include: differences between the purposes and requirements of the statutory provisions under which the prior and subsequent actions have been prosecuted, *Tipler v. E.I. duPont deNemours Co.*, 443 F.2d 125 (6th Cir. 1971); overriding public policy, *United States v. La Fatch*, 565 F.2d 81 (6th Cir. 1977), *cert. denied*, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978); lesser burden of proof in subsequent action than that imposed in the prior action, *Shimman v. Frank*, 625 F.2d 80 (1980); and a broader range of proofs in second action than in the prior action, *Hawkins v. Holiday Inns, Inc.*, 652 F.2d 57 (6th Cir. 1981).

■ If this final inquiry fails to disclose the existence of any special reason for departing from the general operation of collateral estoppel, then the public policy in favor of finality of judgments prevails. The doctrine is properly invoked, and the prior judgment operates to estop the relitigation of any and all issues that were actually litigated and determined in the prior action.

■ Thus, under the foregoing principles, there is a sequence of potentially relevant inquiries to be conducted in cases where res judicata is asserted. If the cause of action in the second suit is different from the one previously litigated and determined, the more lethal doctrine of res judicata is inapplicable, and the estoppel effect of the prior judgment is determined under the principles of collateral estoppel. Thereafter, it is necessary to consider whether the issues in the second action are, in substance, the same as, or identical to those actually litigated and determined in the prior action. If the issues are not the same or were not actually litigated and determined in the first proceeding, the doctrine of collateral estoppel is inapplicable. If, however, all or some of the issues raised in the second action were actually litigated and determined in the prior action, the doctrine technically applies, but further inquiry is required in order to determine the extent to which the doctrine is appropriately invoked. Significant changes in the controlling facts or legal principles since the first judgment will render application of the doctrine inappropriate. Absent such changes, a final inquiry is conducted to consider whether the circumstances of the case are such that a departure from the "normal rules of preclusion" is warranted. If no special circumstances can be discerned, then the general principles under the doctrine of collateral estoppel are controlling and the parties are properly foreclosed from relitigating issues that were actually litigated and determined in the first action.

B. Sixth Circuit 1975 *Bronson* Opinion: Conclusions as to Appropriate Application of Collateral Estoppel

In *Bronson*, the Sixth Circuit was clearly cognizant of the principles of the related doctrines of res judicata and collateral estoppel, and applied them in its consideration of "the important question of the applicability of the doctrine of res judicata to this school desegregation litigation." 525 F.2d at 345. In its own fashion, the Court conducted each of the potentially relevant inquiries identified in the preceding section. As a final step, prior to setting forth this Court's conclusions on the appropriate application of collateral estoppel in light of *Columbus* and *Dayton II*, it is necessary to summarize briefly the sequential determinations made by the Sixth Circuit, which, based on the authority available in 1975, underlie its holding that the plaintiffs herein were to be foreclosed:

[F]rom showing that the defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents ... under the issue preclusion application of collateral estoppel ....

*Id.* at 349.

With respect to the preliminary question whether the *Deal* judgment required "an application of strict res judicata principles ...," *id.* at 347, or "the less comprehensive doctrine of collateral estoppel ..., *id.*, the District Court had noted that "[t]he defendants herein do not suggest that *Deal* should act as an absolute bar to the prosecution of the instant dispute." Opinion on Motion to Determine Affirmative Defense of Res Judicata, doc. # 56, at 7. The court, therefore, concluded that "we are here concerned with the collateral estoppel aspect of the doctrine of res judicata." *Id.*

The Sixth Circuit left this determination undisturbed. It stated, "We believe that the district court properly limited the application of the doctrine to this case by holding that the principles of collateral estoppel, as opposed to res judicata, will be observed." 525 F.2d at 349. Supportive of this belief, the Court also stated:

> [T]here are children attending the Cincinnati schools who either were not born in 1965 or had not started to school. *Their claims were not in existence at the time of the judgment in Deal and could not have been extinguished by it.* The complaint of such children and their parents of alleged continuing wrongful acts subsequent to 1965 declares a different cause of action than that concluded by *Deal,* one to which estoppel does not apply.

*Id.* (emphasis added) (citations omitted). Thus, the Court made a preliminary determination that the estoppel effect of the *Deal* judgment would be governed by the principles of collateral estoppel, rather than the more comprehensive doctrine of res judicata, which would have precluded "further litigation between the parties ...," *id.* at 347, and would, therefore, have resulted in the termination of the lawsuit.

In determining the extent to which collateral estoppel should be applied, the Sixth Circuit conducted each of the potentially relevant inquiries set forth in *Montana v. United States, supra,* although the threshold collateral question, regarding identify of issues, received very little discussion. The Sixth Circuit recalled that "the district court held that the question of segregative intent was critical to the decisions in *Deal I* and *II* and that this issue was settled by a finding that the Cincinnati Board had no such intent up to July 26, 1965, when the *Deal* inquiry ended." *Id.* Later in the opinion, the Sixth Circuit expressed agreement with this conclusion. After reiterating the district court's order foreclosing all inquiry into segregative intent or the actions, inaction or policies of the board prior to July 26, 1965, the Court stated, "[t]hese issues have been decided and under the issue preclusion application of collateral estoppel may not be reopened." *Id.* at 349. Moreover, the breadth of the order, itself, clearly indicates that, under the threshold collateral estoppel inquiry, the Court concluded that the *Bronson* plaintiffs were merely seeking to relitigate issues that were substantially the same as, or identical to those actually litigated and determined against the *Deal* plaintiffs.

Of the three collateral estoppel questions set forth in *Montana,* the Court devoted most of its discussion in *Bronson* to a consideration of the second and third, that is, whether there had been any significant changes in the law or any other special reason that would justify excepting plaintiffs from the general operation of collateral estoppel. In 1975, both inquiries were resolved adversely to plaintiffs. After considering the many authorities relied upon by plaintiffs in support of their position that *Deal* had been overtaken by intervening decisions, the Court concluded that "there has been no such change in the law since *Deal* as to prevent altogether the application of the doctrine of collateral estoppel to this case." *Id.* at 348-49.

Having made this determination, the Court turned its attention to the final in-

quiry. Plaintiffs had contended "that school cases are sui generis and involve national public policy of the highest priority . . . ." *Id.* at 347. The Court acknowledged the "strong public policy against the continuance of racial segregation in public schools . . . ," *id.* at 349, but concluded "that school desegregation cases are [not] so different from other types of litigation . . . ." *Id.* Faced with the difficult task of balancing this policy against the policy in favor of finality of judgments, underlying the doctrine of collateral estoppel, the Court, based on the authority available at that time, struck the balance in favor of "applying the rule of 'issue preclusion.'" *Id.* (citations omitted).

### C. Appropriate Application of Collateral Estoppel In Light of *Columbus* and *Dayton II*

Having identified the questions that must be considered in order to determine the appropriate application of collateral estoppel, and having isolated the Sixth Circuit's responses to these questions in its 1975 *Bronson* opinion, the Court now reconsiders each of these questions in light of *Columbus* and *Dayton II.* Specifically, the Court conducts each of the relevant, sequential inquiries to determine the extent to which the Sixth Circuit's 1975 *Bronson* opinion has been rendered obsolete by *Columbus* and *Dayton II*, and the extent to which its vitality has been unaffected by the intervening Supreme Court cases.

### 1. Broader Rules of Res Judicata Inapplicable

As was the situation when this matter was considered in 1975, defendants herein have not asserted that the *Deal* judgment constitutes an absolute bar to this litigation. They have not asserted, nor has the Court discovered any reason, based on *Columbus* or *Dayton II* or any other authority, for departing from the Sixth Circuit's preliminary determination in *Bronson* that the more comprehensive rules of res judicata are inapplicable to this case. Nothing has occurred in the case law or otherwise in the

years subsequent to 1975 to indicate that the *Bronson* plaintiffs' claims are the same as those brought to judgment in *Deal.* Additionally, as this Court mentioned in its Entry of October 16, 1980, it is logistically very unlikely that any pre-July 26, 1965 plaintiffs remain in this lawsuit. *See,* 510 F.Supp. 1251, 1273 n.4. Therefore, the Sixth Circuit's preliminary determination that collateral estoppel, rather than res judicata, applies in this case is as viable now as it was in 1975, and the preclusive effect of the *Deal* judgment must be determined by reference to the applicable principles of the doctrine of collateral estoppel.

### 2. Identity of Issues In Light of *Columbus* and *Dayton II*

#### a. Collateral Estoppel Inapplicable to Issues Not Actually Litigated and Determined in *Deal*

Having concluded that this case continues to be governed by the principles of collateral estoppel, rather than res judicata, the next inquiry concerns whether, and to what extent, the issues that are or may become relevant in this case, as they now appear, are substantially the same as, or identical to those concluded by the *Deal* judgment. This question must be resolved, as a threshold matter, because the preclusive effect of a prior judgment under the doctrine of collateral estoppel, can be no broader than the issues actually litigated and determined in a prior action. Unlike the related doctrine of res judicata, which serves as an absolute bar to all matters that were, or could have been raised, the application of collateral estoppel is triggered by an identity of issues, and, therefore, cannot be invoked to preclude the litigation of issues that might have been litigated and determined in a prior action, but were not.

Applying these well-settled principles, the Court concludes that there are threshold issues in this case, relating to the board's remote or pre-*Brown* programs and practices, recognized as proper subjects for judicial inquiry for the first time in *Columbus* and *Dayton II* that were not addressed in *Deal,* to which the doctrine of collateral

estoppel is wholly inapplicable. The Court further concludes that there are certain issues that may become relevant herein, relating to the board's post-*Brown* practices, similar to those raised in *Columbus* and *Dayton II* as a result of the threshold inquiries, that were not contemplated or considered in *Deal*, to which the doctrine of collateral estoppel is, likewise, inapplicable.

At the heart of these conclusions is the Sixth Circuit's position in *Deal II*, which accorded paramount legal import to the State's abolition of segregated schooling in 1887, from which it concluded that the Cincinnati school system had been desegregated for some 70 years before *Brown I, and* which accorded a corresponding lack of legal import to schools, programs and practices discontinued prior to the filing of the lawsuit. By resting its legal conclusions solely on the schools, programs and practices still in existence when the lawsuit was filed, and by explicitly declining to rule on the board's remote acts, the Court, in effect, concluded that *no* determination on the discontinued schools, programs and practices was necessary to the judgment reached therein. Since no determination on the board's remote acts was forthcoming, none of the issues that might arguably have been raised at the time with respect to these acts, or any of the issues that are or may become relevant herein in light of *Columbus* and *Dayton II*, can be said to have been settled by the *Deal* judgment. Consequently, the doctrine of collateral estoppel, which only precludes the relitigation of issues which share the requisite element of identity with those actually litigated and determined in a prior action, is inapplicable to any issues in this case, directly relating to, or potentially arising from schools, programs and practices discontinued before *Deal* was commenced.

The issues which, under *Columbus* and *Dayton II*, are or may become relevant in this case fall into one of two broad categories, the first of which consists of the issues that *must* be considered, and the second of which consists of issues that *may or may not become relevant herein*, depending upon the Court's determinations with regard to the first category of issues. More specifically, the first category is comprised of threshold issues directly relating to the board's remote acts, *i.e.*, up to, and including the date of the decision in *Brown I*. The propriety and necessity of considering these issues, which were not addressed in *Deal* because of the Sixth Circuit's position that no ruling needed to be made on such matters, was established for the first time in *Columbus* and *Dayton II*.

The second category is comprised of the issues, relating to the board's post-*Brown*, actions, inactions and policies, which may or may not become relevant in this case, depending upon the determinations made with respect to the threshold issues. Under *Columbus* and *Dayton II*, these issues are raised, and thus need to be considered *only* if plaintiffs prevail on the threshold issues, relating to the board's remote acts. Since the Sixth Circuit made no ruling on the board's remote acts in *Deal*, it obviously could not and did not address or determine any of the *issues* in this second category, even though it unquestionably did consider some of the *evidence* that would, in all probability, be presented in this case on these issues, should their resolution become necessary.

Generally stated, the threshold issues which, under *Columbus* and *Dayton II*, must now be considered in this case if plaintiffs present evidence on the board's remote acts, and upon which plaintiffs have the burden of proof are: (1) whether the board was officially operating a dual school system at the time of *Brown I*, created and/or maintained in contravention of state law by the board's remote, intentionally segregative acts; *or* (2) whether, as a result of the board's remote, intentionally segregative acts, a substantial portion of the school system was segregated at the time of *Brown I* which, coupled with proof that the system is currently highly segregated,

would establish a prima facie showing of current, systemwide de jure segregation.[8]

Assuming for sake of argument, and without deciding, that after conducting the now required inquiries into the board's remote acts, the Court finds that the Cincinnati school system was not unitary, in a constitutional sense, at the time of *Brown I*, the burden of proof would shift to the school board and the issues in the second category would be raised, as they were in *Columbus* and *Dayton II*. Generally stated, the issues that would arise if plaintiffs' evidence supports a finding that the board was officially operating a dual system at the time of *Brown I* are: whether, in the years after *Brown I* and *II*, the board met its affirmative obligation to disestablish the former duality and eradicate all vestiges thereof, or whether its actions, inactions or policies in the ensuing years perpetuated and/or exacerbated the condition extant in 1954, such that the current racial imbalance can be traced to its remote acts, and to its contemporary acts and omissions. Alternatively, if plaintiffs fall short of proving a duality at the time of *Brown I*, but succeed in proving that, as a result of the board's remote, intentionally segregative acts, a substantial portion of the system was segregated at that time, this finding, together with proof that the system is currently highly segregated, will establish a prima facie case of current, systemwide de jure segregation. Upon such a showing, the broad issue that would thereafter be raised is whether the board's remote acts, in any way, caused or contributed to the current condition of segregation.

Since this second category of issues, which *may* arise from the threshold inquiries, involve the board's actions, inactions and policies in the years after *Brown I*, it is

highly probable, if not inevitable, that their resolution would turn, at least in part, on the evidence considered by the *Deal* courts, that is, regarding schools, programs and practices still in existence when the lawsuit was filed. However, the likelihood that some or all of the *evidence* considered in *Deal* would also be considered in this case should not be interpreted as, or equated with a sameness or identity of *issues*. It should be recalled that in *Deal*, the burden of proof, at all times, remained on plaintiffs, and the inquiry therein was limited to the broad question whether, absent a pre-existing duty to balance the racial composition of the schools arising from an established constitutional deficiency at the time of *Brown I*, the school board had acted with segregative intent between approximately 1956 and July 26, 1965. The issues in *Deal* were raised solely with respect to the schools, programs and practices still in existence when the lawsuit was filed. In contrast, if the *Bronson* plaintiffs prevail on the threshold issues, they will have established that the system was unconstitutionally constituted in 1954, and the board's post-*Brown* actions, inactions and policies must then be assessed in light of the duty attaching, as of 1954. The burden of proof would shift to the school board, and the evidence previously considered in *Deal* for the purpose of determining the threshold question of liability would be evaluated herein for the purpose of determining the issue whether the board had met its duty to remedy the effects of its remote, intentionally segregative programs and practices, or whether, on the contrary, the current condition of segregation can be traced to those remote acts.

Thus, under the now mandatory methodology established in *Columbus* and *Dayton II*, there exists a possibility that the out-

---

**8.** Contrary to Cincinnati defendants' contentions, *see* doc. # 481, at 13, the *Deal* courts did not determine whether the school system was racially dual at the time of *Brown I*. Operating on the premise that because segregation had been outlawed in 1887, desegregation had been accomplished for some 70 years before *Brown I*, the *Deal* courts conducted no inquiry into and made no determination about the status of the system in 1954. The issues that were actually litigated and determined in *Deal*, upon which the judgment was rendered, concerned either schools that were in existence when the suit was filed, or programs and practices implemented by the board some two or more years after *Brown I* was handed down. Nothing even faintly resembling the type of inquiry conducted in *Columbus* and *Dayton II*, with respect to the racial composition of the schools as of 1954, was ever conducted in *Deal*.

come of this lawsuit could turn exclusively on issues not determined in *Deal*, to which the doctrine of collateral estoppel is, therefore, inapplicable. Determinations favorable to plaintiffs on threshold issues, which must now be considered under current law, could establish, contrary to the Sixth Circuit's underlying determination in *Deal*, that the Cincinnati school system was not unitary, in a constitutional sense, at the time of *Brown I*. Once such a finding is made, the burden of proof would shift to the school board and would raise the corresponding issues in the second category. The board's failure to carry its burden on these issues would require judgment for plaintiffs and warrant a systemwide desegregation order.

In 1975, when the Sixth Circuit considered whether the issues in this case were the same as those decided in *Deal*, and when it foreclosed, in an across-the-board fashion, any and all inquiries prior to July 26, 1965, for the purpose of determining whether the school board is liable or legally responsible for the racial imbalance of which the *Bronson* plaintiffs were then, and are now complaining, it did not have the benefit of *Columbus* and *Dayton II*. These intervening Supreme Court cases, under which it is possible for plaintiffs to meet their initial burden of proof solely on the type of evidence to which the *Deal* Court accorded virtually no legal import, and about which it made no ruling, provide a heretofore unavailable element of perspective regarding the exact contours of the *Deal* litigation. Reconsidering the question of identity of issues from the present perspective, it now plainly appears that *Deal* did not resolve numerous relevant and potentially dispositive pre-July 26, 1965 issues, some of which antedate the time frame under consideration in *Deal* by, anywhere from, two years to several decades, and some of which involve the same period of years considered therein.

Based on the foregoing, the Court concludes that to the extent that the Sixth Circuit's 1975 *Bronson* opinion would foreclose the consideration and determination of pre-July 26, 1965 issues not actually litigat-ed and determined in *Deal*, it has been rendered obsolete in light of *Columbus* and *Dayton II*. Collateral estoppel is in no way applicable to the threshold issues that must now be considered, or to the issues that may arise as a result of the threshold determinations. Therefore, with respect to these issues which, under *Columbus* and *Dayton II*, are or may become relevant in this case, plaintiffs are no longer bound by the July 26, 1965 cut-off date, established in the Sixth Circuit's 1975 *Bronson* opinion and they are specifically released from the restrictions set forth in this Court's Entry of October 16, 1980, except those arising from the preclusion order imposed upon them by Judge Porter on March 10, 1980, which is unaffected by this decision.

b. Collateral Estoppel Technically Applicable to Issues Actually Litigated and Determined in *Deal*

In the preceding section, the Court concluded that there are two categories of pre-1965 issues which, under *Columbus* and *Dayton II*, are or may become relevant in this case that were not considered in *Deal*, to which the doctrine of collateral estoppel is inapplicable. The Court also indicated that these conclusions raise the possibility that the outcome of this lawsuit will be determined without any overlapping with the issues decided in *Deal*, which only involved schools, programs and policies still in existence when the suit was filed and upon which the plaintiffs, at all times, retained the burden of proving that the board had acted with segregative intent.

These conclusions do not, however, dictate that result, nor do they render the Sixth Circuit's 1975 *Bronson* opinion a nullity. On the contrary, there remains a distinct possibility that the second category of pre-July 26, 1965 issues, to which collateral estoppel is inapplicable, will not become relevant in this case (*i.e.*, if plaintiffs do not prevail on the threshold issues), and that the relevant issues, regarding the board's programs and practices after *Brown* through July 26, 1965, would be substantially the same, if not identical to those deter-

mined in *Deal.* With respect to these issues which do share the requisite identity with the issues actually litigated and determined in *Deal,* the technical application of collateral estoppel has not been affected by *Columbus* and *Dayton II.* At most, the intervening Supreme Court cases necessitate a reconsideration of the remaining collateral estoppel inquiries to determine whether its application has been rendered inappropriate at the present time.

To elaborate briefly, the Court explained, in the preceding section, that the second category of issues, not addressed in *Deal,* will arise and become relevant in this case *only* if plaintiffs prevail on the threshold issues, relating to the board's remote acts. These corresponding issues arise, if at all, only where plaintiffs' evidence supports a finding that the local school authorities were officially operating a dual *or* substantially segregated school system at the time of *Brown I,* created and/or maintained by their remote, intentionally segregative acts. Thus, whether the relevant issues raised with respect to the board's post-*Brown* actions, inactions and policies, at least through July 26, 1965, are those considered in *Columbus* and *Dayton II,* or are substantially the same as those decided in *Deal* is contingent upon the determinations that must be made under the now mandatory inquiries into the board's remote acts.

If plaintiffs ultimately prevail on the threshold issues, thereby establishing that the school system was not unitary, in a constitutional sense, at the time of *Brown I,* the issues that were decided in *Deal,* based solely on the board's programs and practices after *Brown* through July 26, 1965, would not become relevant in this lawsuit. Conversely, if plaintiffs do not satisfy their initial burden of proving that the school system was constitutionally deficient at the time of *Brown I,* the issues in the second category which are predicated on such a finding, will not be before this Court. Instead, the burden of proof would remain on plaintiffs to establish that the board had acted with segregative intent in the subsequent years, thereby, in effect, causing the former unitary system to become constitu-

tionally deficient. At least with respect to the board's actions, inactions and policies between 1956 and July 26, 1965, the relevant issues would be essentially the same as those actually litigated and ultimately determined adversely to the *Deal* plaintiffs.

When the Sixth Circuit considered the question of identity of issues in 1975, without the benefit of *Columbus* and *Dayton II,* it concluded that the doctrine of collateral estoppel was technically applicable to preclude the relitigation of the issues that had been decided in *Deal,* and it thereafter considered the appropriate application of the doctrine under the then available Supreme Court authority. This Court concludes that the doctrine remains technically applicable with respect to the issues actually litigated and determined in *Deal,* which may become relevant in this case, notwithstanding the intervening Supreme Court cases. Therefore, it is necessary to consider whether *Columbus* and *Dayton II* have significantly changed the law applicable to these issues or present any other compelling reason, not discernible to the Sixth Circuit in 1975, that would render the application of collateral estoppel inappropriate to these issues.

3. *Columbus* and *Dayton II* Have Not Significantly Changed the Law Applicable to the Issues Actually Litigated and Determined in *Deal*

Having determined that there remains a possibility that the pre-July 26, 1965 issues actually litigated and determined in *Deal* may become relevant in this case, it is necessary to consider whether the legal principles applicable with respect to these issues have changed significantly since the Sixth Circuit's 1975 *Bronson* opinion. For the reasons stated below, the Court concludes that, separate and apart from the supplementary developments emerging from *Columbus* and *Dayton II,* all of which relate to issues not addressed in *Deal,* there has been no such change in the law since 1975 as would render the application of collateral estoppel inappropriate with respect to the issues decided in *Deal.*

Throughout the instant discussion, the Court has stressed that *Columbus* and *Dayton II* have brought about certain evolutionary, as opposed to revolutionary, changes in the law since 1975. In these cases, the Supreme Court extended and combined the application of several pre-1975 legal principles, from the general body of equal protection law and from the subsidiary body of school desegregation law, to fact situations which were not directly analogous to any previously considered. Rather than overruling or radically departing from any of its pre-1975 precedent, the Court extended the application of various principles from its prior decisions in order to resolve certain matters which had remained uncertain and unsettled under the earlier cases, and thus supplemented or added to the pre-existing body of law.

These supplementary developments have effectively eliminated the continued viability of the Sixth Circuit's position in *Deal II*, which accorded paramount legal import to the fact that the state of Ohio had outlawed segregated schooling in 1887, from which it concluded that the Cincinnati school system was a unitary one for some eighty years prior to the commencement of the lawsuit, and which accorded a corresponding lack of legal import to the board's discontinued or remote acts. Consistent with the now prevailing Supreme Court position, as established for the first time in *Columbus* and *Dayton II*, the type of evidence about which the Sixth Circuit made no ruling in *Deal II* must be considered, and depending upon the determinations made thereon, creates the possibility that the pre-July 26, 1965 issues that will thereafter become relevant in this case are different from those determined in *Deal*, even though they would, in all probability, involve consideration of much the same evidence.

However, *Columbus* and *Dayton II* have not, in any way of which this Court is aware, altered the legal principles applicable in a case where, upon due consideration of plaintiffs' evidence on the board's remote acts, the school system involved is adjudged to have been unitary, in a constitutional sense, at the time of *Brown I*. That is, these cases have not affected the bundle of legal principles that would be applied in a situation where plaintiffs are pressing their claim of current de jure segregation solely on the basis of the school authorities' post-*Brown* or contemporary actions, inactions or policies. If anything, the Supreme Court reaffirmed the validity and soundness of the applicable legal principles, all of which had been developed prior to 1975, by extending their application to the facts of *Columbus* and *Dayton II*, and by placing non-statutory, intentionally segregated school systems, existing at the time of *Brown I*, on the same constitutional level with those maintained at that time pursuant to state statute, and/or those created and/or maintained by a school board's contemporary, intentionally segregative acts.

In this Court's opinion, plaintiffs are entitled to present any evidence they can muster in an effort to establish, contrary to the conclusion reached by the Sixth Circuit in *Deal*, that the Cincinnati school system was officially dual *or* substantially segregated at the time of *Brown I*. However, if plaintiffs herein do not present sufficient evidence to support a finding similar to those made in *Columbus* and *Dayton II, i.e.*, that the board was officially operating a dual or substantially segregated system in 1954, the posture of this case will, in all material aspects, revert to its 1975 status. In other words, if, after conducting the threshold inquiries, this Court reaches the same conclusion as was reached in *Deal* under the now superceded methodology, *i.e.*, that the school system was a unitary one, as of 1954, the pre-July 26, 1965 issues that will thereafter become relevant are those decided in *Deal*, and not those considered in the more recent cases. These issues, raised solely on the board's actions, inactions and policies between roughly 1956 and July 26, 1965, would be resolved, not under any precedent-shattering principles articulated in *Columbus* and *Dayton II*, but rather, by reference to the Supreme Court authority existing when the Sixth Circuit considered the appropriate application of collateral estoppel to these same issues in its 1975 *Bronson*

opinion. Therein, the Sixth Circuit concluded, despite the refinements and clarifications in the law since *Deal*, that there had been no such significant changes in the law as to render the application of collateral estoppel inappropriate with respect to the issues in this case, as they then appeared. Because *Columbus* and *Dayton II* have not, in the intervening years, significantly changed or altered any of the legal principles that would be applicable to these issues, this Court concludes that the Sixth Circuit's 1975 determination remains as accurate under current law, as when made. Therefore, based on the foregoing, the Court concludes, under the second collateral estoppel inquiry, that *Columbus* and *Dayton II* present no justification for permitting the *Bronson* plaintiffs to relitigate the pre-July 26, 1965 issues that were actually litigated and determined in *Deal*.

4. *Columbus* and *Dayton II* Present No Reason, Not Discernible in 1975, to Justify an Exception to Collateral Estoppel With Respect to Issues Actually Litigated and Determined in *Deal*

██ In its 1975 *Bronson* opinion, the Sixth Circuit reiterated its view that " '[n]either collateral estoppel nor res judicata is rigidly applied. Both rules are qualified or rejected when their application would contravene an overriding public policy or result in manifest injustice.' " *Bronson, supra*, 525 F.2d at 349, *quoting, Tipler v. E.I. duPont deNemours and Co.*, 443 F.2d 125, 128 (6th Cir. 1971). However, after considering the circumstances of the case, as they then appeared, and after acknowledging the "strong public policy against the continuation of racial segregation in public schools . . . ," 525 F.2d at 349, the Court concluded that plaintiffs should be foreclosed from attempting to relitigate the pre-July 26, 1965 issues decided in *Deal*. *Id.* Moreover, in a recent res judicata decision, the Sixth Circuit recalled its determination in *Bronson* "that the strong public policy against perpetuation of racial segregation in public schools does not necessarily preclude the application of res judicata and collateral estoppel to school desegregation

cases." *Harrington v. Vandalia-Butler Board of Education*, 649 F.2d 434, 440 (6th Cir. 1981).

Given the Sixth Circuit's recent reaffirmation of its position that the competing public policy considerations in this case do not, in and of themselves, warrant an exception to collateral estoppel, the only remaining question is whether the circumstances of this case, as they now appear, present any other compelling reason, not discernible in 1975, that would render the Sixth Circuit's opinion obsolete and justify a departure from the general operation of collateral estoppel with respect to the issues actually litigated and determined in *Deal*. Based on the preceding discussion, and for the reasons set forth briefly below, the Court concludes that *Columbus* and *Dayton II* do not create or present any new circumstances in this case that would render the application of collateral estoppel inappropriate to the pre-July 26, 1965 issues actually litigated and determined in *Deal*.

By establishing the necessity of conducting threshold inquiries into the board's remote acts where plaintiffs present evidence of same as part of their initial burden, and by predicating the contours of the inquiries into the board's post-*Brown* actions, inactions and policies on the threshold determinations, *Columbus* and *Dayton II* have undoubtedly altered the circumstances of this case since 1975. Whereas, in 1975, it appeared that the only relevant pre-July 26, 1965 issues in this case were those decided in *Deal*, it now appears that there are two categories of issues that are or may become relevant herein that were not contemplated, considered or resolved by the *Deal* judgment. Consequently, under the now prevailing Supreme Court authority, an across-the-board foreclosure of any and all pre-July 26, 1965 inquiries cannot be grounded on the doctrine of collateral estoppel, which only precludes the relitigation of issues actually litigated and determined in a prior action.

However, as explained in the preceding section of the discussion, if plaintiffs in this case fail to sustain their burden of proving

that the Cincinnati school system was officially dual or substantially segregated at the time of *Brown I*, the circumstances of this case will, at that point, be no different than they were in 1975. The relevant issues with respect to the board's programs and practices after *Brown* through July 26, 1965, will be those determined in *Deal* and which continue to be governed by pre-1975 Supreme Court authority. Since the Sixth Circuit found no sufficiently compelling reason to exempt plaintiffs from the application of collateral estoppel to the issues decided in *Deal* when it considered the question in 1975, and because this Court has been apprised of no new circumstance in this case which is not related to the issues that were not addressed in *Deal*, this Court believes that it must abide by the Sixth Circuit's determination in *Bronson* that there are no special circumstances in this case that would justify an exception to the application of collateral estoppel to the issues settled in *Deal*. Thus, although nothing in this opinion prevents plaintiffs from presenting evidence regarding the board's actions, inactions and policies *after July 26, 1965*, for the purpose of attempting to establish a constitutional violation *after that date*, the Court concludes that the Sixth Circuit's 1975 *Bronson* opinion retains full vitality and, therefore, remains binding to the extent that it forecloses the relitigation of the pre-July 26, 1965 issues that were actually litigated and determined in *Deal*.

## IV. Conclusions

Wherefore, based on all of the foregoing, the Court concludes that the Sixth Circuit's holding in *Bronson, supra*, 525 F.2d at 349, precluding plaintiffs herein from "showing that the defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents," has been rendered obsolete by *Columbus* and *Dayton II* to the extent that it would foreclose the litigation of certain pre-July 26, 1965 issues that are or may become relevant in this case, as they now appear, that were not addressed in *Deal*. Although

the Court finds no merit to plaintiffs' primary contention that the intervening cases have so changed the law since 1975 that it would not be inappropriate to invoke collateral estoppel with respect to any of the issues in this case, it concludes that plaintiffs' alternative contention is well taken and that plaintiffs are, therefore, entitled to proceed on the pre-July 26, 1965 issues in this case which do not share the requisite element of identity with those actually litigated and determined in *Deal*. However, the Court further concludes that *Columbus* and *Dayton II* have, in no way, affected the vitality of the Sixth Circuit's 1975 *Bronson* opinion to the extent that it forecloses the relitigation of the issues that may become relevant herein which are substantially the same as, or identical to those settled in *Deal*. With respect to these issues, the Sixth Circuit's holding in *Bronson* remains fully binding.

### A. Issues Not Actually Litigated and Determined in *Deal*

In light of the developments emerging from *Columbus* and *Dayton II*, which supplemented or added to the body of school desegregation law existing in 1975, the Court concludes that there are certain threshold issues in this case, relating to the school board's remote acts that were not addressed in *Deal*, to which the doctrine of collateral estoppel is inapplicable. The Court further concludes that, if plaintiffs prevail on the threshold issues, the pre-July 26, 1965 issues that will thereafter become relevant in this case, upon which the school board would have the burden of proof, do not share the requisite identify with the issues decided in *Deal*, and are, likewise, not subject to the rules of collateral estoppel. Since it now appears, under *Columbus* and *Dayton II*, that there are two categories of pre-July 26, 1965 issues that are or may become relevant in this case that were not actually litigated and determined in *Deal*, the Court concludes that the Sixth Circuit's 1975 *Bronson* opinion has been rendered obsolete to the extent that it would foreclose the litigation of these issues.

Therefore, the *Bronson* plaintiffs will be permitted, without time constraints, to present whatever evidence they can muster, regardless of whether this evidence was presented and/or considered in *Deal,* in their effort to meet their initial burden of proof on the threshold issues. Moreover, plaintiffs will also be permitted to present evidence supportive of any claim that the board failed, in the years after *Brown I,* to meet its continuing affirmative duty to alleviate the effects of its remote, intentionally segregative acts, that is, in an effort to prove that the board's contemporary actions, inactions or policies perpetuated or exacerbated an alleged constitutional deficiency extant in 1954.

With respect to the two categories of issues that are not foreclosed under collateral estoppel, plaintiffs are expressly released from the July 26, 1965 cut-off date, imposed by the Sixth Circuit in its 1975 *Bronson* opinion. With one exception (*i.e.,* the March 10, 1980 preclusion order),[9] the restrictions imposed upon plaintiffs by this Court in its Entry of October 16, 1980, are also removed with respect to these issues. Finally, although it should be self-evident, the Court emphasizes that this ruling, that the doctrine of collateral estoppel is inapplicable to the pre-1965 issues that are or may become relevant in this case in light of *Columbus* and *Dayton II,* which were not actually litigated and determined in *Deal,* applies with equal force to the Cincinnati defendants, as parties or successors to parties to the *Deal* litigation, and to the Suburban and State defendants, who were not parties to the prior action.

## B. Issues Actually Litigated and Determined in *Deal*

Notwithstanding the Court's determinations with respect to the issues to which collateral estoppel is inapplicable, the Court concludes that there remains a possibility that the issues actually litigated and determined in *Deal* will become relevant in this case. Specifically, if plaintiffs do not sustain their initial burden of proving that the school board was officially operating a dual or substantially segregated school system at the time of *Brown I,* created and/or maintained by the board's remote, intentionally segregative acts, the issues that will thereafter become relevant with respect to the board's actions, inactions and policies, after *Brown I* through July 26, 1965, upon which the plaintiffs would have the burden of proof, are essentially the same as those decided adversely to plaintiffs in *Deal.* Because these issues meet the identity requirement, under the threshold collateral estoppel inquiry, the Court concludes that the doctrine is technically applicable thereto. Additionally, having considered the intervening Supreme Court authority under the second collateral estoppel inquiry, the Court further concludes that, apart from the supplementary developments establishing the propriety and necessity of considering issues not addressed in *Deal, Columbus* and *Dayton II* have not significantly changed or altered any of the pre-1975 legal principles applicable to the issues actually litigated and determined in *Deal.* Moreover, the Court further concludes that *Columbus* and *Dayton II* do not present any other reason, not apparent or discernible to the Sixth Circuit in 1975, that would render the application of collateral estoppel inappropriate with respect to these issues. Having thus conducted all three collateral estoppel inquiries, the Court concludes that the Sixth Circuit's 1975 *Bronson* opinion retains vitality and remains binding to the extent that it forecloses the relitigation of the issues actually litigated and determined in *Deal,* which issues will become relevant in this case if plaintiffs do not prevail on the threshold issues relating to the board's remote acts.

## C. Practical Effect of Conclusions on Admissibility and Consideration of Pre-July 26, 1965 Evidence

The practical effect of the Court's determinations on the appropriate application of

---

**9.** The preclusion order entered by Judge Porter on March 10, 1980 is in no way affected by the present decision and, therefore, remains in full force and effect unless and until such time as relief therefrom is sought and good cause shown.

collateral estoppel in light of *Columbus* and *Dayton II* is that all of plaintiffs' evidence, both pre- and post-July 26, 1965, will be admissible at trial, subject to the normal operation of the Federal Rules of Evidence. Initially, the Court will consider plaintiffs' pre-*Brown* evidence for the purpose of resolving the threshold issues that were not addressed in *Deal*. These inquiries will determine what issues will become relevant in this case with respect to the board's post-*Brown* actions, inactions and policies, both before and after July 26, 1965. They will also determine the purposes for which the evidence regarding the board's programs and practices after *Brown* through July 26, 1965 will be considered.

If plaintiffs prevail on the threshold issues, thereby satisfying their initial burden of proof in this case, the burden of proof will shift to the school board and the second category of issues not addressed in *Deal* will be raised. If this occurs, the parties' pre-July 26, 1965 evidence will then be considered, together with their post-July 26, 1965 evidence, for the purpose of determining whether the school board is liable or legally responsible for the current racial composition of the Cincinnati Public Schools.

However, if plaintiffs do not prevail on the threshold issues, they will retain the burden of proof, and although the issues that were actually litigated and determined in *Deal* would be relevant, the Sixth Circuit's 1975 *Bronson* opinion applies, and plaintiffs would be foreclosed from attempting to relitigate these issues. Therefore, plaintiffs' claim of current de jure segregation will, at that point, be assessed only on the basis of evidence regarding the board's actions, inactions and policies *after* July 26, 1965. None of the pre-July 26, 1965 evidence previously admitted will be considered for any purpose other than those expressly approved by the Sixth Circuit in its 1975 *Bronson* opinion, as interpreted by this Court in its Entry of October 16, 1980.

*See, Bronson v. Board of Education, supra,* 510 F.Supp. at 1275–78.[10] Simply stated, if plaintiffs do not meet their initial burden of proof in this case on the threshold issues, which must be considered in light of *Columbus* and *Dayton II*, they will prevail only if they prove that the Cincinnati Board of Education acted with segregative intent *after July 26, 1965* or that the board's actions, inactions or policies *after that date* caused or contributed to the condition of segregation of which they complain.

Tentative Agenda For Meeting Between Court and Counsel on Friday, February 26, 1982

The Court will meet with counsel for all parties in the captioned cause on Friday, February 26, 1982, at 3:30 p. m., in the Court of Appeals Courtroom (Room 822 United States Courthouse, Cincinnati, Ohio). The meeting is, for all intents and purposes, a status conference, to identify any and all matters outstanding, and to establish procedures by which the case can be brought to trial at the earliest possible date.

To that end, the Court asks the parties to be prepared to discuss the following:

1. The pros and cons of certifying this entry and decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

2. Any outstanding discovery matters, including but not limited to: the scope of discovery; the mechanics of the discovery to be utilized; and a timetable for conducting and completing same.

3. Plaintiff's motion for leave to file an amended complaint, *i.e.*, whether defendants now wish an opportunity to respond thereto, and if so, the schedule for so doing.

4. The motions for summary judgment by defendants Green Hills-Forest Park and the Cincinnati Board of Education (for the limited purpose of setting forth a timetable for responses thereto and a hearing date).

---

**10.** As a matter of convenience, the Summary of Conclusions reached by this Court in its Entry of October 16, 1980, interpreting the Sixth Cir-

cuit's 1975 *Bronson* opinion, 510 F.Supp. at 1278–79, is set forth in the Appendix.

5. The mechanics and procedures leading to the stipulation of as many facts as possible.

6. A schedule whereby the Court can meet with counsel (or designated representatives of same) on a regular basis in order to monitor the status of discovery, stipulations, and general trial readiness. A discussion will be had as to the wisdom of designating liaison counsel for the respective groups of parties to enable the Court to more readily convene periodic scheduling conferences.

7. The setting of a realistic trial date that everyone can live with and which will not have to be rescheduled.

If there are any other matters of which counsel is aware that should be discussed during this meeting, the Court would very much appreciate being informed as soon as possible so that they can be added to this tentative agenda.

Because this is a crucial meeting, leading to a timetable for discovery and the setting of a trial date, it is imperative that all counsel of record attend.

### APPENDIX

Because the Court will be in a position to determine which pre-July 26, 1965 issues will become relevant, as between those actually litigated and determined in *Deal* and those comprising the second category of issues not addressed in *Deal*, only *after* the threshold issues have been resolved, it has ruled that all of plaintiffs' evidence, both pre- and post-July 26, 1965, will be admissible at trial. This is a necessary departure from the Court's Entry of October 16, 1980, interpreting the Sixth Circuit's 1975 *Bronson* opinion, which set forth certain limitations upon the admissibility of pre-July 26, 1965 evidence. *See, Bronson v. Board of Education, supra,* 510 F.Supp. 1275–78, 1278–79.

However, if plaintiffs *do not* prevail on the threshold issues, the second category of pre-July 26, 1965 issues not addressed in *Deal* will not become relevant. In that event, plaintiffs are foreclosed from attempting to relitigate the issues that were actually litigated and determined in *Deal* and the following conclusions, as summarized in the October 16, 1980 Entry, *id.* at 1278–79, will be strictly observed to the extent that they prescribe the purposes for which the previously admitted pre-July 26, 1965 evidence will be considered:

1. The only opinion binding on this Court in *Bronson* would be that of Judge Lively. If that opinion is followed by this Court, no attack on Judge Peck's Findings of Fact or Conclusions of Law in *Deal* would be permitted in the present case.

2. The claim preclusion aspect of res judicata would be inapplicable to the present case.

3. Collateral estoppel would bar relitigation of any issues litigated in *Deal* and would preclude all present *Bronson* plaintiffs from attacking *Deal.* To the extent that plaintiffs' Second Amended Complaint may contain allegations of unconstitutional conduct by the Cincinnati defendants prior to July 26, 1965, which are unrelated to alleged inter-district violations under theories two and three in *Milliken v. Bradley, supra,* evidence adduced of same would not be received for the purpose of establishing such a violation.

4. Collateral estoppel would not apply to bar litigation of issues based on allegations of misconduct by the Cincinnati defendants occurring subsequent to July 26, 1965.

5. With respect to post-1965 allegations raised in the Second Amended Complaint, there would be no distinction made between plaintiffs who were in school at the time of *Deal,* and those who were either not born or not yet in school at that time.

6. There would be no finding of liability made against the state defendants on the basis of actions, inactions or policies of the Cincinnati defendants prior to July 26, 1965, that is,

the state defendants would be entitled to assert the applicability of collateral estoppel.

7. Plaintiffs would be foreclosed from relying on the first theory in *Milliken, supra,* as a basis for establishing an interdistrict violation and/or effect prior to July 26, 1965. Liability under this theory would have to be established on the basis of segregative acts committed by the Cincinnati defendants after July 26, 1965.

8. The doctrine of collateral estoppel would not apply to theories two or three in *Milliken;* therefore, plaintiffs would be free to attempt to show, without time constraints, that one or more of the suburban defendants committed segregative acts within their school districts which caused a significant segregative effect in the Cincinnati City School District, or that there were segregative acts occurring between the Cincinnati defendants and one or more of the suburban defendants.

9. The facts stipulated or proven by *Deal* would be judicially noticed by this Court.

10. Evidence admitted in *Deal* would be admissible in the present case to the extent that it is relevant to show the existence or non-existence of post-July 26, 1965 violations committed by the Cincinnati defendants.

11. Facts stipulated or proven in *Deal* would be admissible to the extent that they would facilitate an understanding of testimony in this case.

12. Evidence admitted in *Deal* which does not provide background or which is not relevant would not be admissible.

13. Except by way of proffer, no evidence admitted in *Deal* would be received if offered solely for the purpose of establishing a pre-July 26, 1965 violation by the Cincinnati defendants.

14. No finding would be made on the basis of evidence admitted in *Deal* and admitted in the present case that the Cincinnati defendants violated the plaintiffs' constitutional rights prior to July 26, 1965.

15. Restrictions imposed on the admissibility of evidence admitted in *Deal* would not apply to plaintiffs' allegations concerning interdistrict violations, which were neither raised or litigated in *Deal.*

16. Evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* would be admissible to the extent that such evidence would facilitate an understanding of testimony in this case.

17. Evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* would also be admissible in the present case to show the existence or non-existence of post-July 26, 1965 violations by the Cincinnati defendants.

18. Except by way of proffer, no evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* would be received if offered solely for the purpose of establishing a pre-July 26, 1965 violation by the Cincinnati defendants.

19. No finding would be made on the basis of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* that the Cincinnati defendants violated plaintiffs' constitutional rights prior to July 26, 1965.

20. Evidence of actions, inactions or policies of the Cincinnati defendants, established prior to July 26, 1965, which have not been altered since that date, would be admissible, and would be considered, together with other evidence as cumulative evidence of a post-July 26, 1965 violation by the Cincinnati defendants.